**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DAVID HOLLAND, Individually and on
behalf of all others similarly situated,

Plaintiff,

v.

RITE AID CORPORATION, HEYWARD
DONIGAN, MATTHEW C. SCHROEDER,
JAMES PETERS, JOCELYN KONRAD, JOHN
T. STANDLEY, DARREN W. KARST, and
ELIZABETH BURR

Defendants.

No. 2:23-cv-02962- KBG

**AMENDED CLASS ACTION COMPLAINT
<u>FOR THE VIOLATION OF FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

I.   SUMMARY OF THE ACTION ........................................................................... 1
II.  JURISDICTION AND VENUE ......................................................................... 5
III. PARTIES ........................................................................................................ 6
IV.  RELEVANT NON-PARTIES .......................................................................... 8
V.   SUBSTANTIVE ALLEGATIONS ................................................................ 10

   A.  STATEMENT OF FACTS ........................................................................... 10
      1.  Company Background ........................................................................... 10
      2.  Rite Aid Struggles Under Enormous Debt Burden ........................ 11
         a.  Rite Aid's Debt Balloons as a Result of Debt-Driven Acquisitions, Raising Threat of Default as Leverage and Interest Coverage Ratios Teeter on Non-Compliance ........ 11
         b.  As a Result of Rite Aid's Debt Burden, Retail Pharmacy Remains Rite Aid's Key Earnings Lever ........................................................................... 14
      3.  To Increase Prescription Drug Sales and Pay Down Debt, Rite Aid Knowingly Dispenses Medically Unnecessary Opioids from 2014 to 2019 in Violation of U.S. Law and at the Cost of Patient Lives ........................................................... 16
         a.  Opioid Abuse, Spurred by Prescription Pharmaceuticals, Explodes into a Nationwide Crisis ........................................................................................ 17
         b.  Rite Aid Systematically Dispenses Controlled Substances that Are Not Medically Indicated Without Valid Prescriptions ........................................ 20
         c.  Defendants Knew, or Recklessly Disregarded, that Throughout the Class Period, Rite Aid Pharmacists Were Systemically Dispensing Controlled Substances in Violation of Applicable Law ........................................................................... 23
            1.  Rite Aid Maintains a Regulatory Affairs Department, Which Is Responsible for Ensuring Compliance with Relevant Laws and Reports Directly to Rite Aid's Senior Leadership ........................................................................... 23
            2.  Internal Reports and Pharmacist Notes Entered into Rite Aid's "RACS" System Informed Defendants of Suspicious Prescriptions ........................................ 25
            3.  Rite Aid Tracked Internal Metrics Demonstrating the Company Was Engaged in the Illegal Distribution of Controlled Substances ........................................ 34
            4.  Rite Aid's Controlled Substances Distributor, McKesson, Warned Defendants of at Least 14 Pharmacies Dispensing Suspicious Prescriptions ........................ 35
         d.  Defendants Try to Cover up Rite Aid's Improper Dispensing of Prescription Drugs by Instructing the Third-Party Relations Group to Delete Notes Flagging Suspicious Prescribers ........................................................................................ 36
         e.  Throughout the Class Period, Defendants Knowingly Conceal Evidence Demonstrating Rite Aid's Significant Legal and Regulatory Exposure as a Result of Systemic Unlawful Dispensing of Controlled Substances .......................... 38
            1.  Rite Aid's Dispensing Practices Violated Federal and State Law .......................... 38
            2.  Rite Aid Faces Multiple Lawsuits and Regulatory Actions Relating to Its Unlawful Dispensing of Opioid Prescriptions Beginning as Early as 2012 .......................... 42

3.   In Connection with Investigations and Lawsuits, Defendants Actively Collect, but Continue to Conceal from Investors, Large Quantities of Highly Incriminating Documentation Evidencing Rite Aid's Participation in the Opioid Crisis ............ 45

f.   Peer Pharmacies Begin Announcing Opioid Settlements, Revealing the Extent of Substantial Damages Sought in Opioid Litigation Involving Retail Pharmacies Like Rite Aid ............................................................................................................ 46

g.   The DOJ Intervenes in Opioid Multi-District Litigation, Revealing the Scope and Extent of Rite Aid's Illegal Dispensing of Opioids ........................................ 47

4.   Rite Aid Initiates "RxEvolution" Strategy to Offset Declining Prescriptions from Regulatory Scrutiny and to Reduce Its Debt Load ........................................ 50

a.   Rite Aid Unveils its RxEvolution Plan with a Heavy Emphasis on Retail Pharmacy and Initiatives to Grow Scripts ................................................................... 50

b.   Before Any Discernable Improvements are Made, Defendants Secretly Divert Resources Away from RxEvolution to Focus on the COVID-19 Pandemic ............. 52

c.   Revenue from COVID-19 Tests and Vaccines Mask Rite Aid's Declining Financial Performance in the Short-Term ................................................................... 59

d.   As Vaccination Rates Slow, Defendants Acknowledge Internally that COVID-19-Related Revenues Are Not Sustainable, While Telling Investors Revenues Would Be Sustained Post-Pandemic ........................................................................... 64

B.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS ........................................................................................................ 71

1.   Defendants' Materially False and Misleading Statements Relating to Litigation Exposure for Illegally Dispensing Opioids .................................................... 71

a.   Annual Report on Form 10-K for the Fiscal Year Ended March 3, 2018 ................. 71
b.   May 15, 2018 Albertsons Companies, Inc., Analyst Day ......................................... 75
c.   Annual Report on Form 10-K for the Fiscal Year Ended March 2, 2019 ............. 78
d.   Annual Report on Form 10-K for the Fiscal Year Ended February 29, 2020 ........... 82
e.   Annual Report on Form 10-K for the Fiscal Year Ended February 27, 2021 ........... 86
f.   Annual Report on Form 10-K for the Fiscal Year Ended February 27, 2022 ........... 89

2.   Defendants' Materially False and Misleading Statements Relating to the RxEvolution Plan ..................................................................................................................... 92

a.   Fiscal Q2 2021 Earnings Release and Call ................................................................ 92
b.   October 28, 2020 "A New Day at Rite Aid" YouTube Presentation .......................... 95
c.   Fiscal Q3 2021 Earnings Release and Call ................................................................ 98
d.   Fiscal 2021 Earnings Release and Call .................................................................... 100
e.   Fiscal Q1 2022 Earnings Release and Call .............................................................. 104
f.   June 24, 2021 CNBC Interview ............................................................................... 108
g.   Fiscal Q2 2022 Earnings Release and Call .............................................................. 109
h.   Fiscal Q3 2022 Earnings Release and Call .............................................................. 111
i.   Fiscal 2022 Earnings Release and Call .................................................................... 114
j.   Fiscal Q1 2023 Earnings Release and Call .............................................................. 116

C.   THE TRUTH IS REVEALED ................................................................................. 118

1.   March 30, 2022 Corrective Disclosure .......................................................... 118

2.   September 29, 2022 Corrective Disclosure ................................................ 119
3.   December 21, 2022 Corrective Disclosure ................................................ 119
4.   March 13, 2023 Corrective Disclosure and Materialization of Risk.......................... 120
5.   August 25, 2023 Corrective Disclosure and Materialization of Risk ....................... 121

D.   ADDITIONAL SCIENTER ALLEGATIONS ............................................... 122

1.   That Defendants Admittedly Produced Documentary Evidence of Rite Aid's Illicit Dispensing of Controlled Substances in Response to Governmental and Regulatory Subpoenas Supports a Strong Inference of Scienter ................................... 123

2.   That Rite Aid's Regulatory Affairs Department Knew the Company Was Illegally Dispensing Opioids Creates a Strong Inference of the Individual Defendants' Scienter and Corporate Scienter................................................................. 125

3.   That the Individual Defendants Attended Weekly Meetings Discussing Rite Aid's Declining Covid-19 Revenue Supports a Strong Inference of Scienter ................. 127

4.   That Defendants Deliberately Abandoned and Diverted Resources from Rite Aid's RxEvolution Initiatives Supports a Strong Inference of Scienter ............................ 128

5.   That Defendants Tracked Data on RxEvolution Initiatives and Received Regular Reports on RxEvolution Targets Supports a Strong Inference of Scienter ............ 128

6.   Defendants' Violations of Rite Aid's Own Internal Policies Support a Strong Inference of Scienter ........................................................................ 129

7.   That Defendants Regularly Issued Press Releases and Provided in-Depth Responses to Analyst Questions Detailing Particularized Efforts to Combat the Opioid Crisis, Including Implementation of a Purported "Red Flags" Process to Identify Suspicious Prescriptions, Supports a Strong Inference of Scienter ............................... 131

8.   Excessive Executive Turnover at Suspicious Times Supports Scienter ..................... 134

     a.   Defendant Donigan Was Forced out of the Company in January 2023, Amidst Corrective Disclosures .......................................................... 134
     b.   Chief Legal Officer Paul D. Gilbert Announced His Resignation on March, 10 2023, Mere Days Before the DOJ Complaint Was Filed..................................... 135
     c.   Chief Retail Officer Andre Persaud Departed with No Explanation ..................... 136
     d.   Rite Aid's  Chief Operating Officer Position Wass Eliminated After Heavy Turnover ................................................................... 136
     e.   High Levels of Executive Turnover, Generally .................................... 137

9.   Corporate Scienter............................................................... 138
10.  Insider Selling ................................................................. 139

E.   LOSS CAUSATION ................................................................ 143

1.   March 30, 2022 Corrective Disclosure ............................................... 144
2.   September 29, 2022 Corrective Disclosure ........................................... 145
3.   December 21, 2022 Corrective Disclosure ............................................ 147
4.   March 13, 2023 Corrective Disclosure and Materialization of Risk...................... 149
5.   August 25, 2023 Corrective Disclosure and Materialization of the Risk.................. 150

VI.   Class Action Allegations .......................................................... 152
VII.  Presumption of Reliance .......................................................... 154
VIII. No Statutory Safe Harbor.......................................................... 156
IX.   Claims for Relief ................................................................ 157

A.  Count I: For Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants ........................................................... 157

B.  Count II: For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ................................................................................................................... 159

X.  Prayer for Relief ...................................................................................................................... 161

XI.  Demand For Trial By Jury ........................................................................................................ 162

1.      Plaintiff Jennifer DaSilva ("Plaintiff"), individually and on behalf of all other persons similarly situated, brings this action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), on behalf of herself and all persons and entities other than Defendants (defined below) who purchased or otherwise acquired Rite Aid Corporation ("Rite Aid" or the "Company") common stock between April 26, 2018 and August 25, 2023, inclusive (the "Class Period").

2.      Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of her undersigned attorneys ("Lead Counsel"), which included, among other things: a review of (i) public documents, public filings, and wire and press releases published by and regarding Rite Aid; (ii) unsealed documents filed in past and concurrent litigation involving Rite Aid or similarly situated parties; (iii) analyst and media reports concerning Rite Aid; (iv) interviews with former Rite Aid employees; and (v) information readily obtainable on the internet. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

3.      Rite Aid is one of the top ten largest retail pharmacy chains in the United States, with more than 2,000 locations across seventeen states and territories and 1,263 cities.  Between April 26, 2018 and August 25, 2023, inclusive, Rite Aid and certain of its executives materially misled

investors regarding the source and sustainability of Rite Aid's revenue and earnings and concealed the extent of its substantial exposure to liability for the illegal dispensing of controlled substances.

4.      Plagued by decades of accumulated debt and lukewarm earnings, by the start of the Class Period, Rite Aid faced significant pressure from investors to demonstrate sustainable Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"). The Company had incurred huge amounts of interest expense associated with its heavy debt load, plus significant capital expense connected with operating its stores. Indeed, throughout the Class Period, the Company's interest coverage ratio (the ratio of Earnings Before Interest and Taxes ("EBIT") to interest expense) was consistently poor, reflecting poor financial health and a risk that earnings would not cover expenses. Accordingly, at all relevant times investors and analysts understood that Rite Aid would need to reliably generate earnings that could cover these expenses to simply remain afloat.

5.      Unbeknownst to the investing public, the Company also had significant exposure to opioid liability likely to result in substantial *additional* expense in the form of significant judgment or settlement obligations that could existentially imperil the Company as a going concern. Throughout the Class Period, Defendants misled investors regarding the extent of Rite Aid's exposure to lawsuits and regulatory action relating to its unlawful dispensing of controlled substances—which continued at least until at least June 10, 2019. Concealing the scope and extent of this liability exposure was critical because Defendants knew Rite Aid was not generating sufficient earnings to reliably cover its operating expenses, let alone a significant judgment or settlement amount.

6.      And Defendants knew that settlements and judgments likely would be significant. They had been directly involved in the illegal dispensing efforts, directing pharmacists to delete

notes indicating prescriptions were suspicious and signing relevant certifications to ensure reimbursement by Medicaid and Medicare, for example. Rite Aid also retained huge amounts of documentation evidencing the illegal dispensing practices, which Defendants had been actively collecting and reviewing since 2012 in response to information requests and subpoenas. Moreover, as a named Defendant in more than one thousand cases, Rite Aid knew that the damages sought in the ongoing litigation against retail pharmacies were substantial. Nevertheless, Rite Aid conspicuously failed to disclose this in its public filings—despite making similar disclosures about other ongoing litigation—until a settlement by a peer pharmacy revealed the truth to the marketplace, blowing Rite Aid's cover and leading Rite Aid to adjust its public disclosures moving forward.

7.      In 2019, recognizing its tenuous position, Rite Aid replaced nearly all of its senior executives and began a sharp pivot in business strategy. In March 2020, Defendants unveiled their ambitious turnaround plan for Rite Aid, dubbed the "RxEvolution." Retail Pharmacy, especially pharmacy prescriptions ("scripts"), was Rite Aid's key earnings lever throughout the Class Period. As conceived, the RxEvolution had multiple components intended to strengthen this lever, including remodeling and rebranding hundreds of its stores as "Stores of the Future," implementing a bold telehealth initiative involving "wellness rooms" in its pharmacy locations, pushing organic and natural health products, and bringing its pharmacists out from behind the desk to directly engage with patients for a holistic pharmacy experience. The initiatives were geared toward driving earnings growth by growing revenue in Rite Aid's Retail Pharmacy segment.

8.      Within days of Defendants' debut of RxEvolution, however, the COVID-19 pandemic hit the United States. The Company then almost immediately abandoned its RxEvolution initiatives, slashing RxEvolution budgets, and redirected personnel to COVID-specific projects.

Multiple former employees recall that the scope and scale of the RxEvolution initiatives were diminished beyond recognition and the small changes that were implemented failed to yield meaningful results. Still, the pandemic itself proved a temporary revenue boon to the Company. COVID-19 tests and vaccines were high-margin, non-discretionary items which were subsidized directly by the federal government. Over the course of the pandemic, the federal government would reimburse Rite Aid $427.8 million toward COVID-19 testing, alone, and vaccines were reimbursed at extremely high rates, reaching $40.00 per shot.

9.       During the Class Period, Defendants falsely represented that Rite Aid was aggressively pursuing the RxEvolution plan and seeing script growth and other sustainable, positive effects result. Accordingly, Defendants represented that Rite Aid was well positioned to continue to generate sufficient earnings to meet expenses, even excluding COVID-19 revenue. Not so. Rite Aid's COVID-era earnings resulted largely from administering COVID-19 tests and vaccines—projects Defendants knew could not be maintained in the long run at remotely similar scale—and were not sustainable. In truth, Rite Aid had redirected focus from its RxEvolution initiatives and had not experienced growth in the "core" Retail Pharmacy business that it could expect to maintain post-pandemic.

10.       When the pandemic waned and COVID-19 vaccine revenue sharply declined, Defendants' fraud unraveled. Defendants were forced to admit, in a series of partial corrective disclosures, that they had effectively abandoned RxEvolution and, thus, not achieved sustainable script and revenue growth, and that their COVID-era earnings growth had overwhelmingly resulted from COVID-19 tests and vaccines, not Rite Aid's RxEvolution initiatives. Earnings tumbled, the price of RAD stock dropped in response, and investors were left holding the bag. Shortly thereafter, the true scope and extent of Rite Aid's opioid dispensing practices in the lead

up to the Class Period, and the liability arising therefrom, was exposed when the DOJ filed a detailed Complaint pursuant to the False Claims Act and Controlled Substances Act, sending the price of RAD common stock tumbling yet again. Finally, on August 25, 2023, the Wall Street Journal reported that Rite Aid was planning to file for Chapter 11 bankruptcy to halt the opioid lawsuits in light of its inadequate cash flow and overwhelming debt. In the day following the announcement, the price of RAD common stock fell over 50%, landing well below the NYSE's $1.00 listing threshold.

11.     As a result of Defendants' fraud, RAD stock declined over the course of the Class Period from a close of $33.40 on April 26, 2018, the start of the Class Period, to a close of $0.71 on August 25, 2023, for a total decline of $32.69, or a whopping *97%*. Plaintiff and the Class herein seek redress.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. On July 20, 2023, Defendants moved to transfer this action to this venue and Plaintiff did not oppose such motion. ECF 29.

15.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

16.     Plaintiff Jennifer DaSilva, as set forth in her certification attached hereto, purchased Rite Aid common stock during the Class Period and was damaged thereby.

17.     Defendant Rite Aid Corporation ("Rite Aid") is a retail pharmacy chain that owns and manages retail drug stores. The Company also owns and operates the Pharmacy Benefits Manager ("PBM"), Elixir, which is headquartered in Twinsburg, Ohio. Rite Aid is incorporated in Delaware and has its principal executive offices at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112. Rite Aid's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RAD."

18.     Defendant Heyward Donigan ("Donigan") served as the Company's Chief Executive Officer ("CEO") from August 12, 2019 until January 9, 2023.

19.     Defendant Matthew C. Schroeder ("Schroeder") has served as Rite Aid's Chief Financial Officer ("CFO") since March 2019. Schroeder served as Rite Aid's Chief Accounting Officer and Treasurer from 2017 until his promotion to CFO. According to his LinkedIn profile, from February 2010 to the present, Schroeder has also served as Rite Aid's Global Vice President of Investor Relations and Treasurer.

20.     Defendant James Joseph Peters ("Peters") served as the Company's Chief Operating Officer ("COO") from October 3, 2019 until March 8, 2022.

21.     Defendant Jocelyn Konrad ("Konrad") served as Executive Vice President/Chief Pharmacy Officer at Rite Aid from October 2019 through March 2022. Konrad was employed at Rite Aid in various roles beginning in 2007, including as Executive Vice President Pharmacy and

Retail Operations from March 2019 to October 2019 and Executive Vice President, Pharmacy from August 2015 to March 2019.

22.     Defendant John T. Standley ("Standley") served as the Company's CEO from June 2010 until August 2019. He also formerly served as the Chairman of the Board of Directors (the "Board") from June 21, 2012 until his departure from the Company in 2019.

23.     Defendant Darren W. Karst ("Karst") joined the Company as CFO and Executive Vice President in August 2014, and took on the additional role of Chief Administrative Officer in September 2015. Defendant Karst left Rite Aid in May of 2019.

24.     Defendant Elizabeth Burr ("Burr") currently serves as the Interim Chief Executive Officer of Rite Aid Corporation and has served on Rite Aid's Board of Directors since 2019.

25.     Defendants Donigan, Schroeder, Peters, Konrad, Standley, Karst, and Burr are collectively referred to herein as the "Individual Defendants."

26.     Each of the Individual Defendants directly participated in the management of the Company; was directly involved in the day-to-day operations of the Company at the highest levels; and was privy to confidential proprietary information concerning the Company, its business and operations, and the ongoing litigation in which it was involved.

27.     The Individual Defendants:

a.  Directly participated in the management of Rite Aid;

b.  Were directly involved in the day-to-day operations of Rite Aid at the highest levels;

c.  Were privy to confidential proprietary information concerning Rite Aid and its business and operations;

d. Were directly or indirectly involved in the oversight or implementation of Rite Aid's internal controls; and/or

e. Were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the untrue statements of a material fact or statements that omitted to state a material fact required to be stated or necessary to make the statements made not misleading; were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning Rite Aid; and/or approved or ratified these statements in violation of the federal securities laws.

28.     Rite Aid is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

## IV.     RELEVANT NON-PARTIES

29.     Karen Staniforth ("Staniforth") has served as Rite Aid's Chief Pharmacy Officer ("CPO") from March 2022 to the Present. In this role, Staniforth is a member of Rite Aid's management team, along with Rite Aid's CEO, CFO, and other C-Level executives. From March 2019 to March 2022, Staniforth served as Rite Aid's Senior Vice President of Clinical and Operational Pharmacy Services. In that role, Staniforth reported to Defendant Konrad, the Executive Vice President and CPO during that period. Amongst other responsibilities, Staniforth was responsible for overseeing Rite Aid's Regulatory Affairs Department. From July 2017 to March 2019, Staniforth served as Rite Aid's Senior Vice President of Business Integration.

30.     CW1 was Manager of Project Transformation at Rite Aid from March 2020 to November 2021. CW1 was hired to help create a Project Management Office for Rite Aid at the corporate level as part of its "RxEvolution" plan and served as the main project manager for Rite

Aid's pharmacy store operations throughout the Class Period. CW1 was initially hired to focus on Rite Aid's Stores of the Future project. With the outbreak of COVID-19, CW1 was reassigned to focus mainly on Rite Aid's COVID vaccine rollout, which became one of the main projects CW1 worked on at the Company. CW1 initially reported to Laura Shaw, who was Vice President of Strategic Initiatives and Lean Engineering and responsible for Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA") initiatives. Shaw was promoted to Senior Vice President of Pharmacy Initiatives in June 2020, after which CW1 reported to several different managers, including Vice President Joel Arnao.

31.     CW2 was employed by Rite Aid for two decades in various roles including: Senior Compliance Manager from June 2015 to October 2016; Director, Asset Protection from October 2016 to December 2017; District Manager, Pharmacy and Retail Operations, from December 2017 to February 2020; Regional Retail Operations Leader from February 2020 to July 2021; and Divisional Compliance Leader from June 2021 to August 2022. In the compliance role, CW2 reported to Noah Davis, who was a Director of Field Compliance and Monitoring.

32.     CW3 was a Finance Director at Rite Aid from December 2020 to July 2022. CW3 was the first individual hired to a newly formed Financial Planning & Analytics ("FP&A") team focused on marketing, operations, distribution, and asset protection. CW3 reported to Senior Vice President Frank Walker ("Walker") and to Vice President Jim Moriarty who also reported to Walker. Walker reported directly to Defendant Schroeder. CW3 also attended regular meetings led by Tom Renner ("Renner"), who has worked at Rite Aid for close to 20 years, including as Director of Budget and Forecasting from February 2016 to April 2022 and then as Vice President of FP&A from April 2022 to the present. Renner reported directly to Defendant Schroeder and was commonly known at the Company to have a personal friendship with Defendant Schroeder.

9

33.     CW4 was a Regional Pharmacy Leader at Rite Aid from February 2021 to September 2021 and had managerial responsibility over 20 pharmacies located in Rite Aid stores. CW4 reported to Divisional Pharmacy Vice President, Shelly Boyle. CW4 has also held similar roles in comparable large-chain, retail pharmacies.

## V.     SUBSTANTIVE ALLEGATIONS

### A.   STATEMENT OF FACTS

#### 1.   Company Background

34.     Founded in 1962 as a local health and beauty store, Rite Aid owns and operates over 2,300 retail drug stores across 17 states. Since 2015, Rite Aid has also owned and operated the Pharmacy Benefits Manager, Elixir (formerly EnvisionRx), which is headquartered in Twinsburg, Ohio. A PBM is a third-party company that acts as a go-between for pharmacies and insurance providers, negotiating contract terms and pricing.

35.     Rite Aid has two reportable business segments: "Retail Pharmacy," which constitutes the majority of Rite Aid's business, and "Pharmacy Services," which consists solely of Elixir. Throughout the Class Period, Retail Pharmacy accounted for over 90% of Rite Aid's gross profits and approximately two thirds of its revenue.

36.     The Retail Pharmacy segment includes both prescription pharmacy and front-end retail products, like greeting cards, personal care items, and foods and beverages. Within retail pharmacy, prescription drugs generate the majority of sales. For example, in fiscal 2023, prescription drug sales accounted for over 71% of Rite Aid's total drugstore sales and the front-end products accounted for the remaining approximately 29% of drug store sales.

37.     Rite Aid's Pharmacy Services segment consists solely of Elixir, Rite Aid's Pharmacy Benefits Manager. By controlling their own PBMs, retail pharmacies position

themselves to negotiate with insurance companies on terms most favorable to their own retail pharmacies. Elixir, formerly EnvisionRx, includes multiple PBMs, mail delivery and specialty pharmacy services, network, and rebate administration, as well as prescription discount programs and Medicare Part D insurance for individuals and groups.

## 2.   Rite Aid Struggles Under Enormous Debt Burden

### a.   Rite Aid's Debt Balloons as a Result of Debt-Driven Acquisitions, Raising Threat of Default as Leverage and Interest Coverage Ratios Teeter on Non-Compliance

38.     For close to three decades, Rite Aid has been massively overleveraged due to a series of ill-fated, debt-financed acquisitions. First, in 1996, Rite Aid acquired the West Coast pharmacy chain Thrifty Payless for $2.3 billion in cash, assuming $890 million in debt which vastly increased its leverage. Then, in 1999, government investigations exposed years-long accounting fraud at the Company, forcing Rite Aid to restate its pre-tax income and net income downward by $2.3 billion and by $1.6 billion, respectively, representing the largest restatement ever recorded at that time. The restatement caused Rite Aid's earnings to plummet as its debt mounted due to credit borrowings, further imperiling the Company's leverage ratio and, as the SEC later revealed in June 2002, causing Rite Aid to violate certain debt covenants, including the loan covenants attached to a $1.3 billion line of credit backing short-term commercial paper the Company issued in 1999.[1]

---

[1] The leverage ratio is defined as the debt-to-equity ratio of a company and represents the ability of a company to meet its financial obligations. https://www.investopedia.com/terms/l/leverageratio.asp. For further detail on the Company's covenant violations, *see* Order Instituting Public Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, in the Matter of Rite Aid Corporation, SEC Release No. 46099 (June 21, 2002), https://www.sec.gov/litigation/admin/34-46099.

39.     By March 2007, Rite Aid had accumulated $3.1 billion of outstanding indebtedness. Nevertheless, Rite Aid repeated the mistake it made a decade earlier by acquiring the Eckerd and Brooks drugstore chains in 2007 for $3.4 billion, including a $2.36 billion cash payment which Rite Aid financed through the issuance of new debt. This transaction brought Rite Aid's debt balance to over $5 billion and further increased its leverage ratio, leaving Rite Aid dangerously close to defaulting on its debt agreements. Moreover, corresponding to its significant debt load, Rite Aid's interest expense was extremely high.

40.     Throughout the Class Period, Defendants continually acknowledged Rite Aid's enormous debt burden and the need to increase revenue to reduce the Company's leverage ratio. As Defendant Schroeder stated on the June 25, 2020 Earnings Call, "As we have said previously, reducing our debt and improving our leverage ratio is critical, and we are taking steps to ensure that we achieve this goal, even in the face of unprecedented uncertainty."

41.     In fact, one of Defendant Donigan's first initiatives upon her hire as CEO was the introduction of a debt restructuring plan consisting of an offer to exchange up to $750 million of 6% and 8% senior notes due in 2023 for a combination of senior notes due in November 2026 and cash. But restructuring debt did not solve the related issue of large interest payments on the outstanding debt. Thus, as a result of Rite Aid's huge debt-load, Defendants faced high interest expense throughout the Class Period, as well as other expenses related to the Company's debt.

42.     Rite Aid's high interest expense negatively impacted its "interest coverage ratio," calculated as earnings before interest and taxes ("EBIT") divided by interest expense. Rite Aid's interest coverage ratio was a critical concern to investors because analysts look to a company's interest coverage ratio to determine its ability to pay interest on outstanding debt. Generally, a higher interest coverage ratio indicates greater financial health, and an interest coverage ratio

below one (1) indicates that earnings are insufficient to cover interest expense. The ratio is particularly important in assessing the potential for bankruptcy for companies like Rite Aid with significant debt burdens.

43.    Throughout the Class Period, CVS's interest coverage ratio was between 3.8x and 6.5x.  By contrast, as demonstrated in the chart below, Rite Aid's interest coverage ratio during the same period was nearly always below 1x and never approached 2x, indicating the Company was in danger of being unable to make its interest payments:[2]

**Figure 1**



44.    Indeed, in light of Rite Aid's substantial debt load and high interest expense, Defendants knew that, in order for Rite Aid to remain solvent, Defendants needed to ensure sufficient earnings in Retail Pharmacy to cover debt-related expenses, capital expenditures ("CapEx"), and other expenses. Throughout the Class Period, Rite Aid's interest expense averaged

---

[2] Mathematically, a negative interest coverage ratio, as seen in several of the quarters depicted in Figure 1, is technically an undefined number. Plaintiff has nevertheless plotted the data points here for completeness.

~$215 million annually and CapEx averaged ~$192 million. Thus, at the very minimum, Rite Aid needed to generate sufficient earnings to cover these expenses and any others.

45.      Analysts, too, were attuned to the negative impact interest expense was having on Rite Aid's earnings and repeatedly asked the Company to address it throughout the Class Period. For example, on the June 25, 2020 Earnings Call, Glen Joseph Santangelo of Guggenheim Securities, LLC questioned Defendant Schroeder about whether there was "anything else that would be moving that interest expense number meaningfully." A year later, in the June 24, 2021 Earnings Call, Santangelo raised the same concern, noting the Company's high CapEx and interest expense requirements and querying how the Company's cash flow could suffice to cover expenses. Deutsche Bank analyst George Hill was similarly concerned. In an April 7, 2022 report, Hill estimated that the Company needed to generate ~$400-450 million in annual EBITDA just to cover its debt service and store maintenance costs, to continue as a going concern.

### b.   As a Result of Rite Aid's Debt Burden, Retail Pharmacy Remains Rite Aid's Key Earnings Lever

46.      The Company's debt burden created significant risks and obstacles to growth and hampered Rite Aid's expansion. In a letter to shareholders *prior* to the Eckerd and Brooks acquisition, Rite Aid warned that its "substantial indebtedness could limit cash flow available for [] operations and could adversely affect [its] ability to service debt" and that "covenants in [its] current indebtedness and the indebtedness to be incurred to finance the acquisition impose restrictions that may limit our operating and financial flexibility."

47.      These risks, in fact, manifested. As a result of Rite Aid's debt burden, the Company was unable to expand into the PBM market until well after competitors, thereby ensuring that Retail Pharmacy remained its only significant growth segment at all relevant times as Rite Aid lost market share to competitors. Accordingly, Rite Aid's share of the pharmacy market—once one of

the largest three in the country—dramatically diverged from its competitors. Figure 2 below depicts revenue for CVS, Walgreens, and Rite Aid over time and demonstrates how significantly Rite Aid's performance fell behind its primary competitors:

**Figure 2**



48.    Having just recently issued $2.3 billion in debt to acquire Eckerd and Brooks in June 2007, on top of its pre-existing $3.1 billion debt burden, Rite Aid was ill-positioned to follow CVS into the PBM market in 2007. By the time Rite Aid acquired its own PBM, Elixir (formerly, EnvisionRx), in 2015, the PBM market was heavily saturated and dominated by top players. Thus, though Rite Aid has two reporting segments, the Company remained heavily dependent on its retail pharmacy chain business, with over 90% of its profits consistently coming from its Retail Pharmacy segment, as evident in Figure 3:

Figure 3:



49.    Within Retail Pharmacy, as Defendant Schroeder explained in the September 2020 Earnings Call, "[t]he typical split has been something in the high 60% is pharmacy, the low 30% is front end." By fiscal 2023, prescription drug sales constituted over 71% of Rite Aid's total drug store sales. Thus, Defendants most critical tool for growing their core pharmacy business was prescription growth.

### 3. To Increase Prescription Drug Sales and Pay Down Debt, Rite Aid Knowingly Dispenses Medically Unnecessary Opioids from 2014 to 2019 in Violation of U.S. Law and at the Cost of Patient Lives

50.    In an effort to bolster prescription revenue, from at least 2014 to 2019, Rite Aid systematically, improperly, and knowingly filled unnecessary prescriptions for dangerous and addictive substances in violation of U.S. law and at extreme costs to public health and human lives. On Monday, March 13, 2023, the Department of Justice ("DOJ") intervened in a whistleblower lawsuit brought under the False Claims Act (FCA) against Rite Aid, filing a Complaint (the "DOJ Complaint") alleging that Rite Aid knowingly filled unlawful prescriptions for controlled substances. The DOJ Complaint revealed that Rite Aid had regularly dispensed unlawful opioids

and opioid drug combinations. The extent and systemic nature of these dispensing activities, as well as the Company's willful enablement of the same, were concealed from investors for years, even after Defendants recognized the scope of the problem, largely ceased the practices, and were actively cooperating with multiple investigations into these very activities.

### a. Opioid Abuse, Spurred by Prescription Pharmaceuticals, Explodes into a Nationwide Crisis

51.     Opioids are a class of powerful narcotic substances that can be medically indicated for severe pain but have high potential for dependance and abuse. Serious risks associated with opioids include misuse and abuse, addiction, overdose, and death. Common opioids include oxycodone (OxyContin), hydrocodone (Vicodin), morphine, methadone, and fentanyl (a synthetic opioid). Opioids are particularly dangerous in combination with benzodiazepines or other drugs that depress the central nervous system. This combination of drugs can result in serious side effects, including slowed or difficult breathing and death.[3] Still more dangerous, users seeking increased euphoric effect may combine opioids with benzodiazepines *and* skeletal muscle relaxants to create an even more intense "high." This three-ingredient cocktail—known as the "Trinity"—poses significant risk of respiratory distress or cessation, overdose, and death. The Trinity thus greatly increases the mortality rate associated with opioid overdose.

52.     Overuse and abuse of opioids has developed into a nationwide crisis. Since the year 2000, more than 500,000 people have died in the United States from opioid-involved overdoses, with a particularly high death rate amongst individuals aged 25 to 34.[4] These rises have

---

[3] FDA Drug Safety Communication: FDA Warns About Serious Risks and Death when Combining Opioid Pain or Cough Medicines with Benzodiazepines; Requires Its Strongest Warning, FDA.gov (August 31, 2016).

[4] *The Opioid Crisis and Recent Federal Policy Responses*, Congressional Budget Office: Non-partisan Analysis for the U.S. Congress (September 2022), https://www.cbo.gov/system/files/2022-09/58221-opioid-crisis.pdf.

meaningfully contributed to a decline in life expectancy in the United States since 2014, and more U.S. citizens have now died from opioid overdoses than in World War II.[5] In addition to overdoses, the opioid crisis has contributed to a rise in related deaths, involving hepatitis C and HIV contracted from unclean needles, as well as the effects of in-utero exposure and subsequent withdrawal, known as neonatal abstinence syndrome, in infants.[6] As of 2022, the United States has the highest number of opioid-involved deaths per capita, more than five times the median number for member countries of the Organization for Economic Development.[7] Figure 4 below,[8] depicts rising numbers of overdose deaths in thousands, since 1999.

---

[5] *Id.*

[6] *Id.*

[7] OECD (2019), "Opioid Use", in Health at a Glance 2019: OECD Indicators, OECD Publishing, Paris.
DOI: https://doi.org/10.1787/652ef96a-en.

[8] *Drug Overdose Death Rates*, National Institute on Drug Abuse, https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates.

**Figure 4**



*Includes deaths with underlying causes of unintentional drug poisoning (X40–X44), suicide drug poisoning (X60–X64), homicide drug poisoning (X85), or drug poisoning of undetermined intent (Y10–Y14), as coded in the International Classification of Diseases, 10th Revision. Source: Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple Cause of Death 1999-2021 on CDC WONDER Online Database, released 1/2023.

      53.     Inappropriate dispensing by pharmacies like Rite Aid has spurred the opioid crisis. To begin, such dispensing has led to increasing instances of opioid addiction and abuse by patients. In addition, prescription medication obtained from legitimate pharmacies is often diverted to friends and family, strangers, and third-party drug dealers. Indeed, the secondary market for prescription medication in the United States is notoriously robust. In 2015, for example, 63.1% of the 52,404 (more than 33,000) drug overdoses deaths in the United States were attributed to opioids, and approximately half of these involved a prescription opioid.[9]

---

[9] Gery P. Guy Jr., et al., *Vital Signs: Changes in Opioid Prescribing in the United States, 2006–2015*, Center for Disease Control and Prevention: Morbidity and Mortality Weekly Report (July 7, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.

b. **Rite Aid Systematically Dispenses Controlled Substances that Are Not Medically Indicated Without Valid Prescriptions**

54.    Pharmacists and regulators have identified a series of "red flags" that indicate a prescription is likely to be abused or resold in a secondary drug market. Critical red flags include: prescriptions for "the Trinity," whether filled together or over the course of several days; prescriptions for controlled substances in excessive quantities and/or for over-long periods; duplicative prescriptions for the same substances from multiple prescribers; prescription refills filed more than 48 hours before the expiry of prior prescriptions; patients receiving only prescriptions for controlled substances and/or the Trinity; prescriptions from medical professionals known to be operating "outside the scope of professional practice;" inconsistent prescriber handwriting, suggesting prescription pads may have been taken without authorization; and prescribers and patients with non-local addresses.

55.    As detailed in the DOJ Complaint, Rite Aid concealed from investors that from at least 2014 to 2019, the Company had systematically, improperly, and knowingly filled highly suspicious prescriptions where multiple of the foregoing red flags were present.  Each of these prescriptions was filled by a Rite Aid store, and reimbursements for each were sent into an account in the name of Rite Aid Hdqtrs., Corp.[10] Red flags which, as discussed below, Rite Aid repeatedly ignored, included:

   a. ***Trinity Prescriptions***: An internal Rite Aid corporate review conducted in August 2017 for fills in June 2017 found that over 1,000 patients filled Trinity prescriptions at Rite Aid stores in that month alone. A non-exhaustive list of Trinity prescriptions recorded and collected by Rite Aid is included in the DOJ Complaint at pages 28-29. These prescriptions had no legitimate medical purpose and filling them directly conflicted with Rite Aid's acknowledgement that there is no medical need for prescribing these drugs at the same time. Rite Aid pharmacists expressly noted on the hard

---

[10] Rite Aid Hdqtrs., Corp. is a wholly owned subsidiary of Defendant Rite Aid Corporation, also incorporated in Delaware with a principal place of business in Philadelphia, Pennsylvania.

copy prescriptions, that this combination was the Trinity. The DOJ Complaint includes copies of many such prescriptions. One illustrative example is included below:

**Figure 5**



b. ***Prescriptions for Excessive Quantities and Prolonged Periods***: Rite Aid stores regularly filled prescriptions that vastly exceeded any amounts that could reasonably be necessary for legitimate medical purposes and/or extended well beyond the recommended maximum days of dosing for the substances and Rite Aid's own 12-week red-flag trigger. By way of example, Prescriber Gary Frantz wrote his "patient," C.F., a prescription for 780 30 milligram oxycodone tablets, to be taken 78 times per day, *forty-four times* the recommended standard. Yet Rite Aid pharmacies continued to fill opioid prescriptions written by Frantz for C.F., as explained in the DOJ Complaint. Rite Aid similarly filled unlawful prescriptions written by Prescriber William Bauer for excessive quantities of controlled substances over the course of eleven years—far in excess of Rite Aid's 12-week red-flag period. Bauer repeatedly prescribed controlled substances in excess quantities, also as described in the DOJ Complaint.[11]

---

[11] Prescriber William Bauer was indicted in August 2019 and convicted in July 2021 of 101 counts of distribution of controlled substances and health care fraud and sentenced to five years in prison 2018, *United States v. Bauer*, Case No. 3:19-cr-00490. Bauer knew that the "patient," J.S., had

c. ***Prescriptions for Patients Receiving Only Opioid and Trinity Prescriptions***: Rite Aid stores also filled prescriptions for patients who were prescribed nothing but controlled substances and/or refilled prescriptions for controlled substances before the original doses should have been completed. For example, Rite Aid Store 00789 in New Jersey filled at least 76 prescriptions for patient "H.K.," exclusively for controlled substances and overwhelmingly for the synthetic opioid, fentanyl, as shown in the DOJ Complaint at pages 34-35. Rite Aid pharmacists reported H.K.'s prescriber to Rite Aid's Regulatory Affairs multiple times and a Regulatory Affairs analyst reviewed their practices multiple times, but no action was taken.

d. ***Duplicative Prescriptions***: Rite Aid stores also systemically filled duplicative prescriptions from multiple prescribers. As Company records demonstrated, and the DOJ Complaint revealed to the public, multiple consumers filled duplicative prescriptions for controlled substances at Rite Aid pharmacies written by separate prescribers for the same patients. For example, Patient "T.S." received prescriptions for controlled substances including fentanyl and oxycodone from at least five prescribers on at least two separate occasions, and Patient "S.T." filled at least three prescriptions for oxycodone-acetaminophen in one month from three separate prescribers, one of whom was located out-of-state.

e. ***Prescriptions for Early Refills***: Rite Aid also filled prescriptions for a fill or refill of controlled substances prescription sooner than 48 hours before the prior prescription's due date. Representative samples of unlawful prescriptions filled early and including multiple prescriptions with at least a 30-day supply for the same combination of oxycodone 30 mg, which is widely diverted, are shown the DOJ Complaint at Page 36.

f. ***Prescribers Acting Outside the Usual Course of Professional Practice***: Rite Aid also dispensed controlled substances prescribed by medical practitioners that Rite Aid knew, as a result of repeated warnings from Rite Aid pharmacists, to be operating outside the usual course of professional practice. Rite Aid pharmacists repeatedly warned Rite Aid's Regulatory Affairs Department filed tickets in the RACS system about the prescribing habits of prescribers, "C.H.," "G.N.," "A.D.," and Bauer. For example, in September 2018, a pharmacist warned that Bauer was "prescribing large quantity of opioids with similar diagnosis codes" and that "the number of patients that are on opioids for this diagnosis and the quantity being prescribed make me believe this office is relying too much on opioids for treatment." Nonetheless, Rite Aid filled prescriptions written by Bauer on multiple occasions.

---

attempted suicide eight times, and that four of his attempts involved overdoses of controlled substances.

56.     The extent and systemic nature of these dispensing activities, as well as the Company's willful enablement of the same, were concealed from investors. Despite being fully aware of these "red flags," which indicate a prescription is likely to be abused or resold, Rite Aid nonetheless continued to fill suspect prescriptions in order to increase prescription drug sales to pay down debt.

### c. Defendants Knew, or Recklessly Disregarded, that Throughout the Class Period, Rite Aid Pharmacists Were Systemically Dispensing Controlled Substances in Violation of Applicable Law

57.     Rite Aid and its executives, including the Individual Defendants, knew or recklessly disregarded that Rite Aid's pharmacies were systematically filling unlawful prescriptions from: (i) internal Company audits; (ii) Rite Aid's internal reporting systems documenting suspicious prescriptions; (iii) Rite Aid's internal metrics tracking prescribers and their prescribing habits; and (iv) warnings from McKesson, Rite Aid's distributor of controlled substances, of suspected abuses. Such documentary evidence was received by and/or accessible to Defendants. Nevertheless, Defendants ignored this evidence and allowed Rite Aid to continue illegally dispensing controlled substances and submitting false claims to seek reimbursement from Federal Healthcare.

### 1. Rite Aid Maintains a Regulatory Affairs Department, Which Is Responsible for Ensuring Compliance with Relevant Laws and Reports Directly to Rite Aid's Senior Leadership

58.     Rite Aid has an internal department known as its Regulatory Affairs Department, which is specifically responsible for ensuring Rite Aid's compliance with federal and state laws.[12]

---

12 After October 2015, Rite Aid's Regulatory Affairs Department also included the department known as Government Affairs. The DOJ Complaint periodically uses the term "Government Affairs" in connection with certain functions of the Regulatory Affairs Department but specifies

Karen Staniforth, Rite Aid's Senior Vice President of Clinical and Operational Pharmacy Services

for the majority of the Class Period, was responsible for overseeing the Regulatory Affairs

Department.[13] According to CW1, in that role, Staniforth reported to Defendant Jocelyn (Jocee)

Konrad, Rite Aid's Executive Vice President and CPO.   In March 2020, Staniforth replaced

Konrad as Rite Aid's CPO and currently serves as member of Rite Aid's management team, along

with the Company's CEO, CFO, and others. Rite Aid's CPO reports directly to its CEO, as CW2

confirmed and as shown in the organizational chart below:[14]

**Figure 6**



that "all references to Government Affairs throughout this complaint refer to individuals reporting
to the Senior Vice President of Regulatory Affairs." DOJ Complaint at page 3 n. 1.  . Herein, the
department is referred to as "Regulatory Affairs" throughout for consistency purposes expect
where necessary to describe an individual's specific role or title.
[13] https://annual.nacds.org/speaker/karen-staniforth/.
[14] https://rocketreach.co/rite-aid-management_b5c602d3f42e0c55.

59.     In addition to Staniforth, the Regulatory Affairs Department was led by Janet Hart and Daniel Miller. According to her LinkedIn profile, Janet Hart has been the director of Government Affairs for the past 40 years. Daniel Miller served as Rite Aid's Senior Vice President of Pharmacy Operations from 2009 to 2015 and as Senior Vice President of Pharmacy Regulatory Affairs from August 2015 to April 2020.

60.     Like Staniforth, Janet Hart also communicated directly with Rite Aid senior management about Rite Aid's systems and tools for monitoring and controlling the dispensing of controlled substances. For example, as noted in the DOJ Complaint, Hart acknowledged to Rite Aid senior management in December 2017 that "Rite Aid could leverage existing tools 'to identify outlier prescribers but at present there is not enough time to dive into the data.'" Thus, Rite Aid senior management was aware of concerns surrounding the dispensing of controlled substances, that the tools they had set up showed instances of suspect prescribing, and that the Company was not using the tools at its disposal to investigate, understand, and stop problematic prescribing.

### 2.     Internal Reports and Pharmacist Notes Entered into Rite Aid's "RACS" System Informed Defendants of Suspicious Prescriptions

61.     According to the DOJ Complaint, Rite Aid directed its pharmacists to employ its High Alert Review Protocol ("HARP")[15] before dispensing specific controlled substances, including all strengths of oxycodone products, $\geq$10 mg prescriptions of methadone, 10 mg hydrocodone/acetaminophen 325 mg, all fentanyl products, and all controlled substances paid for in cash or with a discount card for more than $1,000. The six steps of HARP were: (1) review prescription, (2) validate prescription, (3) validate prescriber, (4) validate patient, (5) dispense or

---

[15] This protocol was also referred to as "High Alert Controlled Substance Validation."

25

not dispense, and (6) report suspicious activity. Notably, the decision to dispense or not was designed to occur prior to reporting the suspicious activity.

62.     In an Analyst Day Rite Aid held on May 15, 2018 in conjunction with Albertsons Companies, Inc., Defendant Konrad's remarks were accompanied by a slide deck that visually depicted the HARP process, as below:

**Figure 7:**



63.     According to CW4, a regional pharmacy leader responsible for the pharmacy departments in 20 Rite Aid stores, Rite Aid's policies for monitoring the dispensing of controlled substances—at the individual pharmacy level—were robust and surpassed the industry standard. CW4 has significant experience in similar functions in comparable large-chain, retail pharmacies. That Rite Aid closely monitored the dispensing of controlled substances meant Defendants had access to, or recklessly disregarded, this information.

64.     Rite Aid's internal policies required its pharmacists to comply with HARP Step #6 by submitting "tickets" through the RACS internal reporting system. Rite Aid's Regulatory Affairs

Department, who reported to Chief Pharmacy Officer Karen Staniforth, received, and were supposed to review those tickets and the suspicious prescribers they identified.

65.     From February 2013 through February 2018, however, Rite Aid assigned only a single Regulatory Affairs officer to review all the tickets submitted from Rite Aid pharmacies nationwide. This insufficient staffing created a massive backlog of unreviewed tickets throughout the Class Period for which Rite Aid took no action, while pharmacists continued the unlawful dispensing of prescriptions at Rite Aid Stores.

66.     When the Regulatory Affairs analyst actually did review the ticket, the analyst was supposed to consider: (1) Rite Aid's dispensing data for the prescriber; (2) information about the prescriber, including whether the prescriber had a valid DEA registration number and any history of disciplinary action; (3) internet research on the prescriber and the prescriber's office; and (4) in and after December 2013, dispensing data that Rite Aid purchased from a commercial entity comprising approximately ninety percent of all retail pharmacies in the country.

67.     If the Regulatory Affairs analyst felt that the ticket should be elevated, it went to the supervisor, Janet Hart, Director of Government Affairs, who could: (1) unilaterally end the review, (2) direct the analyst to re-run the dispensing data in six months, or (3) present the file to a three-person committee of Rite Aid employees (the Review Committee), which included Hart, to determine what, if any, course of action to take on that prescriber.

68.     Through its review of these tickets, Rite Aid's Regulatory Affairs Department and, in turn, Defendants knew, or should have known, that Rite Aid's pharmacies were filling suspicious and unlawful prescriptions for controlled substances, including prescriptions for the Trinity and other dangerous drug combinations, prescriptions for excessively high doses, and multiple prescriptions for controlled substances from the same, suspect prescribers.

69.     However, according to confidential witnesses and the DOJ Complaint, Rite Aid failed to comply with its own internal policies and procedures. According to the DOJ Complaint, the Regulatory Affairs Department repeatedly ignored thousands of tickets documenting suspicious controlled substance prescriptions constituting clear "red flags" that Rite Aid was engaging in the distribution of illegal controlled substances. Documentary evidence cited in the DOJ Complaint corroborates the CWs accounts. Indeed, according to the DOJ Complaint, many of the tickets were simply closed out with no follow-up action. And even when the Regulatory Affairs Department did follow up on a ticket, it dismissed the red flag with a generic instruction to use "sound professional judgment."

70.     Moreover, according to the DOJ Complaint which covered a period spanning May 1, 2014 through June 10, 2019, the Review Committee hardly met, and when it did, it rarely decided to block its stores from filling prescriptions written by suspicious prescribers. In fact, Rite Aid instituted prescriber blocks in only a small fraction of cases. According to the DOJ, as of 2015, Rite Aid blocked less than four percent of the over 3,300 flagged prescribers' review files and less than three percent of over 4,600 flagged prescriber files as of 2017.

71.     The DOJ uncovered the below examples where Rite Aid's Regulatory Affairs Department ignored warnings from Rite Aid's pharmacists about specific prescribers who appeared to be unlawfully prescribing controlled substances:

        a.  An Ohio pharmacist submitted a ticket reporting that prescriber J.H., a sports medicine practitioner, had prescribed suboxone, a controlled substance with risk of abuse that is approved solely to treat opioid use disorder and would not typically be prescribed by a sports medicine clinic. The GAD responded that the RAC's "only purpose" was to identify risky "trends in prescribing habits" that put the DEA registration of Rite Aid stores and McKesson's warehouses at risk, that the RAC does not "advise on isolated situations [or] investigate fraudulent prescriptions or stolen prescription pads."

28

b. A pharmacy manager in Pennsylvania filed multiple tickets, including a May 2014 ticket reporting seven prescribers who issued prescriptions solely for suboxone and clonazepam, which patients travelled 27 miles from Philadelphia to Bristol, PA to fill. This prescriber also received generic responses, yet they continued to file tickets on up to eleven different prescribers. The pharmacy manager reported that the District Manager and Regional Vice President for their store instructed that all prescriptions were required to be filled unless Rite Aid performed a corporate block on the prescriber, and the only instance in which they were not required to fill a prescription was if a customer had traveled a long distance.

c. Another Pennsylvania pharmacist submitted a ticket reporting Prescriber J.R. because (a) the prescriber could not be reached by phone to verify the prescriptions, (b) patients paid for the prescriptions in cash, and (c) the handwriting on the prescriptions varied greatly, suggesting forgery. A GAD analyst responded that "the Company" was aware of J.R.'s prescriptions and provided no guidance to the pharmacist to indicate the prescriptions should not be filled. The same pharmacist submitted more tickets with respect to three other prescribers for issuing prescriptions for high volumes of oxycodone and methadone, but ceased reporting when they received no response.

d. A Maryland pharmacist submitted a ticket on Prescriber V.O. and received an initial response from Rite Aid indicating that prior reviews of prescribing data did not support action from the corporate level. When the data was actually reviewed the next day, Rite Aid found that V.O. had (a) prescribed Trinity medications to numerous patients; (b) prescribed similar substances to family members; and (c) been recently reprimanded and prohibited from practicing pain management by a state authority. Based on the above, Rite Aid's GAD concluded that the data did *not* show "a definite pattern of suspicious prescribing habits" though "it does seem to be trending in that direction."

72.     Moreover, The DOJ uncovered the below examples of Rite Aid's Regulatory Affairs Department's failure to act at all in response to warnings from pharmacists about specific prescribers, resulting in Rite Aid pharmacists continuing to fill suspicious prescriptions:

**Prescriber C.H. (Pennsylvania):**

•   As early as 2015, Rite Aid pharmacists repeatedly warned Rite Aid's Regulatory Affairs Department about prescriptions written by Prescriber C.H. A Rite Aid Regulatory Affairs analyst reviewed C.H.'s prescribing habits five times between September 2014 and

October 2016. Throughout this time period, Rite Aid continued to fill unlawful prescriptions written by C.H.

- In September 2014, Rite Aid's Regulatory Affairs Department reviewed for at least the second time the prescribing habits of C.H. and his prescription fills at Rite Aid Stores, identifying multiple patients who had received prescriptions of Trinity medications and families of patients who were prescribed the same or similar controlled substances. Rite Aid performed another such prescriber review in December 2014 and again identified Trinity prescriptions and family members who received the same or similar controlled substances. Despite these reviews of C.H.'s prescribing habits, the Review Committee closed its file on C.H. in February 2015 without written explanation by affixing a sticky note to the hard copy file that said "Close, No Action."

- In May 2015, a Rite Aid pharmacist complained that C.H. prescribed fentanyl patches for patients where such patches "are not recommended" and prescribed daily dosages of oxycodone that "exceeded manufacturer limitations." Rite Aid's Regulatory Affairs analyst responded the next day that there was not "sufficient data to support action from the corporate level."  One month later, in June 2015, a Rite Aid pharmacist in Delaware complained to Rite Aid that the pharmacy had received prescriptions from C.H. for "oxycodone 15mg, large quantities," despite C.H. practicing in Pennsylvania. In September 2015, yet another Rite Aid pharmacist submitted a ticket about C.H., complaining to Rite Aid's Regulatory Affairs Department that there was "more and more suspicious activity from this doctor," including patients with insurance seeking to pay cash for prescriptions to avoid auto-rejection for early fills. Approximately two weeks later, also in September 2015, a separate Rite Aid pharmacist complained to Rite Aid that C.H. tended

to prescribe patients multiple prescriptions for oxycodone of different strengths simultaneously.

- Rite Aid's Regulatory Affairs Department continued to review C.H.'s prescribing habits after receiving each of these pharmacist tickets. As with the earlier reviews, Rite Aid's Regulatory Affairs analyst performed a review in June 2015 and identified patients receiving prescriptions for Trinity medications and family members receiving prescriptions for the same or similar controlled substances. Two more reviews with similar findings occurred in 2016. After each of these reviews, Rite Aid continued to fill C.H.'s opioid prescriptions.

### Prescriber G.N. (Pennsylvania)

- At least as early as April 2015, Rite Aid pharmacists repeatedly warned Rite Aid's Regulatory Affairs Department about the prescribing habits of Prescriber G.N. in Philadelphia, Pennsylvania. Rite Aid's Regulatory Affairs Department received at least four tickets about G.N. and completed at least two reviews of G.N.'s prescribing habits. Nevertheless, Rite Aid continued to fill unlawful prescriptions written by G.N.

- In April 2015, a Rite Aid pharmacist warned that G.N. prescribed zolpidem, alprazolam, cyclobenzaprine, oxycodone 30 milligrams, and hydrocodone 7.5/325 milligrams, to the same patient in the same visit. The pharmacist also warned that G.N. instructed patients to take their oxycodone prescriptions and hydrocodone prescriptions to different pharmacies to get them filled. Shortly thereafter, another Rite Aid pharmacist warned Rite Aid in a ticket that G.N. prescribed the same unnecessary opioids to patients, writing that G.N.'s prescriptions were for the "same drug cocktails for all patients," who "do not seem to be in overt pain and many are able-bodied young men. MD office is known well to be a pill mill.

31

Please look into this MD." Nonetheless, Rite Aid's Regulatory Affairs analyst responded less than an hour later that corporate had already reviewed G.N. and the data "did not seem to indicate a significant contribution to the abuse and diversion of controlled substances that warrants action from the corporate level."

- That internal data, however, actually revealed that: (1) almost thirty percent of G.N.'s prescriptions filled by Rite Aid Stores were for schedule II controlled substances; (2) G.N. prescribed Trinity medications to at least five patients in the past six months; and (3) G.N. prescribed similar controlled substances to family members. Still, after receiving another ticket in December 2016, Rite Aid's Regulatory Affairs team requested that another staff member delete "unacceptable" comments added by pharmacy staff about G.N. in Rite Aid's dispensing software, including "HIS PT'S FILLS SAME…," "DO NOT FILL," and "FAKE CONTROLS."

## **Prescriber A.D. (Connecticut)**

- Beginning as early as February 2015, Rite Aid pharmacists warned Rite Aid's Regulatory Affairs Department about the prescribing habits of A.D., an advanced practice registered nurse in Connecticut. For example, a pharmacist questioned the legitimacy and necessity of her prescriptions, providing an example of a patient who had a prescription for high dosages of fentanyl tablets for a sore ankle, but who walked away quickly with no pain. The pharmacists warned that this was a "[v]ery suspicious practice that prescribes quantities above normal protocols." From February 2015 through September 2016 alone, Rite Aid's Regulatory Affairs Department analyzed A.D.'s prescribing habits four times, the first of which revealed that seventy-six percent of prescriptions filled by Rite Aid Stores were for schedule II-controlled substances. All of those internal reviews showed that A.D.

prescribed Trinity medications to patients and, often, similar controlled substances to family members.

### Prescriber William Bauer (Ohio)

- As early as 2015, Rite Aid pharmacists warned Rite Aid's Regulatory Affairs Department in tickets about the prescribing habits of William Bauer, a neurologist in Ohio. These pharmacists repeatedly questioned the legitimacy and necessity of the prescriptions presented at their stores by Bauer's patients, and yet Rite Aid continued to fill his prescriptions until April 2019, shortly before a federal indictment in August 2019. For example, in May 2018, a pharmacist warned Rite Aid Regulatory Affairs that Bauer "writes a lot of control medications for patients, with several patients on multiple pain meds." In September 2018, another pharmacist warned that Bauer's practice had been "prescribing large quantity of opioids with similar diagnosis codes" and that "the number of patients that are on opioids for this diagnosis and the quantity being prescribed make me believe this office is relying too much on opioids for treatment." Janet Hart responded to that ticket that she would review the prescriber, but that she was "[c]losing the ticket."

- Yet, with the benefit of this data, Rite Aid continued to dispense controlled substances, including oxycodone, opioid combinations, fentanyl, and for oxycodone in multiple strengths, pursuant to unlawful prescriptions written by C.H., G.N., A.D., and William Bauer. Each time, where applicable, Rite Aid sought reimbursement by submitting claims to Federal Healthcare Programs for patients with government health insurance.

### 3. Rite Aid Tracked Internal Metrics Demonstrating the Company Was Engaged in the Illegal Distribution of Controlled Substances

73.     Rite Aid's Regulatory Affairs Department, including supervisor Janet Hart and Chief Pharmacy Officer Karen Staniforth, knew or recklessly disregarded internal data tracking which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which stores filled them. According to the DOJ Complaint, at least as early as September 2015, Rite Aid was tracking data showing the top ten Rite Aid stores by total units dispensed of oxycodone 30 milligrams in each state where it operated.

74.     For example, documentary evidence cited by the DOJ showed that Pennsylvania Store 01956 had the second highest total units of oxycodone 30 milligrams dispensed in the state, and Pennsylvania Store 03637 had the fourth highest total units dispensed in the entire state. Naturally, pharmacists at these stores submitted numerous tickets to Rite Aid about suspicious prescribers and prescriptions, including for oxycodone, which were largely ignored by Rite Aid's Regulatory Affairs Department.

75.     According to the DOJ Complaint, by May 2016, a Rite Aid Regulatory Affairs analyst discussed with the Store's District Manager "concerns identified in [Store] 1956's prescription filling practices," after reviews showed that it was filling the highest percentage of a prescriber's amphetamine prescriptions, despite the fact that other Rite Aid pharmacies were located much closer to the prescriber's office. The Rite Aid Regulatory Affairs analyst considered these to be "[r]ed flags" and stressed that those "should be playing a part in" the Store's decision to fill prescriptions. And yet, Rite Aid did not block the prescriber, alert its pharmacists to these prescribing practices, or apply additional scrutiny to prescriptions written by this prescriber. Rather, Rite Aid continued to fill the prescriptions.

76.     Rite Aid's internal data, together with the pharmacist tickets and hard copy prescription records showed that Rite Aid knew it had filled unlawful prescriptions for opioids and other controlled substances.

### 4.   Rite Aid's Controlled Substances Distributor, McKesson, Warned Defendants of at Least 14 Pharmacies Dispensing Suspicious Prescriptions

77.     According to the DOJ Complaint, Rite Aid's controlled substance distributor, McKesson, raised concerns to Rite Aid relating to the large volume of prescriptions Rite Aid's pharmacies were filling for frequently abused drugs, like oxycodone 30 milligrams.  In fact, in November 2016, McKesson met with Ride Aid to discuss these concerning trends. During that meeting, McKesson identified at least fourteen "outlier" stores for controlled substances and concerning drug purchase trends, including one store in particular, Pennsylvania Store 03637—the same store the DOJ cited as filling an excessive number of illicit prescriptions and that was flagged as suspicious by numerous pharmacists (Section V.A.3.c.3, *supra*).  According to the DOJ Complaint, after McKesson raised its concerns with Rite Aid, McKesson noted internally in its files that it would continue daily monitoring of those stores as Rite Aid's response was "reactive" rather than "proactive."

78.     In a follow up meeting in December 2016, McKesson again noted that Store 03637 in Pennsylvania was the "top purchaser of oxycodone and it has the highest ratio of oxycodone to total [prescriptions] when compared to all other Rite Aid stores." Rite Aid's excuse for ignoring these red flags was that the store had "experienced serious challenges with thresholds" and its pharmacy operated 24 hours a day.

79.     In 2017, when McKesson again reached out to Rite Aid's Regulatory Affairs Department about Store 03637's dispensing of oxycodone, employees in Rite Aid's Regulatory Affairs Department wrote internally that, "Store 03637's oxycodone dispensing was indeed

trending upwards and that, compared to other stores in the same zip code, it "far outpace[d] all other stores in terms of oxycodone script count, percentage of oxycodone scripts to total and oxycodone unit volume." Notwithstanding its acknowledgement of these troubling metrics, Rite Aid simply advised a supervisor overseeing the store to remind the pharmacists to follow the High Alert Review Process.

80.    According to the DOJ Complaint, in December 2017, Janet Hart admitted to Rite Aid senior management that Rite Aid could leverage existing tools "to identify outlier prescribers," but her excuse to Rite Aid senior management for not doing it was that "there is not enough time to dive into the data."

81.    McKesson's warnings, together with Rite Aid's internal acknowledgement and admissions, further demonstrate that Rite Aid knew it was perpetually filling unlawful prescriptions for opioids and other controlled substances.

          **d.    Defendants Try to Cover up Rite Aid's Improper Dispensing of Prescription Drugs by Instructing the Third-Party Relations Group to Delete Notes Flagging Suspicious Prescribers**

82.    According to the DOJ Complaint, on multiple occasions, the Regulatory Affairs Department admonished pharmacists for raising red flags in the first place. Specifically, on multiple occasions, the Regulatory Affairs Department's internal research in response to tickets revealed that pharmacists had already flagged the suspect prescriber profiles in the Company's dispensing software (including its NextGen prescribing system), thus confirming that the prescriber and/or prescriptions were likely problematic. In response, the Regulatory Affairs Department admonished the pharmacists for writing "unacceptable" notes in the Company's dispensing software.

83.     For example, on March 19, 2015, a Rite Aid Regulatory Affairs analyst admonished a Rite Aid pharmacist via email for a note that the pharmacist had added to a profile for a prescriber with the initials M.L. that stated, "this may be a cash only pill mill??? verify and notate." The Regulatory Affairs analyst stated that the note would be removed, and that the pharmacist should "remember to always be very cautious of what is put in writing, whether it be in an e-mail, RACS ticket, note on a patient or prescriber file, or any other written form. There is no process in place to review these notes, but we will remove them when encountered."

84.     In another email dated October 2, 2015 sent in response to a ticket that complained about prescriber A.O. writing a high number of prescriptions for oxycodone and prescribing for out-of-state patients (both red flags recognized by Rite Aid), the same Regulatory Affairs analyst stated "[w]e do not routinely monitor notes but we do have a responsibility to remove them if discovered during the review process." The analyst went on to state that the only reason a ticket should be submitted is "to help identify trends in prescribing habits that may indicate a prescriber is making a significant contribution to the abuse and/or diversion of controlled substances that puts the DEA Registrations of our stores and McKesson's warehouses at risk."

85.     Rite Aid had a specific department known as the Third Party Industry Relations Group that was authorized to delete information from prescriber profiles at the direction of Regulatory Affairs. Beginning in January 2016, the same Rite Aid Regulatory Affairs analyst instructed the Third Party Industry Relations group to monitor prescriber notes on a monthly basis. The Third Party Industry Relations employee then ran a report every week to monitor notes added to prescriber files and provided them to Regulatory Affairs for review and, presumably, to ensure notes with "red flags" were deleted.

86.     According to the DOJ Complaint, the same Regulatory Affairs analyst ordered an employee to delete pharmacists' notes from a March 28, 2016 note indicating that New York prescriber M.T. was "writing excessive dose[s] for oxycodone." Likewise, on May 12, 2016, Rite Aid Regulatory Affairs analyst directed the removal of notes from Prescriber V.O.'s profile stating, "DO NOT FILL CONTROLS," "md under investigation," and "Corporate monitoring this D.R. Possible suspicious activity." The analyst's email states that notes also were removed from the prescriber profile on October 20, 2015, and that Rite Aid had been monitoring this prescriber "since 2013 . . . ." Despite numerous pharmacist notes warning of suspicious prescriptions and over-prescribing controlled substances, Rite Aid Regulatory Affairs analysts simply deleted the notes and district managers were directed to tell their employees "to be mindful of everything that is put in writing . . . ."

       **e.   Throughout the Class Period, Defendants Knowingly Conceal Evidence Demonstrating Rite Aid's Significant Legal and Regulatory Exposure as a Result of Systemic Unlawful Dispensing of Controlled Substances**

       **1.   Rite Aid's Dispensing Practices Violated Federal and State Law**

87.     Rite Aid's conduct in dispensing controlled substances in excess of medical necessity was contra to many governing state and federal laws, including the non-exclusive examples included in the Table below:

**Table 1**

| State | Code | Relevant Language |
|---|---|---|
| Connecticut | CONN. GEN. STAT. ANN. § 21a-249(f) | "prescriptions for controlled substances shall comply fully with any additional requirements of the federal food and drug laws, [and] the federal Controlled Substances Act . . . ." |
| Delaware | 24 DEL. ADMIN. CODE § 4.1.1.1-2. | prescriptions for controlled substances be issued only by practitioners who are authorized to do so by the jurisdiction in which they practice and are registered or exempt from |

| | | |
|---|---|---|
| | | registration in Delaware. All prescriptions for controlled substances "must be issued for a legitimate medical purpose by practitioner acting in the usual course of their professional practice." § 4.2.1 |
| Maryland | MD. CODE ANN., HEALTH-GEN. § 21-220 | Prescription is defined as "an order by a prescriber, or a prescriber's order transferred from one pharmacist to another, for Program covered pharmacy services in accordance with applicable federal and State laws. The prescription must be deemed valid in the professional judgment of the pharmacist filling the prescription. Id. § 10.34.20.02(A). |
| Michigan | MICH. COMP. LAWS ANN. § 333.7333(1) | It is required that practitioners prescribe controlled substances in "good faith," which is defined as "in the regular course of professional treatment to or for an individual who is under treatment by the practitioner for a pathology or condition other than that individual's physical or psychological dependence on or addiction to a controlled substance . . . ." |
| New Hampshire | N.H. REV. STAT. ANN. § 318-B:1(XXVIII) | A prescription is as "an oral, written, or facsimile or electronically transmitted order for any controlled drug or preparation issued by a licensed practitioner to be compounded and dispensed by a pharmacist and delivered to a patient for a medicinal or therapeutic purpose arising from a practitioner-patient relationship." |
| New Jersey | N.J. ADMIN. CODE § 13:35-7.2(a) | "[a] practitioner, acting within the scope of lawful practice and after an examination or evaluation of the patient's condition, may issue a written prescription for a drug to a patient . . . ." |
| Ohio | OHIO REV. CODE ANN. § 3719.06(A)(1) | To qualify as a "valid prescription" in Ohio, the prescription for a controlled substance must be made by "[a] licensed health professional authorized to prescribe drugs, if acting in the course of professional practice, in accordance with the laws regulating the professional's practice, and in accordance with the rules adopted by the state board of pharmacy . . . ." "A prescription, to be valid, must be issued for a legitimate medical purpose by an individual prescriber acting in the usual course of the prescriber's professional practice." OHIO ADMIN. CODE 4729-5-30 (rescinded) (current version at OHIO ADMIN. CODE 4729:5-5-15(A)). |
| Pennsylvania | PA. STAT. AND CONS. STAT. § 780-111(d) | "[a] practitioner may prescribe, administer, or dispense a controlled substance or other drug or device only (i) in good faith in the course of his professional practice, (ii) within the scope of the patient relationship, and (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession." |

| Virginia | VA. CODE ANN. § 54.1-3303(A)-(C) | A "valid prescription" may be issued only by a prescriber who is authorized to prescribe controlled substances. The prescriber must have a bona fide practitioner-patient relationship. § 3303(B). "A prescription shall only be issued for a medicinal or therapeutic purpose in the usual course of treatment or for authorized research. A prescription not issued in the usual course of treatment or for authorized research is not a valid prescription." § 3303(C). |
|---|---|---|
| **Federal Law** | | |
| False Claims Act | 31 U.S.C. §§ 3729- 3733 | Any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States Government for damages and penalties. 31 U.S.C. § 3729 (a)(1)(A)-(B). |
| Controlled Substances Act | 21 U.S.C. §§ 801- 971 | It is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. 21 U.S.C. § 841(a)(1). |
| Drug Enforcement Administration, Prescriptions | 21 C.F.R. §§ 1306.01- 1306.27 | A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act ( 21 U.S.C. 829 ) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances. 21 C.F.R. § 1306.04(a). |
| Medicare Program, Voluntary Prescriptions, Application Procedures and Contracts with Part D Plan Sponsors | 42 C.F.R. §§ 423.500- 423.520 | All subcontracts between Part D Plan Sponsors and downstream entities must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. § 423.505(i)(4)(iv); As a condition for receiving a monthly payment . . . the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers . . . must request payment under the contract on a document that certifies (based on best |

| | | knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment…. § 423.505(k)(1), (k)(3); |
|---|---|---|
| Medicare - Voluntary Prescription Drug Benefit Program | 42 U.S.C. §§ 1395w-101-104. | Medicare only covers drugs for medically accepted indications. 42 U.S.C. §1395w-102(e)(1), (e)(4). Prescriptions for controlled substances that are not issued for legitimate medical purposes are not for "medically accepted indications" and are therefore not covered by Medicare Part D. *Id.* Similarly, Medicare only covers drugs dispensed pursuant to "valid" prescriptions, which comply "with all applicable state law requirements." 42 C.F.R. §423.100. |
| Medicaid | 42 U.S.C. § 1396 | Medicaid coverage extends only to "prescribed drugs," and thus does not include drugs dispensed pursuant to invalid prescriptions. 42 U.S.C. § 1396d(a)(12) |
| TRICARE (formerly, "CHAMPUS") | 32 C.F.R. § 199.9(a)(4); § 199.4(e)(11) | All pharmacies that provide services to TRICARE beneficiaries are required to comply with TRICARE's program requirements, including its anti-abuse provisions. 32 C.F.R.§ 199.9(a)(4). TRICARE will pay only "for medically necessary prescription drugs required in the treatment of an illness or injury…" 32 C.F.R. § 199.4(a)(1)(i). Benefits "cannot be authorized to support or maintain an existing or potential drug abuse situation whether or not the drugs (under other circumstances) are eligible for benefit consideration and whether or not obtained by legal means." 32 C.F.R. § 199.4(a)(1)(i). |

88.    As demonstrated above, Rite Aid violated the Controlled Substances Act ("CSA"), codified at 21 U.S.C. 801-971, which makes it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. 21 U.S.C. § 841(a)(1). Dispensing controlled substances requires registration with the U.S. Drug Enforcement Administration ("DEA"), which further provides that a prescription (written or oral) is legally valid under the CSA only if issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). However, Rite Aid regularly filled prescriptions that were not legally valid under these laws.

89.     Rite Aid's conduct was further unlawful with respect to prescriptions filled for beneficiaries of government insurance programs, which have strict compliance requirements. Significantly, approximately half of prescriptions filled by Rite Aid pharmacies were covered by government insurance programs. In 2022, for example, 38.2% of Rite Aid's prescription pharmacy sales were covered by Medicare Part D and 18.2% were covered by Medicaid and Medicaid-managed plans. Medicare only covers drugs for medically accepted indications. 42 U.S.C. §1395w-102(e)(1), (e)(4). Prescriptions for controlled substances that are not issued for legitimate medical purposes are not for "medically accepted indications" and are therefore not covered by Medicare Part D. *Id.* Similarly, Medicare only covers drugs dispensed pursuant to "valid" prescriptions, which comply "with all applicable state law requirements." 42 C.F.R. §423.100.

90.     Many states further required Rite Aid to affirmatively certify compliance with applicable law as a condition for reimbursement of individual claims. Thus, Rite Aid's systematic dispensation of controlled substances pursuant to suspect prescriptions violated numerous state laws. Accordingly, Rite Aid's compliance certifications for Medicaid participation and reimbursement were false and violative of the False Claims Act.

91.     In response to these Rite Aid's violations, state and federal governments began investigations and, starting in 2012, Rite Aid was named as a Defendant in multiple lawsuits.

### 2. Rite Aid Faces Multiple Lawsuits and Regulatory Actions Relating to Its Unlawful Dispensing of Opioid Prescriptions Beginning as Early as 2012

92.     Federal and State agencies have been investigating Rite Aid's dispensing practices for over a decade. As early as April 2012, the DEA sent Rite Aid an administrative subpoena requesting information about sales of pseudoephedrine products. Likewise in 2012, the U.S. Attorney's Office for the Northern District of New York issued a subpoena to Rite Aid in connection with investigation of possible civil violations of the Combat Methamphetamine

Epidemic Act of 2005. In June 2013, U.S. Attorney's Office for the Eastern District of California

served Rite Aid a Civil Investigative Demand ("CID") regarding the Company's drug utilization

review process and dispensing of drugs categorized as "Code 1" by the State of California. By its

own admission in its SEC filings, the Company cooperated with the investigations, researched the

government's allegations, and produced documents including prescription files related to Code 1

drugs.

93.     Shortly before the Class Period began, the United States government made clear

that it considered the opioid crisis a critical priority. On October 26, 2017, then-President Trump

and Eric Hargan, acting Secretary of the Department of Health and Human Services, declared the

opioid crisis a "public health emergency." The federal budget allocated to combatting the opioid

crisis reflected the increased attention, with federal funding to address the epidemic nearly tripling

between 2017 and 2020, by one estimate.

94.     Also in 2017, Rite Aid was named a Defendant in the multi-district litigation

("MDL"), *In re National Prescription Opiate Litigation* (Case No. 17-md-2804), in the Northern

District of Ohio. Two of the consolidated cases in the MDL were designated "bellwether cases"

and set for trial. On May 25, 2018, Rite Aid filed a motion to dismiss the complaints in the

bellwether cases, after which the cases proceeded to active discovery. Rite Aid described the

discovery requests as "intensive" and "involving the production of documents and participating in

the depositions of several key individuals." Rite Aid admitted in a 10-Q filed with the SEC on

October 6, 2020, and subsequently thereafter, that *more than a thousand* federal opioid-related

lawsuits named Rite Aid or a related entity as a defendant and those lawsuits were consolidated

and transferred to the multi-district litigation *In re National Prescription Opiate Litigation* (Case

No. 17-MD-2804).

95.     The DOJ, Attorneys General of several states and the federal government disseminated subpoenas, civil investigative demands, and other requests regarding opioids and other controlled substances during the same period. Rite Aid admitted in its 10-K for the fiscal year ended February 29, 2020, which was filed with the SEC on April 27, 2020, and subsequently thereafter, that it was "cooperating with and responding to these investigatory inquiries."

96.     Recognizing that the Company faced significant danger in connection with opioid litigation, at the October 30, 2018 annual meeting of Rite Aid shareholders, Rite Aid shareholders voted to require the independent directors of Rite Aid's Board to disclose in a report to be provided to investors by October 1, 2019, what governance measures they had taken since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis. The proposal that the shareholders approved was sponsored by the UAW Retiree Medical Benefits Trust and stated as the basis for the proposal:

> Rite Aid is the fourth largest retail pharmacy in the U.S. market with almost half of its total revenues attributed to drug prescriptions, according to its most recent 10-K. The Company is facing significant legal scrutiny over its legal obligation to report to federal authorities suspicious spikes in sales of opioids. Rite Aid is a defendant in the Ohio multidistrict opioid litigation. Additionally, a lawsuit by several municipalities in West Virginia alleging that Rite Aid's inadequate oversight of its distribution of opioids contributed to the epidemic in that state was moved to federal court in April 2018. The company faces similar lawsuits in Tennessee and South Carolina, according to its most recent annual report.

97.     By virtue of their cooperation with government investigations and the accounting that Rite Aid shareholders expressly demanded, Defendants knew, or should have known, the extent of Rite Aid's improper distribution of controlled substances throughout the Class Period and the significant liability likely to arise therefrom.

**3. In Connection with Investigations and Lawsuits, Defendants Actively Collect, but Continue to Conceal from Investors, Large Quantities of Highly Incriminating Documentation Evidencing Rite Aid's Participation in the Opioid Crisis**

98.     Rite Aid, by its own admission, cooperated with the federal government's investigations into the Company's dispensing of controlled substances and produced relevant documentation for the government in connection thereto. The DOJ Complaint included this evidence, thereby revealing that Rite Aid held documentary evidence in its possession showing it was filling illegal prescriptions for controlled substances. Beyond simply withholding the evidence, Defendants had specifically reviewed and compiled it in response to government subpoenas and requests for information. The DOJ Complaint specifically revealed the following documentary evidence, which Rite Aid had in its possession and provided to the DOJ prior to the Class Period:

      a.  On a set of February 8, 2017 prescriptions, a Rite Aid pharmacist included express, handwritten notes indicating that the prescription constituted the Trinity;

      b.  Rite Aid documented evidence that Prescriber Gary Frantz issued prescriptions to patient C.F. for oxycodone 30 mg tablets, 780 tablets, 78 per day. The filling pharmacist indicated in handwriting on the hard copy prescription that he gave C.F. 372 tablets because it was "all [he] had;"

      c.  Rite Aid had hard copy prescriptions saved proving that Rite Aid pharmacies continued to fill opioid prescriptions written by Frantz for C.F.;

      d.  Rite Aid also filled unlawful prescriptions issued by Prescriber William Bauer, which included prescriptions for excessive quantities of controlled substances that Bauer wrote for patient J.S. for more than eleven years. This was far in excess of any medically necessary amount, as well as Rite Aid's red flag of twelve consecutive weeks.

99.     As explained in Section V.A.3.b. *supra*, both Frantz and Bauer, heavy prescribers of illegal controlled substances, were indicted in August 2019—Frantz pled guilty, and Bauer was convicted and sentenced to five years in prison.

> **f.  Peer Pharmacies Begin Announcing Opioid Settlements, Revealing the Extent of Substantial Damages Sought in Opioid Litigation Involving Retail Pharmacies Like Rite Aid**

100.   In March of 2022, CVS announced that it had reached a $484 million settlement with the state of Florida related to opioid prescriptions at its pharmacies. News of the settlement was widely reported and offered the first inkling into the amounts of damages plaintiffs and attorneys general were seeking and could realistically obtain from retail pharmacies like Rite Aid in opioid actions. In the ensuing months, large retail pharmacies continued to announce public settlements in connection with opioid actions around the country. For example, on November 2, 2022, CVS and Walgreens agreed to pay $5 billion each, totaling over $10 billion to settle lawsuits nationwide relating to prescription opioids.

101.   These historic settlements were indicative of the exposure all pharmacies that had prescribed significant amounts of opioids—like Rite Aid—had to opioid litigation. Rite Aid was in a similar position to CVS with respect to liability for dispensing opioids because both were amongst the top 10 largest distributors of opioids in the United States between 2006 and 2012, with Rite Aid prescribing over 1.3 billion opioid pills in this period alone.

102.   Unlike CVS and Walgreens, however, Rite Aid had an enormous debt burden and concerning leverage ratio, as discussed V.A.2.a, *supra*. Moreover, Rite Aid's earnings were barely sufficing to cover its current interest expense and capital expense. Thus, whereas competitor chains may have been positioned to pay off a significant judgment overtime, a significant settlement or judgment—even if a payment plan were implemented—posed a potentially existential threat to Rite Aid's viability.

103.   Indeed, once the news of the CVS settlement was public, Rite Aid could no longer fully deny that the damages sought in the opioid litigation in which it was a named Defendant were similarly substantial. Accordingly, in Rite Aid's first subsequent filing with the SEC, the 2022 10-

K, filed on April 25, 2022, Rite Aid adjusted its risk disclosures to include that substantial damages were sought in connection with opioid litigation. Specifically, in that and subsequent filings, Rite Aid added the following language with respect to the opioid litigation: "Substantial damages are sought from the Company in virtually all of these matters." Rite Aid had previously included this precise language in its filings in connection with other categories of liabilities but had conspicuously and misleadingly excluded it in connection with opioid litigation.

> **g.  The DOJ Intervenes in Opioid Multi-District Litigation, Revealing the Scope and Extent of Rite Aid's Illegal Dispensing of Opioids**

104.    In October 2019, a qui tam complaint was filed by three former Rite Aid employees in the Northern District of Ohio. The Complaint was filed under seal and alleged violations of federal and state false claims acts related to the dispensing of controlled substances, namely opioids.[16]

105.    Based on the facts collected from Rite Aid during the DOJ's investigation, on March 13, 2023, the DOJ intervened in the multi-district litigation in Ohio and filed an unsealed complaint against Rite Aid and certain subsidiary entities alleging that Rite Aid failed to implement effective controls to prevent illegal and improper dispending of opioids, or to otherwise detect diversion and abuse of controlled substances and committed violations of the Controlled Substances Act and the False Claims Act in connection with Rite Aid's systematic dispensing of controlled substances.

106.    The DOJ filed a press release on March 13, 2023, announcing its intervention against Rite Aid, stating in pertinent part: "[w]e allege that Rite Aid *filled hundreds of thousands of prescriptions* that did not meet legal requirements. According to our complaint, Rite Aid's

---

[16] The qui tam complaint was amended in January 2020 and again in January 2021.

pharmacists repeatedly filled prescriptions for controlled substances with obvious red flags, and Rite Aid intentionally deleted internal notes about suspicious prescribers. These practices opened the floodgates for millions of opioid pills and other controlled substances to flow illegally out of Rite Aid's stores." Just three days prior, Paul D. Gilbert, who was named the Chief Legal Officer and assumed all leadership over the Company's legal efforts in 2022, had resigned.

107.    The DOJ Complaint revealed that from at least May 1, 2014, to June 10, 2019, Rite Aid filled at least hundreds of thousands of illegal prescriptions for controlled substances. Rite Aid filled these prescriptions knowing or, at the least, recklessly ignoring that these controlled substances were medically unnecessary and illegal because the prescriptions (1) had red flags, often multiple ones, that Rite Aid had identified internally as indicating a prescription was unlawful and that pharmacists knew from training and experience were highly indicative of abuse; and (2) were frequently issued by prescribers who, based on information provided by Rite Aid, operated in a manner indicating unlawful prescribing. Even Rite Aid's distributor, McKesson, raised concerns relating to the large volume of prescriptions of frequently abused drugs, like opioids, that were filled by Rite Aid Stores.

108.    Crucially, the DOJ Complaint exposed that Defendants had knowledge of the above and of the likely resulting liability throughout the Class Period, but actively concealed it from investors. Specifically, the DOJ Complaint revealed that Rite Aid pharmacists filled prescriptions for controlled substances routinely and pervasively without regard for obvious red flags. Instead of taking corrective action, Rite Aid's Regulatory Affairs Department deleted notes written by pharmacists about suspicious prescribers. Defendants knew all of this through Staniforth and Hart who oversaw the Regulatory Affairs Department (which was responsible for ensuring Rite Aid's compliance with federal and state laws) and reported to Defendants.

109. Further, the DOJ Complaint revealed that Defendants knew through Rite Aid's own internal data which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which Rite Aid stores filled them, yet Defendants did nothing to prevent the unlawful prescribing. Moreover, Rite Aid actively submitted false claims data and made false certifications and false attestations that were material to the reimbursement of fraudulent claims for prescription drugs that were not medically indicated, lacked medical necessity, and/or were not authorized by valid prescriptions and, consequently, were not eligible for reimbursement.

110. The DOJ Complaint sought treble damages under the False Claims Act alleging that Rite Aid knowingly presented materially false or fraudulent claims for reimbursement and knowingly issued false records or statements. The DOJ sought damages and civil penalties under federal and state statutes for each allegedly false claim arising in relation to Medicaid, Medicare, Federal employee plans and Tricare, among other government programs. The Complaint also sought damages for knowingly dispensing controlled substances pursuant to prescriptions that were issued without a legitimate medical purpose and outside the usual course of professional practice in violation of 21 U.S.C. §§ 829(a), (b), and (c), and 842(a)(1); and 21 C.F.R. § 1306.04, as well as for unjust enrichment.

111. The lawsuit was widely reported. For example, Bloomberg reported on March 13, 2023, "[o]ver a five-year period starting in 2014, Rite Aid pharmacists filled hundreds of thousands of opioid prescriptions that weren't written for " 'a medically accepted indication' in violation of federal drug laws, federal prosecutors said Monday in a court filing." [17] Axios also reported on March 13, 2023, "The DOJ alleges that the prescriptions were filled despite clear 'red flags' that

---

[17] March 13, 2023, Bloomberg, "Rite Aid Must Face Justice Department's Opioid Allegations," https://www.bloomberg.com/news/articles/2023-03-13/rite-aid-corp-rad-must-face-justice-department-s-opioid-allegations (Last visited July 27, 2023).

indicated they were 'unlawful.' Prosecutors also accused the pharmacy chain of ignoring evidence about the matter from some of its pharmacists, its distributor, and its own internal data and of intentionally deleting internal notes about suspicious prescribers."[18]

### 4. Rite Aid Initiates "RxEvolution" Strategy to Offset Declining Prescriptions from Regulatory Scrutiny and to Reduce Its Debt Load

112.    Facing negative publicity for its role in the opioid crisis and an enormous debt load, Rite Aid pivoted in 2019, hiring new executives and announcing a large-scale turnaround plan it dubbed its "RxEvolution." Generating "script growth," or growth from dispensing prescription drugs, remained key, particularly because the Company could no longer depend on opioid prescriptions to boost numbers.

113.    In August 2019, Rite Aid announced that Heyward Donigan would head up the RxEvolution turnaround plan and replace John Standley as CEO, effective immediately. Other high-level executive positions were similarly replaced as part of a sweeping reset plan. Matt Schroeder replaced Darren Karst as CFO, and Bryan Everett assumed the Chief Operating Officer role from Kermit Crawford.

### a. Rite Aid Unveils its RxEvolution Plan with a Heavy Emphasis on Retail Pharmacy and Initiatives to Grow Scripts

114.    Rite Aid formally announced its RxEvolution plan during an Investor/Analyst Call on March 16, 2020. In the call, Defendant Donigan touted the plan's proposed changes, stating: "[t]o get this company really thriving, it is time for a radical change. This is our RxEvolution."  As outlined, the plan had three prongs: (1) growing Rite Aid's PBM, Elixir, into the dominant mid-market PBM; (2) shifting to a pharmacist-centric approach, wherein pharmacists would regularly

---

[18] March 13, 2023, Axios, "DOJ lawsuit accuses Rite Aid of unlawful opioid prescriptions," https://www.axios.com/2023/03/14/rite-aid-lawsuit-doj-opioids (Last visited July 27, 2023).

come out from behind the counter to engage with consumers and act as consumer advocates; and, most significantly, (3) growing retail. In particular, the plan aimed to appeal to a target consumer base of millennial and Gex-X women by creating an integrated and holistic pharmacy experience that offered direct contact with pharmacists and pushed "natural" and organic supplements and treatments in addition to traditional pharmaceuticals.

115.     Growing retail—and specifically, prescription scripts—was the key part of the RxEvolution plan. Retail pharmacy was, and continued to be, Rite Aid's primary lever for generating earnings. According to CW1, most of Rite Aid's revenue comes from the pharmacies, and the rest was just "secondary." Thus, growing scripts by adopting a "pharmacy-first approach", was, as Donigan described in the March 16, 2020 Analyst Day Call, the "key to Rite Aid's RxEvolution." Similarly, a June 24, 2021 article quotes Donigan as stating that "[g]oing forward, we're focused exclusively on our pharmacy." On the June 24, 2021 Earnings Call, Donigan brought the point home, stating: "[a]t the end of the day, what we've said, I think, repeatedly is we have to grow scripts. That is our #1 priority, is growing scripts. We can't shrink our way into this because we have fixed costs in our pharmacies that we have to maintain. So we have to grow scripts."

116.     The retail component of the RxEvolution plan unveiled on the March 16, 2020 Analyst Day Call had several components. First, the plan touted a transition to "Stores of the Future," which involved a complete remodel, "with a fresh, updated and inviting look and feel and feature curated health and wellness brands, products and services to meet our customers' personal, family, pet and caregiver needs." The goal for fiscal year 2021 was to introduce 75 Stores of the Future. Second, the plan sought to reposition pharmacists at the "front and center" and "as chief whole being health advocates" with the idea of imitating Apple's genius bar environment. Third,

the plan would include a telehealth initiative centered on "wellness rooms," which were supposed to be flexible, multipurpose spaces equipped with telemedicine capabilities to deliver remote care. Pharmacists were to engage with customers in the warm, inviting and pleasant environments of these wellness rooms to meet the needs of local communities.

117.    Also as part of its retail initiatives, the RxEvolution debuted a project the Company called "east meets west," which introduced a new product line up of "better for you" products that were natural, organic, clean, cruelty-free, fair trade and chemical-free. Rite Aid announced that by the end of fiscal year 2023, margin benefit from these products would be just shy of $100 million. "By investing in our expansion of a new assortment focused on health, beauty and better-for-you products and enhancing our assortment with a focus on healthier product attributes, we are building the foundation for executing our health and wellness strategy," which would result in "a continued positive trend in revenue and EBITDA growth."

118.    Ultimately, Rite Aid promised investors more than a just new logo, touting that "it's truly a transformation deep to our core, not a superficial one." Yet as it turned out, a new logo and new signage is as far as most Rite Aid stores got.

**b. Before Any Discernable Improvements are Made, Defendants Secretly Divert Resources Away from RxEvolution to Focus on the COVID-19 Pandemic**

119.    On March 11, 2020, coinciding nearly exactly with Rite Aid's announcement of its RxEvolution plan, the World Health Organization declared the COVID-19 outbreak a pandemic. In response, Rite Aid's RxEvolution efforts quietly stalled. Defendants began heavily diverting Company resources away from the RxEvolution projects and into COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. For example, CW1 and other members of CW1's newly hired team were redeployed to work on the COVID vaccine rollout. CW4 similarly recalls

that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses.

120.    CW2 recalls a lot of confusion about the changes that were supposed to be made at the stores and that a lot of changes were made "on the fly."  For example, CW2 said that the signage that was intended for the stores changed multiple times. CW2 recalled that the SVP of Retail, Bill Engen, visited CW2's region in August 2020 and said that the signage at the stores was wrong, apparently not knowing about new signage that had been sent out, which is what the stores had put up. CW2 observed that the store-level employees were trying to do what was asked of them, but that it was "confusing and stressful" because of the muddled information they received, resulting in a lot of pressure and finger pointing.  Overall, CW2 said the rebranding was "utter chaos" and it felt as though "there was no plan in place." As discussed below, each of the below efforts that were instigated as part of an overall strategy for creating sustainable earnings was curtailed, abandoned, or failed:

121.    ***Stores of the Future***: CW1 was specifically hired as a project manager for the "Stores of the Future" project. As conceived, Rite Aid's imagined Stores of the Future would have included significant physical changes to overall layout and integrated features like electronic price tags. The initial estimated budget for the Stores of the Future initiative, according to CW1, was $8 million ***per store***.  The $8 million figure was discussed at meetings that CW1 regularly attended about the Stores of the Future after CW1 was hired to work as a project manager for the Stores of the Future project. CW1 recalls that meetings relating to each of the projects CW1 worked on were attended by the senior leadership at Rite Aid directly responsible for that project, and that the Stores of the Future meetings were attended by the Rite Aid Senior Vice President who served as the "Head of Construction".

122.    CW1 stated that around September of 2020 and "a week or two" prior to the September 2020 shareholder call that "kicked off" the Stores of the Future project, Paul Davidowicz, a Rite Aid Senior Vice President who served as the "Head of Construction," together with his boss Robert Palmer, Rite Aid's Vice President of Store Planning, reduced the project's budgets to $1 million per store and then lowered it again to about $0.7 million per store. The Company also diverted personnel resources from the Stores of the Future project. According to CW1, much of the team hired along with them to develop the Stores of the Future was reassigned to the COVID-19 vaccine project.

123.    To contain costs and stay within the new $.7 to 1 million per store budget, CW1 recalls that "***nearly everything had to be cut***." Specifically, CW1 recalls that many of the stores slated to be upgraded simply "got a new logo." Similarly, CW4 recalls that upgrades were planned for a number of the stores in CW4's region. In Spring of 2021, some of those stores received exterior upgrades, including power washes or paint jobs, but the interiors retained their designs "from the '90s.". None of the walls between the pharmacies and the front ends of the stores were removed during this period, despite Defendants' emphasis on this interior design change in their promotion of the RxEvolution plan. Likewise, CW3 recalls that, from the FP&A perspective, by the last calendar quarter of 2021 the Stores of the Future project was reduced to a really small project.

124.    Thus, unbeknownst to investors, the scope of the Stores of the Future project was dramatically reduced. When the plan was conceived, the Company had planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021 as Defendants publicly disclosed. When the pandemic hit, that target was quickly reduced to fifty (50) stores and then to ten (10). According to CW1, the reduction was never expressly discussed at the meetings they attended, but the list of

stores kept getting shorter and project completion dates pushed forward. Eventually, Rite Aid stopped using the term "Stores of the Future" altogether.

125.    The Company piloted its first three Stores of the Future in November 2020 and internally announced plans to open similar stores in other markets over "the next several months."[19] CW1 received emails approximately bi-weekly from the Company's construction team listing the planned Stores of the Future and recalls that numerous Rite Aid senior executives were copied on the emails, ***including Defendant Konrad***. The list of stores in the email got continually shorter. CW1 recalls that the email chain was already being circulated when CW1 joined the Company in March 2020 and CW1 continued to receive the emails throughout CW1's entire tenure at the Company. By the time CW1 left the Company in November 2021, five or fewer Stores of the Future had been completed. Thus, at most, Rite Aid opened two (2) Stores of the Future between November 2020 and November 2021.

126.    According to CW2, the few changes that were implemented at the stores did not meaningfully impact Rite Aid's performance because they were merely cosmetic, such as: lowered shelving height, adding pharmacist desks, color changes, and removing walls in front of pharmacies. CW1 recalls that the reason Rite Aid was continually reducing the number of planned Stores of the Future was the costs of the upgrades combined with the fact that the changes were not providing any financial benefit to Rite Aid. To the contrary, initial "bumps" following the opening of a new Store of the Future consistently subsided to previous levels within one to two weeks.

---

[19] Paige Minemyer, *Rite Aid Unveils Its Stores of the Future in Bid to Become Healthcare Destination*, Fierce Healthcare (November 9, 2020), https://www.fiercehealthcare.com/practices/rite-aid-unveils-its-stores-future-bid-to-become-healthcare-destination. (Add: https://risnews.com/first-look-inside-rite-aids-stores-future?)

127.     Defendants knew the cosmetic changes were not improving Rite Aid's performance because the Company tracked data metrics that allowed Defendants to see sales data, down to a very granular level. According to CW1, "everyone" at the Company could access this data by requesting it from the "data analytics guy," who, CW1 recalled, worked for Defendant Schroeder. Accordingly, Defendants knew that when Covid vaccine revenue subsided, it would not be replaced by increased revenue from Stores of the Future.

128.     *Telehealth*: The telehealth component of Rite Aid's RxEvolution plan was also a failure. CWs 1 and 2 recall that the telehealth initiative centered on the installation of "wellness rooms" in Rite Aid stores. The Company intended that customers would use the rooms for digital wellness. The plan was that  customers would be able to enter the rooms, get their vitals checked, and then be connected with a medical professional to discuss healthcare concerns.

129.     However, CW1 recalled that, as a result of the COVID-19 pandemic, patients were not using Rite Aid's telehealth services as a result of changes in telemedicine brought about by COVID and, thus, not using the dedicated rooms in pharmacies. Specifically, due to the pandemic, healthcare consumers began utilizing telehealth services directly from their homes via Zoom and the like, rendering Rite Aid's in-store "telehealth" functions redundant. In CW2's divisional compliance role, CW2 visited multiple stores as part of an audit function and to speak to pharmacists. CW2 recalled that it was "clear right away" that customers were not using the rooms, and that the rooms ended up being "a big waste of space." Instead, the rooms were being used for storage.

130.     During internal Company audit visits, CW2 also spoke with individual store managers who recalled conversations with store managers expressing concerns that the revamped store was not doing as well as expected. According to CW1, the rooms were used as intended ***by***

*a total of two customers* and "both calls [with their doctors] dropped because the kiosk was not working."

131.    Rite Aid recognized that the telehealth rooms were a failure. CW1 recalls that Rite Aid held a number of meetings to identify other uses for the Telehealth rooms but that no decision was ever made. CW1 said that Chris Bohrer,[20] Rite Aid's Senior Vice President of Payor and Strategic Initiatives, was supposed to do an analysis on options for the rooms, but it never materialized. CW1 also recalled that the Company continued to talk about and pursue the telemedicine initiatives only to "justify" the work Rite Aid had already put into them.

132.    *"East Meets West"*: Rite Aid's attempt to push more organic and "natural," or holistic, products to appeal to its target audience of millennial and Gen-X women also did not bear fruit. CW2 observed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products."

133.    According to CWs 1 and 2, Rite Aid kept category sales reports, broken down by units and dollars, to record which products were selling. CW1 and 2 confirmed that the reports were available on Rite Aid's internal portal, and all employees at the district level and above could access them.

134.    In CW2's role as Regional Retail Leader, CW2 reviewed category sales reports. The top-selling items, according to CW2, were always standard, over-the-counter drug products like ibuprofen, and never "natural" products. Moreover, the "natural" products were rarely sold out. CW2 confirmed that Rite Aid was losing sales because it was sacrificing prime shelf space that could have been dedicated to popular, sponsored, or Rite Aid branded products.

---

[20] Like CW1, Bohrer also joined Rite Aid in connection with the RxEvolution initiative. Business Wire, *Two Key Leaders Join Rite Aid to Accelerate RxEvolution* (August 11, 2020), https://www.businesswire.com/news/home/20200811005570/en/Two-Key-Leaders-Join-Rite-Aid-to-Accelerate-RxEvolution. (Last accessed September 7, 2023.)

135.    ***Broadened Job Definition for Pharmacists***: Rite Aid's RxEvolution envisioned a greater role for pharmacists as patient care consultants. Accordingly, Rite Aid executives spoke of bringing pharmacists out from behind a desk so that they could engage directly with customers. Defendants Konrad and Peters told investors that Rite Aid pharmacists were excited about the role shift and felt the new job definition accorded more closely with the reasons they had gone to pharmacy school in the first place. In reality, the opposite was true. CW1 explained that selling holistic products to customers "did not go over well with the pharmacists because they did not go to pharmacy school to sell these types of products."

136.    As a result of Defendants abandoning Rite Aid's RxEvolution turnaround plan shortly after the pandemic started, as well as declining revenue from other businesses, including lower vaccine revenue, Rite's key performance metrics worsened. For example, CW1 reviewed the number of flu shots Rite Aid administered ***each month*** in 2021 compared with prior years. The analysis revealed that customers were receiving fewer flu shots than in the past, which Rite Aid speculated was due to "shot fatigue." Contrary to Defendants' public representations, these numbers remained low at least through the end of 2021. Likewise, CW1 recalls that Rite Aid was administering fewer shingles shots than it had in the past, to the point that it was forced to return some shingles vaccines to the manufacturer. CW1 communicated the report on the flu vaccine numbers to CW1's superiors and recalls that there was "concern" about the numbers at the Company CW1's reports were circulated to Rite Aid senior executives, ***including Defendant Konrad***, whom CW1 also interacted with "on a social level." CW1 recalls that this concern about overall declining vaccine revenue was also communicated to Rite Aid senior executives by Summer Williams Kerley, Rite Aid's Vice President of Clinical and Market Access Solutions, at multiple meetings. In fact, CW1 recalls that Rite Aid brought back the "Shingrix" shot, a shingles

vaccine specifically for adults over 50, in "an effort to cut expenses and make the numbers look better."

137.     Moreover, CWs 3 and 4 both recalled that Rite Aid was having significant trouble retaining pharmacists and staff. CW4 stated that the pharmacy staff shortage was likely due to Rite Aid paying staff less than competitors. Moreover, CWs 3 and 4 explained Rite Aid had not adequately prepared for the COVID testing and vaccine initiatives as competitors like Walgreens had done, leading to overwork, fatigue, and attrition in both staff and pharmacists. Indeed, CW4 recalls more than one occasion on which a pharmacy location needed to be closed in the afternoon because Rite Aid had too few pharmacists available to operate them.

138.     Moreover, CW3 recalls that during CW3's time at the Company, which spanned from December 2020 to July 2022, if monthly financial results looked bad, they were often "changed to be more favorable" by Tom Renner, VP of FP&A. These changes sometimes occurred in the last week of a month, creating stark contrast between the final results and the results at week three of the month. CW3 stated that CW3 believed these changes were likely at the direction of the CFO, Matt Schroeder, who was friends with Renner and "played basketball with him." CW3 and CW3's FP&A colleagues attended meetings with Renner, including meetings where they were planning for the following year and where Renner told them what to "put in" the forecasts and they tried to "fight back" and say that the adjusted amount was not realistic. CW3 stated that there was significant speculation by the team that Tom Renner was promoted while many others were laid off because of his willingness to manipulate these numbers.

### c. Revenue from COVID-19 Tests and Vaccines Mask Rite Aid's Declining Financial Performance in the Short-Term

139.     While the pandemic's stay-at-home orders were detrimental to many retail businesses, for Rite Aid, the pandemic also provided a temporary boost to revenue and gross profit

because of two new and highly profitable—but necessarily short-term—revenue sources: COVID-19 tests and COVID-19 vaccines.

140.     Indeed, throughout the Class Period, Rite Aid's EBIT exceeded its interest expense in only six quarters and nearly all were in 2020 and 2021, coinciding with COVID-19 test and vaccine rollouts:

**Figure 8**



141.     As shown in the above figure, the Company saw high EBIT throughout 2020 as a result of COVID-19 testing. However, earnings began to wane in late 2020 until the COVID-19 vaccine became available, which provided another temporary boost to earnings.  When vaccine earnings waned in late 2022, however, revenues dropped below pre-pandemic levels and have since failed to recover.

142.     ***COVID-19 Testing***: COVID-19 testing became available quickly after the pandemic began. As part of its emergency public health initiative, the federal government allocated significant funds toward reimbursing providers to ensure testing would be made available. In March of 2020, Congress passed the Families First Coronavirus Response Act ("FFCRA") and the

Health Care Enhancement Act ("PPPHCEA), each of which allocated $1 billion to reimburse providers for providing COVID-19 tests to uninsured individuals. Additional legislation, including the Coronavirus Aid, Relief and Economic Security ("CARES") Act, provided $100 billion in relief funds, including to healthcare providers. The American Rescue Plan Act of 2021 ("ARPA") also provided additional funds to reimburse providers for COVID-19 testing.

143. Chain pharmacies like Rite Aid were some of the first facilities to offer COVID-19 testing.  Throughout 2020, Rite Aid continued to expand testing sites and locations. For example, in May 2020, Rite Aid had 71 testing sites across twelve states and the capacity to conduct up to 10,000 tests daily across all locations.  On July 29, 2020, Rite Aid pharmacies offered COVID-19 testing to everyone aged 18 and above, regardless of symptoms, and by February 2021, Rite Aid had over 1,200 testing sites and had expanded availability to minors.

144. By September 24, 2020, Rite Aid had administered over 550,000 tests, and, by the end of 2020, over a million COVID-19 tests. Correspondingly, Rite Aid announced an 11.5% increase in revenue in the third calendar quarter of 2020, driven by growth in the Company's retail pharmacy and pharmacy services segments.  In total, the federal Department of Health and Human Services ("HHS") awarded Rite Aid **$427.8 million** toward COVID-19 testing, alone, over the course of the pandemic.[21] This number is exclusive of amounts paid by private insurers and individuals.

145. When confronted directly by analysts, Defendants coyly acknowledged that Covid testing materially contributed to the Company's bottom line. As Defendant Schroeder stated on the Q4 2021 Earnings Call in response to a direct :

---

[21] usaspending.gov/award/CONT_AWD_75P00120C00030_7570_-NONE-_-NONE-

Yes. I'll jump on and say that there are - the testing brings a positive benefit to the bottom line. We haven't gone into quantifying what that benefit is. I would say it's - it's a benefit of sizing nearly as sizable is some of the impacts that we've talked about that had - that weigh upon our guidance but it does have a positive impact for us.

146.     Schroeder's painfully confusing answer intentionally concealed the Company's overall declining performance from investors.

147.     *COVID-19 Vaccines*: When testing rates declined, the Company shifted its focus to administering COVID-19 vaccines. As Defendants stated in the December 17, 2020 press release published in conjunction with an earnings announcement for the third calendar quarter of 2020, "[w]e have administered over one million COVID-19 tests and will be partnering with the CDC to help administer COVID-19 vaccines in our communities."

148.     On February 11, 2021 Rite Aid announced in a press release that, in partnership with the federal government, "Rite Aid pharmacies will receive direct federal allocations initially in five states," and "[a]t launch, we expect to receive 100 doses per participating store, per week." Indeed, Rite Aid was one of a select group of chain pharmacies selected to participate in the Federal Retail Pharmacy Program for COVID-19 Vaccination, that same day, putting Rite Aid at the forefront of the vaccine initiative. In March 2021, Rite Aid extended vaccines to teachers, school staff and childcare providers. On April 30, 2021, Rite Aid announced in a press release that, "it is now administering the COVID-19 vaccine at all locations, spanning more than 2,500 stores in 17 states. Following the latest guidance from the Biden Administration, all those aged 16 years or older are now eligible for vaccination."

149.    Like COVID-19 tests, COVID-19 vaccines generated significant revenue and earnings for the Company. Specifically, until March 15, 2021, Medicare paid $28.39 for single-dose vaccines like the Johnson & Johnson vaccine, and, for two-dose vaccines such as the Pfizer-BioNTech and Moderna vaccines, $16.94 for the first dose and $28.39 for the second dose. On and after March 15, 2021, the rates were increased to $40.00 for each dose administered in both single-dose vaccines and vaccines requiring multiple doses.[22] CW2 observed that because of the federal governments reimbursement policies, the margins on COVID-19 vaccines were significantly higher than for most prescription drugs.

150.    Almost from the outset of the COVID-19 pandemic, Rite Aid set a goal of administering one million shots. CW1 explained that the Company deemed vaccine distribution a "Special Project" and held weekly "war room meetings" following the initial rollout and continuing until the Company reached its 1 million shot goal. CW1 further explained that the Company held meetings about COVID at least three times per week covering various aspects of the COVID vaccine rollout (distribution, communication, events, staffing, etc.), and then a weekly "update" meeting on overall status. CW1 attended these meetings and recalls that the 1 million shot goal and Rite Aid's progress toward meeting it was discussed during the meetings. According to CW1, the meetings were led attended by Defendant Konrad, who was the third in command in the Company over all the pharmacies and reported to Defendant Donigan. After Konrad was let go on March 8, 2022, the meetings were attended by Karen Staniforth, who was Rite Aid's Senior Vice President and Chief Pharmacy Officer and in charge of pharmacy operations. Staniforth also reported directly to Defendant Donigan.

---

[22] Special Edition – Medicare Payment Increase for COVID-19 Vaccine, *Biden-Harris Administration Increases Medicare Payment for Life-Saving COVID-19 Vaccine*, CMS.Gov (March 15, 2021), https://www.cms.gov/outreach-and-educationoutreachffsprovpartprogprovider-partnership-email-archive/2021-03-15-mlnc-se.

151.    In order to track the numbers of vaccines administered, CW1 explained that the stores generated reports, which CW1 had access to, that detailed store-level data on the numbers of vaccines administered.  CW1 personally created spreadsheets to track events that Rite Aid held to get more customers vaccinated. The information CW1 gathered included the types of events that were held, the number of shots that were administered at the events, and the demographics of the people who were vaccinated. CW1 provided the information to Staniforth's group, who passed it along to the White House, which was working on collection demographic data related to vaccine administration. The reports, including the vaccine data collected for the White House, were circulated to Rite Aid executives, including Donigan.

152.    CW1 also attended "hundreds" of meetings related to COVID vaccine rollout. CW1 recalls that Defendant Schroeder attended these meetings, and that Staniforth was at "almost every meeting."

153.    Thus, Defendants were keenly aware of the revenue being generated by COVID 19 initiatives relative to Rite Aid's overall Company revenue.

### d. As Vaccination Rates Slow, Defendants Acknowledge Internally that COVID-19-Related Revenues Are Not Sustainable, While Telling Investors Revenues Would Be Sustained Post-Pandemic

154.    In April of 2021, Rite Aid reached its target of administering 1 million vaccines. Rite Aid knew that this date was approaching; CW1 tracked the vaccine data and was able to predict the date the goal would be reached within a day of accuracy. As soon as this target was reached, CW1 recalls, the vaccine project began to "die out."  There were no more meetings about it, there was no longer an internal push to get people vaccinated, and the project was no longer considered a "Special Project." CW1 said that the project died out because it was "no longer the number one priority" because the vaccine was "just a shot" and "fewer people were getting

vaccinated." CW1 continued to track the number of vaccines that were being administered for a brief time after the million shot goal was reached. In June 2021, the number "dropped off really quickly," CW1 observed, and the decline was "significant," whereas the number had been consistent for a few months before the target was reached.

155.     Indeed, the Company experienced an almost 50% decline in vaccines administered in the fiscal quarter that ended August 28, 2021, compared with the prior quarter, reflecting nationwide trends. As evident in Figure 9 below, around June 2021, the rate of vaccination in the United States dropped. The numbers ticked slightly upward again when booster shots became available in September 2021, but they never returned to the numbers seen in late 2020 and early 2021, and for good reason. Far fewer people received booster shots than primary dose series— approximately 17% of the population versus 69.5%.[23] But even if everybody in the United States who received an initial shot series had received a booster, the number of vaccines being administered daily would not have approached the levels seen during the initial vaccine rollouts. Whereas the initial doses of the two primary vaccines approved in the United States were administered in 2-dose series, "booster" shots were, and were always intended as, single-dose shots.

---

[23]  CDC  COVID  Data  Tracker:  https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-onedose-pop-total.

**Figure 9:**[24]



156.    Indeed, by late 2021 the total percentage of people vaccinated began to plateau, as

evident in Figure 10:

---

[24]      Image          source:          https://ourworldindata.org/grapher/daily-covid-19-vaccination-doses?tab=chart&country=~USA

**Figure 10:²⁵**



157.    Contrary to Defendants' representations that Company revenue could be sustained post-pandemic, the revenue boosts from COVID-19 testing and vaccines that Rite Aid experienced during the pandemic were not sustainable. And, unbeknownst to investors, the Company had not implemented the changes planned pursuant to RxEvolution to offset the declines.

158.    Thus, corresponding to decreases in the numbers of vaccines administered, Rite Aid's earnings dropped, as well, with EBIT values dropping below zero, as evident in Figure 11:

---

²⁵ Image source: https://usafacts.org/visualizations/covid-vaccine-tracker-states/

**Figure 11:**



159.   As shown in the figure above, when booster shots became widely available in September 2022, Rite Aid's earnings showed a corresponding, small boost which reached its climax in November 2022. The booster peak, however, was nowhere close to the numbers observed when the highest volume of shots was being administered and did not last.

160.   Investors became highly concerned about the unquantified impact of COVID tests and vaccines on Rite Aid's earnings, how declines in these would impact future earnings, and to what extent these factors were considered in Rite Aid's earnings projections. On the Earnings Call Rite Aid held on   April 14, 2022 in connection with announcing its earnings for fiscal 2022, for example, a JP Morgan & Chase analyst asked: "So first off, just given the COVID vaccines and testing has been one of the larger swing factors in your results over the last few quarters, and *just based on a number of the inbound questions we've gotten over the past few weeks or so*. Just wanted to see if you could provide some incremental color on the profit associated with vaccines and testing in order to just get a better sense for the performance of the underlying business." Defendants, however, refused to provide any clarity and simply dodged the question.

161.     Nevertheless, Rite Aid executives continued to tell investors that Rite Aid would not see any negative effects on EBITDA because of its RxEvolution initiatives and the promise that supplemental COVID earnings would not meaningfully wane.  For example, Defendant Donigan stated during the June 24, 2021 Q1 2022 earnings call that "COVID vaccines are not a onetime thing for us as a company… COVID vaccines will be a permanent, I think, weapon in our arsenal. I think it is very fair to assume that these vaccines, just like flu shots, just like Shingrix, just like pneumonia, are here to stay and a permanent part of our arsenal. So I think it's one of the benefits of COVID." On December 21, 2021, Defendant Donigan guaranteed that Rite Aid's revenue and earnings would not be impacted by fewer vaccines because COVID-19 was here to stay: "I really, really strongly believe is there's no ex COVID. I don't think there's any time in the next 3 to 4 years if we're lucky that there is no COVID. And I think COVID testing is here to stay as well." Donigan continued, "I don't think we see a world without COVID vaccines…" and "I think that they're very likely to forever in our lifetime us to be happening once or twice a year…" She also claimed that the vaccines are "good business."

162.     At the same time, Defendants continued to tout the progress of their RxEvolution efforts. For example, in the earnings call held on April 15, 2021, Defendants touted the RxEvolution had been both "validated" and "proven essential" in Fiscal 2021, and that the year had shown "real signs of progress and validation of our strategy." Similarly, on the earnings call held on September 23, 2021, Defendant Donigan stated: "Our RxEvolution strategy is showing promising results and I'm encouraged that we're not only exceeding expectations, but also demonstrating that our strategy is gaining momentum." Later in the same call, Defendant Donigan discussed some of the specifics of the plan, stating, for example that Rite Aid was "continuing [its]

strong trend in inventory turns from prior quarters demonstrating that people are really liking our new merchandise."

163.    Thus, Rite Aid's earning projections falsely presumed that revenue would continue at COVID-19 levels post-pandemic, even though Defendants knew internally that such revenues were continuing to decline. Specifically, Rite Aid projected EBITDA of $460-$500 million for Fiscal 2023, which Defendant Schroeder stated during a June 23, 2022 investor call included COVID-19 vaccine revenue.

164.    When analysts questioned whether the projections were realistic without the injection of the same high levels of vaccine revenue, Defendants assured them that Rite Aid had implemented sustainable change that would be reflected in earnings and that Rite Aid did not expect vaccine revenue to subside. For example, on the June 23, 2022 Q1 2023 earnings call, in response to analyst George Robert Hill of Deutsche Bank's question about how Rite Aid was planning to recuperate lost revenue from vaccines, Defendant Donigan maintained that core scripts were growing and assured investors that the growth Rite Aid experienced was not strictly from vaccines, stating: "we've shown that we can grow our scripts, even cycling the significant benefit we got from vaccines last year. So our core scripts are up. And that's just the beginning." Schroeder added, "so some of our script growth is back-end loaded in the year as you think about modeling."

165.    Each of these representations was false. The Company's efforts at transforming the Company through its RxEvolution had been either abandoned or reduced so substantially as to be largely immaterial, and the changes Rite Aid had implemented were merely cosmetic and had not yielded positive results. Moreover, Defendants were already observing vaccine revenue subsiding and expressly acknowledged internally that it would not continue at even post-pandemic levels.

166.    By September 29, 2022, COVID-19 vaccine revenue had waned to the point that Defendants were forced to begin to expose the truth about the vaccine's overwhelming contribution to Rite Aid's fiscal performance. To maintain the façade as long as possible, Defendants disclosed the extent of the impact in spurts. Thus, Donigan acknowledged on Q2 2023 earnings call that "Retail Pharmacy sales and gross profit dollars were negatively impacted by the expected decline in demand for COVID vaccines and PCR tests." Further, Rite Aid announced $331.3 million in losses for the second quarter of fiscal year 2023, compared to a loss of $100.3 million a year earlier. Rite Aid's revenue also dropped to $5.9 billion from $6.11 billion the prior year. Rite Aid's press release attributed the results, in part, as "largely due to a reduction in revenue from Covid vaccines and testing." As vaccines became increasingly less profitable, Rite Aid's losses continued to increase.  On December 21, 2022, Rite Aid issued a press release, filed on Form 8-K with the SEC, revealing that third quarter revenue fell 2.3% to $6.08 billion, and net loss nearly doubled to $67.1 million compared to a loss of $36 million the year prior.

167.    Defendant Donigan's efforts were publicly revealed to have failed, and she left the Company on January 7, 2023. According to CW2, "no one was surprised that Donigan was let go."

## B. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

### 1. Defendants' Materially False and Misleading Statements Relating to Litigation Exposure for Illegally Dispensing Opioids [26]

#### a. Annual Report on Form 10-K for the Fiscal Year Ended March 3, 2018

168.    On April 26, 2018, the Company filed its Annual Report on Form 10-K for the Year ended March 3, 2018 (the "2018 10-K") with the SEC, signed by Defendants: John T. Standley,

---

[26] Alleged False and Misleading Statements are bolded and underlined. Italicized statements are retained from the original, underlined statements are for emphasis. The remaining statements are provided for context.

Chairman and Chief Executive Officer; Darren W. Karst, Chief Financial Officer; and Matthew

C. Schroeder, Chief Accounting Officer.

169.    The 2018 10-K included the following risk disclosures which were materially false

and misleading when made and omitted to disclose material information:

> *We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant regulatory change could adversely affect our business, the results of our operations or our financial condition.*
>
> Our business is subject to numerous federal, state and local laws and regulations. Changes in these regulations may require extensive system and operating changes that may be difficult to implement. **Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business…**
>
> **
>
> *Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.*
>
> **Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of drugs.** … **Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission.**
>
> *We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.*
>
> Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products. **In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death.** Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products. A product liability judgment against us or a product recall could have a material, adverse effect on our business, financial condition or results of operations.

170.    The above statements were materially false and misleading when made and omitted

to disclose material information because (a) they represented non-compliance with applicable laws

and regulations and increases in liability as  hypothetical possibilities when the risk being warned

of had materialized, as Rite Aid had been systematically, repeatedly, and knowingly failing to

comply with applicable laws and regulations pertaining to the dispensing of controlled substances

for years; and (b) Rite Aid was experiencing errors in dispensing of pharmaceuticals because of

deliberate, improper dispensing, as evidenced by:

    i.    Internal Rite Aid documents cited in the DOJ Complaint showing Rite Aid *filled* "*hundreds of thousands of prescriptions*" that did not meet legal requirements but where red flags were present;

    ii.    Internal Rite Aid documents cited in the DOJ Complaint showed that the Regulatory Affairs Department ignored and/or failed to act on thousands of tickets submitted by pharmacists citing "red flags" of suspicious prescriptions;

    iii.    According to the DOJ Complaint, Rite Aid's controlled substance distributor, McKesson, raised concerns to Rite Aid on multiple occasions, including on November 16, 2016, relating to the large volume of prescriptions Rite Aid's pharmacies were filling for frequently abused drugs, like oxycodone 30 milligrams, and identified the offending pharmacies, such as Pennsylvania Store 03637—the same store the DOJ cited as filling an excessive amount of illicit prescriptions and that was flagged as suspicious by numerous pharmacists;

    iv.    The DOJ Complaint cited emails from the Regulatory Affairs Department chastising pharmacists for putting notes in physician profiles documenting suspicious prescription habits and then deleting such comments from Rite Aid's systems;

    v.    Internal data gathered by Rite Aid's RACS system about which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which Rite Aid stores filled them informed Defendants that Rite Aid was not in compliance with state and federal regulatory laws;

    vi.    Rite Aid's systems and procedures, such as the six-step HARP process, alerted Defendants to "thousands" of instances of unlawful prescriptions by Rite Aid's pharmacies, in violation of Rite Aid's own internal policies requiring the Regulatory Affairs department to review and act on suspicious prescriptions and federal and state laws and regulations; and

    vii.    CW4 recalled that Rite Aid's policies for monitoring the dispensing of controlled substances at the individual pharmacy level were robust and surpassed the industry standard.

171.    Additionally, in the 2018 10-K, in Section 22, Commitments, Contingencies and Guarantees, and under a section entitled, "Legal Matters and Regulatory Proceedings," Rite Aid made the following disclosures which were materially false and misleading, and/or omitted material facts necessary that reasonable investors would consider important:

> The Company is involved in legal proceedings and is subject to investigations, inspections, claims, audits, inquiries, and similar actions by governmental authorities arising in the ordinary course of its business… While the Company's management cannot predict the outcome of any of the claims, **the Company's management does not believe that the outcome of any of these legal matters will be material to the Company's consolidated financial position. It is possible, however, that the Company's results of operations or cash flows could be materially affected by an unfavorable resolution of pending litigation or contingencies.**

172.    The foregoing statements were materially false and misleading when made, and/or omitted material facts that reasonable investors would consider important because the Company failed to disclose that Rite Aid had been filling "hundreds of thousands" of unlawful prescriptions and, thus, the Company's exposure to state and federal liability arising from its illegal dispensing of controlled substances was substantial, which would negatively impact earnings, as evidenced by the following detailed evidence cited in the DOJ Complaint and from confidential witnesses:

i.   The DOJ Complaint detailed numerous instances where Rite Aid stores had systematically filled prescriptions with numerous red flags, including pharmacies with abnormally high prescriptions of controlled substances, in at least fourteen of its pharmacies;

ii.   Defendants violated and ignored Rite Aid's own internal systems, processes and procedures that expressly alerted Defendants to "hundreds of thousands" of instances where Rite Aid pharmacies were unlawfully filling prescriptions of controlled substances;

iii.   Rite Aid's own internal reports and data detailing which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which Rite Aid stores filled them alerted Defendants that Rite Aid was improperly filling prescriptions;

iv.   Defendants received warnings from McKesson about large volumes of suspect prescriptions filled by certain Rite Aid stores;

v.   Defendants failed to effectively monitor Rite Aid's own reporting system which resulted in hundreds of thousands of tickets pending with no response;

vi.   Rite Aid's Regulatory Affairs Department that reported to the Individual Defendants expressly directed that notes written by pharmacists warning of suspicious practices be deleted; and

vii.   As a result of the above, Rite Aid had incurred significant litigation exposure from thousands of lawsuits seeking substantial damages in ongoing litigation relating to improper dispensing of opioids and negative results or judgments that were likely to imperil the Company's results of operations and cash flows.

173.   Thus, the purported risks were too vague and insufficiently specific to risks that existed at the time.

**b.  May 15, 2018 Albertsons Companies, Inc., Analyst Day**

174.   On May 15, 2018, Rite Aid, along with Albertsons Companies, Inc., held an analyst call ("May 15, 2018 Analyst Day Call") to discuss the proposed merger between Albertsons and Rite, which ultimately did not go through. During the May 15, 2018 Analyst Day Call, Defendants reported false and misleading statements about Rite Aid's efforts to combat the opioid crisis. Defendant Jocelyn Konrad falsely stated that Rite Aid had systems in place to ensure that every prescription is filled accurately, and their red flag process ensures that prescription are for legitimate medical needs:

> **We continue to review and enhance our policies and procedures and invested significantly to make enhancements to our systems to ensure every prescription is filled accurately.** Beyond this, specifically, in regards to the opioid epidemic sweeping our country, patient safety has taken on a new meaning. As medication experts, we know the power of medication when they are used correctly but also how dangerous they can be if misused or abused. We want to be part of the solution, and as such, we've taken a multifaceted approach in response to the opioid epidemic. Over the past few years, we worked to make naloxone, the opioid overdose reversal medication, available in all of our pharmacies without a prescription. And we are actively educating patients and caregivers when opioids are dispensed. **Additionally, we've implemented a red flag process to validate controlled substance prescription, ensuring they are for legitimate medical needs.** And we offer ongoing training to our pharmacy teams and provide resources to patients in store with prescriptions and online. And through our Rite Aid Foundation, we've

launched the KidCents safe medication disposal program, giving our communities an avenue to safely dispose of unwanted, unused or expired medication. We also sell medication disposal envelopes in our stores and support all GEAT back dating.

And lastly, as we move to Slide 64, let's bring it all together with our proprietary pharmacy system. **Our proprietary dispensing system known as next-gen is paramount to our commitment to patient safety and supports all of our key initiatives.** As we make upgrades to our system, we constantly keep the pharmacists' experience in mind and how they can best serve their patients in one place.

175.   Slide 64 of the presentation accompanying Defendant Konrad's remarks touted the NextGen System's "Patient Safety and Convenience Tools," including a "Red Flag Process," as below:

**Figure 12:**



176.   Slide 63 further detailed the Red Flag Process, touting the purported process "*ensures the prescription is valid and legitimate*," as below:

**Figure 13:**



177.    The foregoing statements were materially false and misleading when made, and/or omitted material facts necessary that reasonable investors would consider important, because (a) Defendants ignored and/or did not follow Rite Aid's validation and "red flag" processes and procedures and either knew, or recklessly disregarded that Rite Aid's pharmacists routinely dispensed unlawful controlled substances where red flags were present, which Defendants knew were indicative of unlawful prescribing and protocol indicated should not be filled; thus, (b) Defendants did not "ensure" that such prescriptions were medically necessary; and (c) Defendants

knew and withheld evidence that Rite Aid was systemically dispensing controlled substances in violation of state and federal law, as evidenced in the DOJ complaint by at least the following:

  i.    Internal Rite Aid documents cited in the DOJ Complaint showing Rite Aid *filled hundreds of thousands of prescriptions* that did not meet legal requirements but where red flags were present;

  ii.   Internal Rite Aid documents cited in the DOJ Complaint showed that the Regulatory Affairs Department ignored and/or failed to act on thousands of tickets submitted by pharmacists citing "red flags" of suspicious prescriptions;

  iii.  According to the DOJ Complaint, Rite Aid's controlled substance distributor, McKesson, raised concerns to Rite Aid on multiple occasions, including in November 2016 meeting, relating to the large volume of prescriptions Rite Aid's pharmacies were filling for frequently abused drugs, like oxycodone 30 milligrams, and identified the offending pharmacies, such as Pennsylvania Store 03637—the same store the DOJ cited as filling an excessive amount of illicit prescriptions and that was flagged as suspicious by numerous pharmacists;

  iv.   The DOJ Complaint cited emails from the Regulatory Affairs Department chastising pharmacists for putting notes in physician profiles documenting suspicious prescription habits and then deleting such comments from Rite Aid's systems; and

  v.    Defendants violated Rite Aid's own internal policies requiring the Regulatory Affairs department to review and act on suspicious prescriptions pursuant to step 6 of HARP.

### c. Annual Report on Form 10-K for the Fiscal Year Ended March 2, 2019

178.    On April 25, 2019, the Company filed its Annual Report on Form 10-K for the year ended March 2, 2019 (the "2019 10-K") with the SEC, signed by Defendants John T. Standley, Chief Executive Officer; and Matthew C. Schroeder, Chief Financial Officer.  The 2019 10-K included the following risk disclosures which were materially false and misleading when made and omitted to disclose material information:

> *We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant regulatory change could adversely affect our business, the results of our operations or our financial condition.*

Our business is subject to numerous federal, state and local laws and regulations. Changes in these regulations may require extensive system and operating changes that may be difficult to implement. **Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business…**

\*\*

*Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.*

**Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of drugs.** … **Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission.**

*We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.*

Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products. **In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death.** Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products. A product liability judgment against us or a product recall could have a material, adverse effect on our business, financial condition or results of operations.

179.    The above statements were materially false and misleading when made and omitted to disclose material information because (a) they represented non-compliance with applicable laws and regulations and increases in liability as hypothetical possibilities when the risk being warned of had materialized, as Rite Aid had been systematically, repeatedly, and knowingly failing to comply with applicable laws and regulations pertaining to the dispensing of controlled substances for years; and (b) Rite Aid was experiencing errors in dispensing of pharmaceuticals because of deliberate, improper dispensing, as evidenced by:

i.   Internal Rite Aid documents cited in the DOJ Complaint showing Rite Aid *filled* "*hundreds of thousands of prescriptions*" that did not meet legal requirements but where red flags were present;

ii.   Internal Rite Aid documents cited in the DOJ Complaint showed that the Regulatory Affairs Department ignored and/or failed to act on thousands of tickets submitted by pharmacists citing "red flags" of suspicious prescriptions;

iii.   According to the DOJ Complaint, Rite Aid's controlled substance distributor, McKesson, raised concerns to Rite Aid on multiple occasions, including in a November 2016 meeting, relating to the large volume of prescriptions Rite Aid's pharmacies were filling for frequently abused drugs, like oxycodone 30 milligrams, and identified the offending pharmacies, such as Pennsylvania Store 03637—the same store the DOJ cited as filling an excessive amount of illicit prescriptions and that was flagged as suspicious by numerous pharmacists;

iv.   The DOJ Complaint cited emails from the Regulatory Affairs Department chastising pharmacists for putting notes in physician profiles documenting suspicious prescription habits and then deleting such comments from Rite Aid's systems;

v.   Internal data gathered by Rite Aid's RACS system about which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which Rite Aid stores filled them informed Defendants that Rite Aid was not in compliance with state and federal regulatory laws;

vi.   Rite Aid's systems and procedures, such as the six-step HARP process, alerted Defendants to "thousands" of instances of unlawful prescriptions by Rite Aid's pharmacies, in violation of Rite Aid's own internal policies requiring the Regulatory Affairs department to review and act on suspicious prescriptions and federal and state laws and regulations; and

vii.   CW4 recalled that Rite Aid's policies for monitoring the dispensing of controlled substances at the individual pharmacy level were robust and surpassed the industry standard.

180.   Additionally, in the 2019 10-K, in Section 21, Commitments, Contingencies and Guarantees, and under a section entitled, "Legal Matters and Regulatory Proceedings," Rite Aid made the following disclosures which were materially false and misleading, and/or omitted material facts necessary that reasonable investors would consider important:

The Company is involved in legal proceedings… and is subject to investigations, inspections, claims, audits, inquiries, and similar actions by… governmental

authorities arising in the ordinary course of its business… While the Company's management cannot predict the outcome of any of the claims, **the Company's management does not believe that the outcome of any of these matters will be material to the Company's consolidated financial position. It is possible, however, that the Company's results of operations or cash flows could be materially affected by an unfavorable resolution of pending litigation or contingencies.**

181.    The foregoing statements were materially false and misleading when made, and/or

omitted material facts that reasonable investors would consider important because the Company

failed to disclose Rite Aid had been filling "hundreds of thousands" of unlawful prescriptions and,

thus, the Company's exposure to state and federal liability arising from its illegal dispensing of

controlled substances was substantial, which would negatively impact earnings, as evidenced by

the following detailed evidence cited in the DOJ Complaint and from confidential witnesses:

i.     The DOJ Complaint detailed numerous instances where Rite Aid stores had systematically filled prescriptions with numerous red flags, including pharmacies with abnormally high prescriptions of controlled substances, in at least fourteen of its pharmacies;

ii.    Defendants violated and ignored Rite Aid's own internal systems, processes and procedures that expressly alerted Defendants to "hundreds of thousands" of instances where Rite Aid pharmacies were unlawfully filling prescriptions of controlled substances;

iii.   Rite Aid's own internal reports and data detailing which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which Rite Aid stores filled them alerted Defendants that Rite Aid was improperly filling prescriptions;

iv.    Defendants received warnings from McKesson about large volumes of suspect prescriptions filled by certain Rite Aid stores;

v.     Defendants failed to effectively monitor Rite Aid's own reporting system which resulted in hundreds of thousands of tickets pending with no response;

vi.    Rite Aid's Governmental Affairs department, which reported to the Individual Defendants, intentionally deleted notes written by pharmacists warning of suspicious practices; and

vii.   As a result of the above, Rite Aid had incurred significant litigation exposure from thousands of lawsuits seeking substantial damages in ongoing litigation relating to

improper dispensing of opioids and that negative results or judgments that were likely
to imperil the Company's results of operations and cash flows.

182.     Thus, the purported risks were too vague and insufficiently specific to risks that
existed at the time.

### d. Annual Report on Form 10-K for the Fiscal Year Ended February 29, 2020

183.     On April 27, 2020, the Company filed its Annual Report on Form 10-K for the Year
ended February 29, 2020 (the "2020 10-K") with the SEC, signed by Defendants: Bruce G.
Bodaken, Chairman; Heyward Donigan, Chief Executive Officer; and Matthew C. Schroeder,
Chief Financial Officer.

184.     The 2020 10-K included the following risk disclosures which were materially false
and misleading when made and omitted to disclose material information:

> *We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant regulatory change could adversely affect our business, the results of our operations or our financial condition.*
>
> Our business is subject to numerous federal, state and local laws and regulations. Changes in these regulations may require extensive system and operating changes that may be difficult to implement. **Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business…**
>
>                                       **
>
> *Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.*
>
> **Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of drugs**. … **Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission.**

*We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.*

Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products. **In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death.** Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products. A product liability judgment against us or a product recall could have a material, adverse effect on our business, financial condition or results of operations.

185.    Additionally, starting in the 2020 10-K, Rite Aid added a new risk factor disclosing risks related to litigation. However, the Company failed to disclose that its exposure to state and federal liability arising from its illegal dispensing of controlled substances was substantial, given that Rite Aid knew the extent to which it was illegally dispensing prescriptions. The following risk factor therefore was materially false and misleading and/or omitted material facts necessary that reasonable investors would consider important:

**_We are exposed to risks related to litigation and other legal proceedings_**.

\*\*\*

We cannot predict with certainty the outcomes of these legal proceedings and other contingencies, and the costs incurred in litigation can be substantial, regardless of the outcome. As a result, we could from time to time incur judgments, enter into settlements or revise our expectations regarding the outcome of certain matters, and **such developments could harm our reputation and have a material adverse effect on our results of operations in the period in which the amounts are accrued and/or our cash flows in the period in which the amounts are paid.**

186.    The above statements were materially false and misleading when made and omitted to disclose material information because (a) they represented non-compliance with applicable laws and regulations and increases in liability as  hypothetical possibilities when the risk being warned of had materialized, as Rite Aid had been systematically, repeatedly, and knowingly failing to comply with applicable laws and regulations pertaining to the dispensing of controlled substances for years; (b) Rite Aid was experiencing errors in dispensing of pharmaceuticals because of

deliberate, improper dispensing; and (c) they warned that they *could* experience harm to reputation which *could* have a material adverse effect on operations when the risk had already materialized because they were already facing significant litigation in which substantial damages were sought, as evidenced by the following:

i.   Internal Rite Aid documents cited in the DOJ Complaint showing Rite Aid ***filled*** "***hundreds of thousands of prescriptions***" that did not meet legal requirements but where red flags were present;

ii.  Internal Rite Aid documents cited in the DOJ Complaint showed that the Regulatory Affairs Department ignored and/or failed to act on thousands of tickets submitted by pharmacists citing "red flags" of suspicious prescriptions;

iii. According to the DOJ Complaint, Rite Aid's controlled substance distributor, McKesson, raised concerns to Rite Aid on multiple occasions, including in a November 2016 meeting, relating to the large volume of prescriptions Rite Aid's pharmacies were filling for frequently abused drugs, like oxycodone 30 milligrams, and identified the offending pharmacies, such as Pennsylvania Store 03637—the same store the DOJ cited as filling an excessive amount of illicit prescriptions and that was flagged as suspicious by numerous pharmacists;

iv.  The DOJ Complaint cited emails from the Regulatory Affairs Department chastising pharmacists for putting notes in physician profiles documenting suspicious prescription habits and then deleting such comments from Rite Aid's systems;

v.   Internal data gathered by Rite Aid's RACS system about which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which Rite Aid stores filled them informed Defendants that Rite Aid was not in compliance with state and federal regulatory laws;

vi.  Rite Aid's systems and procedures, such as the six-step HARP process, alerted Defendants to "thousands" of instances of unlawful prescriptions by Rite Aid's pharmacies, in violation of Rite Aid's own internal policies requiring the Regulatory Affairs department to review and act on suspicious prescriptions and federal and state laws and regulations; and

vii. CW4 recalled that Rite Aid's policies for monitoring the dispensing of controlled substances at the individual pharmacy level were robust and surpassed the industry standard.

187.    Also, in the 2020 10-K, in Section 21, Commitments, Contingencies and Guarantees, and under a section entitled, "Legal Matters and Regulatory Proceedings," Rite Aid made the following disclosures which were materially false and misleading, and/or omitted material facts necessary that reasonable investors would consider important:

> The Company is involved in numerous legal matters… and is subject to regulatory proceedings including investigations, inspections, claims, audits, inquiries, and similar actions by… governmental authorities arising in the ordinary course of its business… While the Company's management cannot predict the outcome of any of the contingencies, **the Company's management does not believe that the outcome of any of these legal matters… will be material to the Company's consolidated financial position. It is possible, however, the Company's results of operations or cash flows could be materially affected by unfavorable outcomes in outstanding legal matters or regulatory proceedings.**

188.    The foregoing statements were materially false and misleading when made, and/or omitted material facts that reasonable investors would consider important because the Company failed to disclose Rite Aid had been filling "hundreds of thousands" of unlawful prescriptions and, thus, the Company's exposure to state and federal liability arising from its illegal dispensing of controlled substances was substantial, which would negatively impact earnings, as evidenced by the following detailed evidence cited in the DOJ Complaint and from confidential witnesses:

i.   The DOJ Complaint detailed numerous instances where Rite Aid stores had systematically filled prescriptions with numerous red flags, including pharmacies with abnormally high prescriptions of controlled substances, in at least fourteen of its pharmacies;

ii.  Defendants violated and ignored Rite Aid's own internal systems, processes and procedures that expressly alerted Defendants to "hundreds of thousands" of instances where Rite Aid pharmacies were unlawfully filling prescriptions of controlled substances;

iii. Rite Aid's own internal reports and data detailing which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which Rite Aid stores filled them alerted Defendants that Rite Aid was improperly filling prescriptions;

iv.  Defendants received warnings from McKesson about large volumes of suspect prescriptions filled by certain Rite Aid stores;

85

v.     Defendants failed to effectively monitor Rite Aid's own reporting system which resulted in hundreds of thousands of tickets pending with no response;

vi.     Rite Aid's Governmental Affairs department, which reported to the Individual Defendants, intentionally deleted notes written by pharmacists warning of suspicious practices; and

i.     As a result of the above, Rite Aid had incurred significant litigation exposure from thousands of lawsuits seeking substantial damages in ongoing litigation relating to improper dispensing of opioids and that negative results or judgments that were likely to imperil the Company's results of operations and cash flows.

189.     Thus, the purported risks were too vague and insufficiently specific to risks that existed at the time.

### e.  Annual Report on Form 10-K for the Fiscal Year Ended February 27, 2021

190.     On April 27, 2021, the Company filed its Annual Report on Form 10-K for the Year ended February 27, 2021 (the "2021 10-K") with the SEC, signed by Defendants: Bruce G. Bodaken, Chairman; Heyward Donigan, Chief Executive Officer; and Matthew C. Schroeder, Chief Financial Officer.

191.     The 2021 10-K included the following risk disclosures which were materially false and misleading when made and omitted to disclose material information:

*We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant legislative, regulatory, or public policy change could adversely affect our business, the results of our operations or our financial condition.*

Our business is subject to numerous federal, state and local laws and regulations. Changes in these regulations may… require extensive system and operating changes that may be difficult to implement. **Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business…**

\*\*

*Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.*

**Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of drugs**. … **Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission.**

*We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.*

Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products. **In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death.** Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products… A product liability judgment against the Company or a product recall could have a material, adverse effect on our business, reputation, financial condition or results of operations.

192.   Additionally, Rite Aid added additional details to the risk factor related to litigation. However, the Company still failed to disclose that its exposure to state and federal liability arising from its illegal dispensing of controlled substances was substantial, given that Rite Aid knew the extent to which it was illegally dispensing prescriptions. The following risk factor therefore was materially false and misleading and/or omitted material facts necessary that reasonable investors would consider important:

**_We are exposed to risks related to litigation and other legal proceedings_**.

We cannot predict with certainty the outcomes of these legal proceedings and other contingencies, and the costs incurred in litigation can be substantial, regardless of the outcome. Proceedings that we believe are insignificant may develop into material proceedings and subject us to unforeseen outcomes or expenses. Additionally, the actions of certain participants in our industry may encourage legal proceedings against us or cause us to reconsider our litigation strategies. As a result, we could from time to time incur judgments, enter into settlements or revise our expectations regarding the outcome of certain matters, and **such developments could harm our reputation and have a material adverse effect on our results of operations, financial condition and business practices**.

193.    The above statements were materially false and misleading when made and omitted to disclose material information because (a) they represented non-compliance with applicable laws and regulations and increases in liability as  hypothetical possibilities when the risk being warned of had materialized, as Rite Aid had been systematically, repeatedly, and knowingly failing to comply with applicable laws and regulations pertaining to the dispensing of controlled substances for years; (b) Rite Aid was experiencing errors in dispensing of pharmaceuticals because of deliberate, improper dispensing; and (c) they warned that they *could* experience harm to reputation which *could* have a material adverse effect on operations when the risk had already materialized because they were already facing significant litigation in which substantial damages were sought, as evidenced by the following:

   i.    Internal Rite Aid documents cited in the DOJ Complaint showing Rite Aid ***filled*** "***hundreds of thousands of prescriptions***" that did not meet legal requirements but where red flags were present;

   ii.   Internal Rite Aid documents cited in the DOJ Complaint showed that the Regulatory Affairs Department ignored and/or failed to act on thousands of tickets submitted by pharmacists citing "red flags" of suspicious prescriptions;

   iii.  According to the DOJ Complaint, Rite Aid's controlled substance distributor, McKesson, raised concerns to Rite Aid on multiple occasions, including in a November 2016 meeting, relating to the large volume of prescriptions Rite Aid's pharmacies were filling for frequently abused drugs, like oxycodone 30 milligrams, and identified the offending pharmacies, such as Pennsylvania Store 03637—the same store the DOJ cited as filling an excessive amount of illicit prescriptions and that was flagged as suspicious by numerous pharmacists;

   iv.   The DOJ Complaint cited emails from the Regulatory Affairs Department chastising pharmacists for putting notes in physician profiles documenting suspicious prescription habits and then deleting such comments from Rite Aid's systems;

   v.    Internal data gathered by Rite Aid's RACS system about which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which Rite Aid stores filled them informed Defendants that Rite Aid was not in compliance with state and federal regulatory laws;

vi.   Rite Aid's systems and procedures, such as the six-step HARP process, alerted Defendants to "thousands" of instances of unlawful prescriptions by Rite Aid's pharmacies, in violation of Rite Aid's own internal policies requiring the Regulatory Affairs department to review and act on suspicious prescriptions and federal and state laws and regulations; and

vii.  According to CW4, Rite Aid's policies for monitoring the dispensing of controlled substances—at the individual pharmacy level—were robust and surpassed the industry standard.

### f.   Annual Report on Form 10-K for the Fiscal Year Ended February 27, 2022

194.   On April 25, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the Year ended February 26, 2022 (the "2022 10-K"), signed by the following Defendants: Bruce G. Bodaken, Chairman; Heyward Donigan, Chief Executive Officer; and Matthew C. Schroeder, Chief Financial Officer.

195.   The 2022 10-K included the following risk disclosures which were materially false and misleading when made and omitted to disclose material information:

> *We are subject to governmental regulations, procedures and requirements; our noncompliance or a significant legislative, regulatory, or public policy change could adversely affect our business, the results of our operations or our financial condition.*
>
> Our business is subject to numerous federal, state and local laws and regulations. Changes in these laws, regulations, or in related public policy may require extensive system and operating changes that may be difficult to implement, increase our operating costs and require significant capital expenditures. **Untimely compliance or noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business…**
>
> **
>
> *Certain risks are inherent in providing pharmacy services; our insurance may not be adequate to cover any claims against us.*
>
> **Pharmacies are exposed to risks inherent in the packaging and distribution of pharmaceuticals and other healthcare products, such as with respect to improper filling of prescriptions, labeling of prescriptions, adequacy of warnings, unintentional distribution of counterfeit drugs and expiration of**

**drugs**. … **Our results of operations, financial condition or cash flows may be adversely affected if in the future our insurance coverage proves to be inadequate or unavailable or there is an increase in liability for which we self-insure or we suffer reputational harm as a result of an error or omission.**

*We may be subject to significant liability should the consumption of any of our products cause injury, illness or death.*

Products that we sell could become subject to contamination, product tampering, mislabeling or other damage requiring us to recall our products… **In addition, errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death.** Product liability claims may be asserted against us with respect to any of the products or pharmaceuticals we sell and we may be obligated to recall our products… A product liability judgment against the Company or a product recall could have a material, adverse effect on our business, reputation, financial condition or results of operations.

*We are exposed to risks related to litigation and other legal proceedings.*

We cannot predict with certainty the outcomes of these legal proceedings and other contingencies, and the costs incurred in litigation can be substantial, regardless of the outcome. Proceedings that we believe are insignificant may develop into material proceedings and subject us to unforeseen outcomes or expenses. Additionally, the actions of certain participants in our industry may encourage legal proceedings against us or cause us to reconsider our litigation strategies. As a result, we could from time to time incur judgments, enter into settlements or revise our expectations regarding the outcome of certain matters, and **such developments could harm our reputation and have a material adverse effect on our results of operations, financial condition and business practices.**

196.     The above statements were materially false and misleading when made and omitted

to disclose material information because (a) they represented non-compliance with applicable laws

and regulations and increases in liability as  hypothetical possibilities when the risk being warned

of had materialized, as Rite Aid had been systematically, repeatedly, and knowingly failing to

comply with applicable laws and regulations pertaining to the dispensing of controlled substances

for years; (b) Rite Aid was experiencing errors in dispensing of pharmaceuticals because of

deliberate, improper dispensing; and (c) they warned that they *could* experience harm to reputation

which *could* have a material adverse effect on operations when the risk had already materialized

because they were already facing significant litigation in which substantial damages were sought, as evidenced by the following

     i.     Internal Rite Aid documents cited in the DOJ Complaint showing Rite Aid *filled* "*hundreds of thousands of prescriptions*" that did not meet legal requirements but where red flags were present;

    ii.    Internal Rite Aid documents cited in the DOJ Complaint showed that the Regulatory Affairs Department ignored and/or failed to act on thousands of tickets submitted by pharmacists citing "red flags" of suspicious prescriptions;

   iii.   According to the DOJ Complaint, Rite Aid's controlled substance distributor, McKesson, raised concerns to Rite Aid on multiple occasions, including in a November 2016 meeting, relating to the large volume of prescriptions Rite Aid's pharmacies were filling for frequently abused drugs, like oxycodone 30 milligrams, and identified the offending pharmacies, such as Pennsylvania Store 03637—the same store the DOJ cited as filling an excessive amount of illicit prescriptions and that was flagged as suspicious by numerous pharmacists;

   iv.   The DOJ Complaint cited emails from the Regulatory Affairs Department chastising pharmacists for putting notes in physician profiles documenting suspicious prescription habits and then deleting such comments from Rite Aid's systems;

    v.    Internal data gathered by Rite Aid's RACS system about which prescribers wrote the highest volume of prescriptions of frequently abused drugs and which Rite Aid stores filled them informed Defendants that Rite Aid was not in compliance with state and federal regulatory laws;

   vi.   Rite Aid's systems and procedures, such as the six-step HARP process, alerted Defendants to "thousands" of instances of unlawful prescriptions by Rite Aid's pharmacies, in violation of Rite Aid's own internal policies requiring the Regulatory Affairs department to review and act on suspicious prescriptions and federal and state laws and regulations; and

  vii.   According to CW4, Rite Aid's policies for monitoring the dispensing of controlled substances—at the individual pharmacy level—were robust and surpassed the industry standard.

**2. Defendants' Materially False and Misleading Statements Relating to the RxEvolution Plan**

**a.    Fiscal Q2 2021 Earnings Release and Call**

197.    On September 24, 2020, Rite Aid filed a Form 8-K reporting its financial position and results of operations for fiscal Q2 2021, ended August 29, 2020, signed by Defendant Schroeder, and held an accompanying earnings call (the "Q2 2021 Earnings Call").

198.    On the Q2 2021 Earnings Call, Defendants touted the purported progress of Rite Aid's RxEvolution plan, stating that Defendants were "**aggressively accelerating**" the plan and moving "**swiftly and confidently**" to execute it. Moreover, Defendants assured investors that the "**fundamentals of [their] business [were] strong**" and that they "**ha[d]n't missed a beat**" in implementing the RxEvolution plan. In her prepared remarks, Defendant Donigan stated:

> Now let's turn our attention to our results for Q2 and the progress we're making to bring our new RxEvolution strategy to life. As a company, we're taking significant steps in our journey to revolutionize our industry and elevate our role as an indispensable health care provider… **We're aggressively accelerating the key initiatives that will drive our transformation through the RxEvolution strategy,** which focuses on becoming a dominant mid-market PBM, unlocking the value of our pharmacists and revitalizing our retail and digital experiences. And finally, **we're focused on continuing to drive the operational excellence needed to achieve strong results and position our company for future long-term sustainable growth…**
>
> Overall, the fundamentals of our business are strong, and our team is laying the foundation for sustainable growth through our bold new RxEvolution strategy. We're committed to becoming a dominant mid-market PBM, unlocking the value of our pharmacists and revitalizing our retail and digital experiences.
>
> Thanks to our team's relentless focus on execution, **we haven't missed a beat in bringing our strategy to life.** Every day, there will be more and more visible signs of a whole new Rite Aid.

199.    In the same call, Defendant Peters similarly stated:

> Much important work lies ahead of us. We know that. **But I am energized by the progress we're making as we aggressively implement the RxEvolution strategy** and work together to become a growing, differentiated and thriving organization.

*** 

As we reported at Analyst Day, our Stores of the Future will be completely remodeled with a fresh, updated and inviting look and feel and feature curated health and wellness products and services to meet our customers' personal, family, pet and caregiver needs.

*** 

Before I turn it over, I'd just like to say that **we are moving swiftly and confidently to execute our plan and build a whole new Rite Aid by relaunching our brand, overhauling our stores and merchandise, building our Stores of the Future, and evolving the role the pharmacist plays as a community health provider and connector**.

200.    The above statements were false and misleading when made because, (a) rather than aggressively pursue the RxEvolution without missing a beat, Defendants had all but abandoned the RxEvolution initiatives, curbing the budget for the Stores of the Future so significantly that "nearly everything" was cut; and (b) the fundamentals of Rite Aid's business were not strong because the Company was burdened with enormous amounts of debt and ongoing related expenses that its earnings could not sustainably cover, as evidence by the following:

     i.    According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's were redeployed from the Stores of the Future project to work on the COVID vaccine rollout.

     ii.    CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses.

     iii.   According to CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store.

     iv.   CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021 but this target was quickly reduced to fifty (50) stores and then to ten (10).

v.     According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic.

vi.    The Telehealth part of RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services or the dedicated rooms in pharmacies and, as CW2 recalled, the rooms instead were being used for storage.

vii.   According to CWs 1 and 2, Rite Aid's category sales reports showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and, as CW2 stated, were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition.

viii.  COVID-19 revenues were not sustainable and were masking the Company's deteriorating financial condition resulting from Defendants' decision to abandon RxEvolution, as well as Rite Aid's high debt. Thus, Rite Aid's fundamentals were not strong.

201.   In that same call, Defendants falsely and misleadingly omitted to disclose the significant contribution of COVID vaccines to Rite Aid's quarterly earnings, thereby masking the failed RxEvolution plan.

202.   In his prepared remarks, Defendant Schroeder stated:

**<u>Our increase in Retail Pharmacy segment revenue was driven by an increase in same-store sales of 3.5%.</u>** Front-end same-store sales were up 6.1% after excluding cigarette and tobacco sales. Pharmacy same-store sales increased by 2.3% with same-store prescription count up 2.6% on a 30 day-adjusted basis due to growth in maintenance prescriptions, offset by a reduction in acute prescriptions of 4.9% resulting from the postponement of doctor's office visits and elective surgical procedures in connection with COVID and a lower incident of infections in cough, cold and flu from people staying at home…

203.   The above statement was false and misleading because it failed to disclose the short-term contribution of COVID-19 tests to Rite Aid's earnings or that COVID-19 testing was significantly masking Rite Aid's overall declining financial and operational performance. As Defendants, themselves, admitted at the close of the Class Period, declines in Rite Aid's revenue were due to declines in COVID testing and vaccines, thereby acknowledging that these factors had

significantly contributed to earnings and made Rite Aid's performance look better than it really was.

### b. October 28, 2020 "A New Day at Rite Aid" YouTube Presentation

204.   On October 28, 2020, Rite Aid posted a video to YouTube entitled "A New Day at Rite Aid," featuring Defendant Peters. In the video, Defendant Peters falsely touted the Company's ongoing commitment to its RxEvolution plan and made false claims about the plan's successes to date. In his video remarks, Defendant Peters stated:

> This strategy which we call Rx Evolution, is a comprehensive one that doubles down on our pharmacy business and focuses on unlocking the value of pharmacies and Pharmacists, revitalizing our retail and digital experience, and becoming the dominant mid-market PBM.
>
> ***
>
> I'm excited to give you an exclusive sneak peek at some elements of our full brand relaunch **which we roll out across all our markets in just a couple of weeks, a brand launch that involves far more than a new logo but one with substance and impact that involves every step of the consumer journey, both digitally and in store**.
>
> ***
>
> We certified all 6,300 plus of [our pharmacists] as integrative pharmacy specialists so that they can educate consumers on a much more holistic set of alternative remedies that complement traditional medicines. So we're looking at pharmacist very differently. We're unlocking their potential for that perfect fusion where traditional therapies meet alternative remedies and being the whole health advocate for every single customer that comes into the pharmacy. **Our pharmacists are embracing this new role. They love the fact that they're engaging in a way they envision when they actually chose to become a pharmacist.**
>
> ***
>
> We're cleaning and refreshing all our store exteriors with our new logo, signage and digital pylons and **we'll soon be formally launching our new brand with the surround sound messaging on the perfect fusion between traditional and alternative remedies**. As the customer shops the front, end they'll soon notice our

merchandise overall, and it is an overhaul, with visually impactful messaging emphasizing the better for you products our consumers want, **not the traditional mass items we've been incentivized by vendors to promote.**

\*\*\*

**We're thrilled to be grand opening our very first Stores of the Future this month within weeks with many more to come as we continue to redefine the Rite Aid experience across our retail footprint.**

With an updated blue mortar and pestle to reinforce our pharmacy core and replacing the old, tired red with green leaves to represent our embrace of holistic alternative remedies, our new logo better represents the new Rite Aid in what we stand for to be clear. **Our efforts obviously go well beyond a new logo you just saw. Our branding is more than a symbol. It's a redefinition of purpose, a revitalization of a business** and an industry with a new brand that comes to life with every touch point along the consumer 's journey.

\*\*\*

This mission was important enough a year ago before a pandemic upended life as we knew it, now it's essential and we're up for the task.

205.    In the same video, Defendant Konrad made similar statements that were likewise

materially false and misleading when made:

We're bringing that pharmacist out from behind the counter. We're making our pharmacists even more accessible than they have been in the past and **they will be front and center in every one of our pharmacies in the Stores of the Future** so that that customer, every customer knows who our pharmacist is and begins to build those relationships so as they need them and when they need them for whatever it is, they can be that trusted resource that we know they are today.

\*\*\*

We're allowing our pharmacists **and freeing up their time through lean initiatives** and, I will tell you, speaking to **our pharmacists, they are so excited** that for the first time in retail pharmacy that we are empowering them **to do exactly what they've always wanted to do. They love being in front of the customers they love that we actually physically put them there** and we're creating the space around them to support them so that they can interact more with their customers through every interaction that they have. The Store of the Future definitely is a completely different experience than any other retail pharmacy in the market.

96

206.   The above statements were materially false and misleading when made because:

i.   According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team were redeployed from the Stores of the Future project to work on the COVID vaccine rollout;

ii.   CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

iii.   According to CWs 3 and 4, Rite Aid's pharmacists were not excited about the proposed changes to their job definitions, and, in fact, were quitting at high rates;

iv.   According to CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

v.   CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021, this target was quickly reduced to fifty (50) stores and then to ten (10);

vi.   According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

vii.   The Telehealth part of RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, the dedicated rooms in pharmacies were being used for storage;

viii.   According to CWs 1 and 2, Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition; and

ix.   CW1 stated that Rite Aid did not plan to open "many more" Stores of the Future and was actually reducing its targeted number of stores on a regular basis.

207.   Commenters on the October 28, 2020 video were mainly investors. On the basis of the material presented in the video, comments included, "Very interesting. I'm gonna go buy me some rite aid stock."; "Got myself some leaps! Clear pivot from the old management.";  and "I'm

in heavily too! It's going to get very interesting very soon I think. I'm 20k shares into it and feel very comfortable in my investment."

### c. Fiscal Q3 2021 Earnings Release and Call

208.     On December 17, 2020, Rite Aid filed a Form 8-K with the SEC announcing its financial position and results of operations for Fiscal Q3 2021, ending November 28, 2020, signed by Defendant Schoeder, and held an accompanying earnings call (the "Q3 2021 Earnings Call").

209.     In the Q3 2021 Earnings Call, Defendants, again, falsely represented that they were accelerating the RxEvolution plan and growing Rite Aid's business, claiming that customer feedback to their pilot Stores of the Future had been positive. In the call, Defendant Donigan stated:

> We're really pleased with the results for the quarter. **We continue to grow our business and achieve major milestones in our transformation through the RxEvolution strategy**, all the while demonstrating the essential role we play in our communities during this unprecedented global pandemic.
>
> ***
>
> **So as a team, we're accelerating the key initiatives that will drive our transformation through the RxEvolution strategy**, which focuses on establishing Elixir as a clearly differentiated market leader in managing pharmacy spend and total cost of care for health plan and employer clients as well as omnichannel member engagement to drive better health outcome. **And in retail, we're unlocking the value of our pharmacists and revitalizing our retail and digital experiences. And we'll continue working together to deliver the operational excellence needed to achieve strong results as we generate free cash flow, reduce our debt and improve our leverage ratio**.

210.     The above statements were false and misleading when made because:

   i.    According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team were redeployed from the Stores of the Future project to work on the COVID vaccine rollout;

   ii.   CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

iii.    Rite Aid's pharmacists were unhappy with the proposed changes to their job definitions, and, according to CWs 3 and 4, were quitting at high rates;

iv.    According to CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

v.    CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021 but this target was quickly reduced to fifty (50) stores and then to ten (10);

vi.    According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

vii.    The Telehealth part of RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, the dedicated rooms in pharmacies were being used for storage;

viii.    CW2 observed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products;"

ix.    According to CWs 1 and 2, Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition; and

x.    CW 1 stated that Rite Aid did not plan to open "many more" Stores of the Future, and was actually reducing its targeted number of stores on a regular basis.

211.    In the same call, Defendant Peters falsely claimed Rite Aid was rolling out new

Stores of the Future and that Rite Aid had received positive feedback:

**<u>Customer feedback to our pilot stores has been outstanding, and we are pleased with the early initial results, both in terms of sales and margin performance. We plan to roll out our next wave of pilot stores in Q4</u>. <u>More broadly, we will continue to upgrade our entire fleet</u>** using an analytical approach that guides the type of investment, the level of investment and the timing of investment on a market-by-market and store-by-store basis.

212.    The above statements were false and misleading when made because:

99

i. According to CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store for Stores of the Future and then lowered it again to about $0.7 million per store;

ii. CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021, this target was quickly reduced to fifty (50) stores and then to ten (10);

iii. According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

iv. The Telehealth part of RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, not using the dedicated rooms in pharmacies and, instead were being used for storage;

v. According to CWs 1 and 2, Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition; and

vi. CW 1 stated that Rite Aid did not plan to open "many more" Stores of the Future, and was actually reducing its targeted number of stores on a regular basis.

### d. Fiscal 2021 Earnings Release and Call

213.   On April 15, 2021, Rite Aid filed a Form 8-K reporting its financial position and results of operations for fiscal Q4 2021 and the full 2021 fiscal year ended February 27, 2021, signed by Defendant Schroeder, and held an accompanying earnings call (the "Q4 2021 Earnings Call") on the same day.

214.   On the Q4 2021 Earnings Call, Defendants touted the continuing success of Rite Aid's RxEvolution plan and their purported ongoing commitment to implementing it. In her prepared remarks, Defendant Donigan stated:

It was also a year in which **our RxEvolution strategy was not only validated, but proven essential**. I'm really eager to share more on how our strategy came to life throughout the year.

\*\*\*

Just over a year ago at our Analyst Day, we told you we would be a demonstrably different company within the next year. And **we have delivered on that promise**, **making substantial changes to position us for profitable growth**… We opened our first three flagship store remodels, and we continue to be pleased with both the sales and margin performance in these stores.

\*\*\*

Despite the short-term challenges, our teams are clear on what needs to be done: Win today and in the future by creating real health care value, improving the consumer engagement and transforming our work to improve financial performance. **With these initiatives well underway, we're accelerating our actions toward a more nimble, efficient and effective Rite Aid.** We have and will continue to effectively manage through this crisis **while positioning our business for current and long-term success**.

215.    On the same call, Defendant Peters claimed Rite Aid had made "real progress" which was similarly false and misleading when made:

> We're just one year into our RxEvolution transformation **and this year has shown signs of real progress and validation of our strategy**. And we are encouraged that **we are focused on the right opportunities looking ahead**.

216.    The above statements were materially false and misleading when made because Defendants' RxEvolution strategy was not well underway, validated, nor proven essential in Fiscal 2021; Defendants had not delivered on their promise to make Rite Aid a demonstrably different company; and the RxEvolution initiatives were not yielding positive results. To the contrary, rather than accelerating Rite Aid's actions toward a changed Company and positioning its business for long-term success, Defendants had all but abandoned the RxEvolution initiatives, as evidenced by the following:

   i.    According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team to work on the Stores of the Future project were redeployed to work on the COVID vaccine rollout;

ii.   CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

iii.   Rite Aid's pharmacists were not in favor of the proposed changes to their job definitions, and, according to CW4, were quitting at high rates;

iv.   According CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

v.   CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021 but this target was quickly reduced to fifty (50) stores and then to ten (10);

vi.   According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

vii.   The Telehealth part of RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, not using the dedicated rooms in pharmacies and, instead were being used for storage;

viii.   CW2 observed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products;" and

ix.   According to CWs 1 and 2, Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition; and

x.   Thus, contrary to Defendants' false statements, as a result of the foregoing, Defendants had not made "real progress" or "validated" the RxEvolution plan and, as a result, Rite Aid was not positioned for "current and long-term success."

217.   During the question and answer portion of the Q4 2021 Earnings Call, Defendants were directly asked whether the pandemic had any impact on the execution of the RxEvolution turnaround plan. In response, Defendants assured that it had not, that "*everything*" was "on track," that they had executed on *"every* strategic initiative" outlined at the March 16, 2020 Analyst Day, and that they remained committed to "*everything* [they had] set out to do."

**Michael Minchak**

It's Mike Minchak on for Lisa. So first, just wondering if you could talk about how the pandemic may have impacted some of your key longer term turn-around initiatives. Has there been any delay in those initiatives just given the near-term focus on vaccine administration and testing? And if we look back to the Analyst Day last March, you've laid out some longer-term targets for fiscal '23. Should we think about those targets still remaining intact at this point?

**Heyward Donigan**

<u>**Everything is on track**</u>. I mean, I think that's one of the most remarkable things that I even kind of reflect on and can't believe is that <u>**we have executed on every strategic initiative that we set ourselves up for back at Analyst Day over a year ago.**</u>

…

So I think there is a lot of noise in the pandemic. But the fact that <u>**we've been able to do all of that**</u> in addition to launching COVID testing, keeping our store clean, protecting our associates and our customers and getting people vaccinated, it's been quite a year. <u>**And so we remain committed to everything that we had set out to do**</u>.

218.    The above statements were materially false and misleading when made because Defendants had not executed on every strategic initiative outlined in the Analyst Day call, were not "on track" to achieve the goals they had laid out in the March 2020 Analyst Day call, and did not remain committed to everything they had set out to do, as evidenced by the following:

      i.    According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team to work on the Stores of the Future project were redeployed to work on the COVID vaccine rollout;

     ii.    CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

   iii.    Rite Aid's pharmacists were not in favor of the proposed changes to their job definitions, and, according to CWs 3 and 4, were quitting at high rates;

   iv.    According CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

    v.    CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75

103

upgraded in Fiscal 2021 but this target was quickly reduced to fifty (50) stores and then to ten (10);

vi.      According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

vii.     The Telehealth part of RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, not using the dedicated rooms in pharmacies and, instead were being used for storage;

viii.    CW2 observed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products;" and

ix.      According to CWs 1 and 2, Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition; and

x.       Thus, contrary to Defendants' false statements, as a result of the foregoing, Defendants were not "on track" to meet the goals they had laid out in the March 2020 Analyst Day call and did not "remain committed to everything [they had] set out to do."

### e.   Fiscal Q1 2022 Earnings Release and Call

219.    On June 24, 2021, Rite Aid filed a Form 8-K reporting its financial position and results of operations for Fiscal Q1 2022, ended May 29, 2021, signed by Defendant Schroeder, and held an accompanying earnings call ("Q1 2022 Earnings Call") on the same day.

220.    On the Q1 2022 Earnings Call, Defendants continued to mislead investors regarding the progress of Rite Aid's RxEvolution plan, and specifically the development of their Stores of the Future and included the below statements that were false and misleading when made.

221.    As part of her prepared remarks, Defendant Donigan stated: "**In addition, this quarter, we opened seven new flagship stores**, four of which opened in Boise, Idaho, and three in the Virginia Beach, Virginia market. **This brings us up to 10 flagship stores opened**, and Jim will share more on what we're seeing and learning in this important work as it progresses."

222.    Similarly, Defendant Peters stated: "As Heyward mentioned earlier, **we opened seven new flagship pilot stores this quarter, bringing us to 10 total stores open**. We are pursuing a test and learn approach while assessing the impact of various components of our new flagship prototype in different market conditions.

223.    The above statements were false and misleading when made and misleadingly omitted critical, material information because Rite Aid's "flagship" stores were significantly different than the Stores of the Future flagships they had previously touted because:

  i.   According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team to work on the Stores of the Future project were redeployed to work on the COVID vaccine rollout;

  ii.   According CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

  iii.   CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021 but this target was quickly reduced to fifty (50) stores and then to ten (10);

  iv.   According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

  v.   The Telehealth part of the RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, the dedicated rooms in pharmacies instead were being used for storage; and

  vi.   According to CWs 1 and 2, Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition.

224.    During the question and answer portion of the same call, Defendants again falsely assured investors—in response to direct analyst questions—that Rite Aid's earnings growth was

sustainable and not simply a function of COVID tests and vaccines, suggesting that Rite Aid was implementing the RxEvolution plan as described and COVID test and vaccine growth would be sustained:

**Glen Santangelo**

I appreciate all those comments. But, Heyward, maybe from a big picture perspective, I mean, if you put the vaccine commentary and profitability and perspective, you earn $95 million in EBITDA in your Retail Pharmacy Segment and about $70 million that was vaccine.

So that would kind of imply you were just modestly profitable in your retail segment, and you had 2% to 3% organic script growth ex the vaccine. And so, I can see how that could get better, but I think – what I think we're kind of struggling with is to – in looking at the company in totality where you have $300 million in CapEx requirements, $200 million in interest expense requirements.

*It seems like we're a far way away from generating sustainable free cash flow*. And just to follow up on Matt's comments, he is hoping the leverage sitting, to use your math, at six times, with the hope of sort of taking that to four times in the coming years, *that's almost $1 billion in free cash flow that's kind of needed to bring that leverage down to that level*.

And so, I'm just trying to understand the big picture path to kind of get us there. *Is it really an improvement in scripts? Is it just an overall improvement in Elixir? It feels like a lot of things need to happen to kind of get to where you want to be.* Sorry, that was kind of a long-winded question, but…

**Heyward Donigan**

Yes. Well, I mean that is the ultimate dilemma of taking over a company in the situation with this amount of debt. And so, I think we are a company that is very much in need of demonstrating organic growth. **And I think had -- we have some early indicators of showing that we can do that even in the middle of a pandemic**.

If you look at our inventory turns and if you look at our recent results ex-OTC and acute, you can see, what I will call, rays of hope that **our underlying business is improving**. And so I think the issue that we have right now is the most profitable part of our business has been under extreme duress, and not just has been but still is, and that's the cough, cold, flu, and all the acute business that has not yet come back.

So, as we look at it and as we model this out, we have to just take that into consideration and look at the business ex all of those factors and what a rebound would look like plus increase. We have taken market shares, so **we have shown that on the front end, we can take market share**. At the end of the day, what we've

said, I think repeatedly, is we have to grow scripts, that is our number one priority is growing scripts.

…

And the other thing I would say is **COVID vaccines are not a one-time thing for us as a company. COVID vaccines, whether there is a booster shot this year or next year, we're living with COVID. We're living with -- COVID vaccines will be a permanent, I think, weapon in our arsenal**. And what we don't know is how many boosters, when will the boosters, if they'll do it under 12. We are not assuming any of that happens this year.

225.    The above statements were false and misleading when made because Rite Aid was not demonstrating organic growth and its core business was not improving, nor was the Company able to sustain current revenue growth, which, unknown to investors, was solely the result of COVID-19 vaccines and testing, because Defendants had all but abandoned Rite Aid's RxEvolution turnaround plan, as evidenced by the following:

i.     According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team were redeployed from the Stores of the Future project to work on the COVID vaccine rollout;

ii.    CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

iii.   According to CW4, Rite Aid's pharmacists were not on board with the proposed changes to their job definitions, and, in fact, were quitting at high rates;

iv.    According CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

v.     CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021, this target was quickly reduced to fifty (50) stores and then to ten (10);

vi.    According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

107

vii.   The Telehealth part of the RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, the dedicated rooms in pharmacies instead were being used for storage;

viii.  According to CWs 1 and 2, Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition;

ix.    Rite Aid was already acknowledging internally during Company meetings that vaccines would not be a continuing source of significant revenue; and

x.     According to CW1, as soon as Rite Aid reached its target of administering 1 million shots, it ceased to consider COVID vaccination a "Special Project" and stopped holding weekly meetings about it because it was  "no longer the number one priority" at the Company because the vaccine was "just a shot" and "fewer people were getting vaccinated."

**f.   June 24, 2021 CNBC Interview**

226.   Also on June 24, 2021, Defendant Donigan appeared on CNBC's Squawk Box to discuss the Company's financial results and plans. In the interview Defendant Donigan falsely touted the ongoing success of the RxEvolution plan with respect to the push to sell organic products to customers, falsely stating:

> We're almost three times in terms of our inventory terms which are up 8% and that's really a reflection on **how strong our merchandise mix is as well as our better for you organic product offerings which are more on trend targeting our new customer** which is the female from age 25 to 49. She's really coming into buy things for her kids and things for herself and things for her parents. So we're pretty excited because **we really are starting to see the results and the traction that we were hoping for**.

227.   The above statement was false and misleading when made because:

i.     Rite Aid's RxEvolution initiatives were not showing positive results;

ii.    According to CWs 1 and 2, Rite Aid's plan to push natural and holistic products was not succeeding and Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition; and

108

iii.   Natural and holistic products were never top sellers and rarely sold out during the Class Period.

### g.   Fiscal Q2 2022 Earnings Release and Call

228.   On September 23, 2021, Rite Aid filed a Form 8-K reporting its financial position and results of operations for Fiscal Q2 2022, ended August 28, 2021, signed by Defendant Schroeder, and held an accompanying earnings call (the "Q2 2022 Earnings Call").

229.   In the press release attached to the 8-K filing, Defendants continued to mislead investors regarding the progress of the RxEvolution plan and the strength of Rite Aid's core business that purportedly could be sustained without the short-term benefit of COVID tests and vaccines:

> Since launching our strategy last March, **our organization is executing a clear plan to build top-line momentum with an intense focus on improving our profitability**. **We have transformed our business to be more relevant to our target growth consumer and more efficient in how we operate, while making investments necessary to drive the long-term health of our business**. **The progress on our RxEvolution strategy validates our belief that, as the trusted everyday care connector, Rite Aid will drive lower healthcare costs through better coordination, stronger engagement, and personalized services that help our customers achieve whole health for life.**

230.   In her prepared remarks on the Q2 2022 Earnings Call, Defendant Donigan falsely claimed that Rite Aid's RxEvolution strategy was "exceeding expectations" and driving "new growth:"

> Before digging into the results, I want to spend a moment on the big picture. Our RxEvolution strategy is showing promising results and I'm encouraged **that we're not only exceeding expectations, but also demonstrating that our strategy is gaining momentum**. We all know the important role pharmacists play in the health of the communities we serve. Never has that been more obvious than during a pandemic. **We're also seeing our retail and digital evolution drive new growth** and demonstrate a new Rite Aid for our retail customers.
> …
> As for the second quarter, we grew our revenues 2.2% to $6.1 billion, including a 6.5% increase in our retail segment. And we improved our inventory turns by 7%. **Continuing our strong trend in inventory turns from prior quarters demonstrating that people are really liking our new merchandise**.

231.    The above statements were false and misleading when made because Defendants had all but abandoned the RxEvolution initiatives and, thus, Rite Aid was not "executing a clear plan to build top-line momentum" or engaging in an "intense focus on improving our profitability," as evidenced by the following:

i.    According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team were redeployed from the Stores of the Future project to work on the COVID vaccine rollout;

ii.    CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

iii.    Rite Aid's pharmacists were not excited about the proposed changes to their job definitions, and, according to CWs 3 and 4, were quitting at high rates;

iv.    According CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

v.    CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021, this target was quickly reduced to fifty (50) stores and then to ten (10);

vi.    According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

vii.    The Telehealth part of RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, not the dedicated rooms in pharmacies instead were being used for storage;

viii.    According to CWs 1 and 2, Rite Aid's plan to push natural and holistic products was not succeeding and Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition; and

ix.    According to CW1, Rite Aid's own internal data consistently showed that any initial boost to sales from RxEvolution initiatives faded within weeks.

### h.   Fiscal Q3 2022 Earnings Release and Call

232.    On December 21, 2021, Rite Aid filed a Form 8-K reporting its financial position and results of operations for fiscal Q3 2022, ended November 27, 2021, signed by Defendant Schroeder, and held an accompanying earnings call (the "Q3 2022 Earnings Call").

233.    On the Q3 2022 Earnings Call, Defendants continued to misrepresent to investors that the RxEvolution was driving sustainable change and growth. Defendant Donigan made the following statements that were false and misleading when made:

> Thanks, Trent, and good morning, everyone. I'm pleased with our third quarter performance as we grew our revenue and increased adjusted EBITDA by nearly 13%. … As we move forward, **we are unleashing the next evolution of our strategy, and we are laser-focused on an evolved view of the pharmacy of the future**. What that really means is a pharmacy business that's not limited to what we usually think about, a traditional in-store definition of pharmacy. **Rather, our efforts, and we've been talking about this for a couple of years, are centered on an expanded view of pharmacy and what we've been calling internally our omnipharmacy strategy. That is our RxEvolution is driving our transition from a company with numerous loosely tied pharmacy parts to an omnipharmacy business whose value and relevance as a whole is far greater than the sum of its individual parts**.

234.    The above statements were false and misleading when made and Rite Aid's RxEvolution was not driving EBITDA growth or transition as a Company because Defendants had all but abandoned the RxEvolution initiatives, as evidenced by the following:

   i.   According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team were redeployed from the Stores of the Future project to work on the COVID vaccine rollout;

   ii.   CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

   iii.   According to CW4, Rite Aid's pharmacists were not on board with the proposed changes to their job definitions, and, in fact, were quitting at high rates;

iv.   According to CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

v.   CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021, this target was quickly reduced to fifty (50) stores and then to ten (10);

vi.   According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

vii.   The Telehealth part of the RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, the dedicated rooms in pharmacies instead were being used for storage;

viii.   According to CWs 1 and 2, Rite Aid's plan to push natural and holistic products was not succeeding and Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition;

ix.   CW1 stated that Defendants had significantly reduced their plans for new Stores of the Future, and would only open—at most—two additional stores between the pilot rollout and November 2021; and

x.   The Company remained burdened with enormous amounts of debt and ongoing related expenses that its earnings could not sustainably cover.

235.   On the same call, Defendants falsely claimed that any headwinds from declines in COVID-19 tests and vaccines would be counterbalanced by other trends, including increases in front-end margins related to RxEvolution initiatives:

We recognize the headwind that the expected reduction in COVID-related benefits is to fiscal 2023. **We expect benefits from several areas to offset this gap**, including: cost reductions from our store closure program, which we expect to contribute benefits in excess of the $25 million run rate benefit that we will get from the 63 closures already approved; **improvements in front-end margin from the launch of a new loyalty program and expansion of our own brands**; improved PBM margins from our new rebate aggregation agreement; **progression toward more normalized levels of acute script activity in the pharmacy**; and operating

expense efficiencies from further back office consolidation in our retail and pharmacy businesses and continuing to leverage lean.

236. The above statements were false and misleading when made because Defendants

knew that future earnings from improvements and innovations would not offset the loss of revenue

from COVID-19 testing and vaccines because Defendants had all but abandoned the RxEvolution

initiatives and, thus, would be unable to sustain COVID-level revenues, which masked the

Company's poor financial and operational performance, as evidenced by:

    i.    According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team were redeployed from the Stores of the Future project to work on the COVID vaccine rollout;

    ii.    CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

    iii.    According to CW4, Rite Aid's pharmacists were not on board with the proposed changes to their job definitions, and, in fact, were quitting at high rates;

    iv.    According to CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

    v.    CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where  Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021, this target was quickly reduced to fifty (50) stores and then to ten (10);

    vi.    According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

    vii.    The Telehealth part of RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, the dedicated rooms in pharmacies instead were being used for storage;

    viii.    According to CWs 1 and 2, Rite Aid's plan to push natural and holistic products was not succeeding and Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen

and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition;

ix.   CW1 stated that Defendants had significantly reduced their plans for new Stores of the Future, and would only open—at most—two additional stores between the pilot rollout and November 2021;

x.   Rite Aid was already acknowledging internally that vaccines would not be a continuing source of significant revenue; and

xi.   According to CW1, as soon as Rite Aid reached its target of administering 1 million shots, it ceased to consider COVID vaccination a "Special Project" and stopped holding weekly meetings about it because it was "no longer the number one priority" at the Company because the vaccine was "just a shot" and "fewer people were getting vaccinated."

xii.   As a result of the above, Rite Aid would not see benefits from the gap in decline in COVID-19 project revenue.

### i. Fiscal 2022 Earnings Release and Call

237.   On April 14, 2022, Rite Aid filed a Form 8-K reporting its financial position and results of operations for fiscal Q4 2022 and the full 2022 fiscal year for the period ended February 26, 2022, signed by Defendant Schroeder and held an accompanying earnings call (the "Q4 2022 Earnings Call") on the same day. During the Q4 2022 Earnings Call, Defendant Schroeder continued to misrepresent that Rite Aid was implementing meaningful, sustainable change in its core pharmacy business and generating earnings growth thereby, stating: "**We expect to see continued growth in comp sales and script growth in our core business after excluding the impact of COVID**."

238.   The above statements were materially false and misleading and omitted to disclose material information because they implied that Rite Aid's EBITDA growth in 2022 was attributable to steps Defendants had taken in the midst of a challenging environment, rather than a tailwind from COVID vaccines and tests, Rite Aid was not then seeing meaningful growth in comp

sales or script growth in its core business, and Rite Aid had long abandoned pursuing the

RxEvolution plan it laid out to stabilize and grow the company, as evidenced by the following:

i.    According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team were redeployed from the Stores of the Future project to work on the COVID vaccine rollout;

ii.    CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

iii.    According to CW4, Rite Aid's pharmacists were not on board with the proposed changes to their job definitions, and, in fact, were quitting at high rates;

iv.    According CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

v.    CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021, this target was quickly reduced to fifty (50) stores and then to ten (10);

vi.    According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

vii.    The Telehealth part of the RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, the dedicated rooms in pharmacies were being used for storage;

viii.    CW2 observed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products;"

ix.    According to CWs 1 and 2, Rite Aid's plan to push natural and holistic products was not succeeding and Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition;

x.    CW1 stated that Defendants had significantly reduced their plans for new Stores of the Future, and would only open—at most—two additional stores between the pilot rollout and November 2021;

xi.     Rite Aid was already acknowledging internally that vaccines would not be a continuing source of significant revenue; and

xii.    COVID-19 revenues were masking the Company's deteriorating financial condition resulting from Defendants' decision to abandon RxEvolution. Thus, Rite Aid was not experiencing any growth, let alone "continued growth" and its earnings could not sustainably cover expenses, including interest expense from Rite Aid's heavy debt load.

### j.  Fiscal Q1 2023 Earnings Release and Call

239.    On June 23, 2022, Rite Aid filed a Form 8-K reporting its financial position and results of operations for fiscal Q1 2023, ended May 28, 2022, signed by Defendant Schroeder and held an accompanying earnings call (the "Q1 2023 Earnings Call") on the same day. On the Q1 2023 Earnings Call, Defendants continued to falsely assure investors that they had grown pharmacy scripts in a way that was sustainable and external to COVID vaccine tailwinds.

240.    The question and answer portion of the call included the following exchange between analyst George Hill and Defendant Donigan, in which Donigan falsely assured that Defendants "[had] shown [Rite Aid] could grow scripts even cycling the significant benefit [they] got from vaccines":

**George Robert Hill**, Deutsche Bank AG, Research Division
Yes. I guess, Matt, my first question is kind of a big picture question, which is that if you look at the $100 million in EBITDA that the company delivered this quarter, *you take out $30 million to $35 million in the vacs, the business did $65 million*. Of course, there will be a continuing benefit from the vacs *but the profitability of the business basically needs to double every quarter from this quarter to kind of hit around the midpoint of the guidance*. You've talked about some of the embedded cost cuts. I guess what I would ask is, could you and Heyward kind of talk through where you see the growth opportunities versus the cost reductions? Kind of what I'm trying to get to is that -- are we -- *do we feel like we're back in the growth phase* of the business coming out of the pandemic? Or are we still more than a shrink-to-grow type outlook?

**Heyward Rutledge Donigan**, President, CEO & Director
Yes, George, it's Heyward. Thanks. I think it's a combination. We are -- **we've shown that we can grow our scripts, even cycling the significant benefit we got from vaccines last year. So our core scripts are up. And that's just the beginning**…

241.    The above statements were materially false and misleading and omitted to disclose material information because they implied that Rite Aid's EBITDA growth in 2022 was attributable to steps Defendants had taken in the midst of a challenging environment, rather than a tailwind from COVID vaccines and tests, Rite Aid was not then seeing meaningful growth in comp sales or script growth in its core business, and Rite Aid had long abandoned pursuing the RxEvolution plan it laid out to stabilize and grow the company, as evidenced by the following:

i.      According to CW1, in response to the COVID pandemic, in late 2020 Rite Aid began diverting resources from its RxEvolution projects to instead work on COVID-19 relief efforts, such as COVID-19 testing and vaccine administration. CW1 and other members of CW1's newly hired team were redeployed from the Stores of the Future project to work on the COVID vaccine rollout;

ii.     CW4 recalled that "everybody" at Rite Aid was consumed with COVID-related initiatives, leaving no time for other focuses;

iii.    According to CW4, Rite Aid's pharmacists were not on board with the proposed changes to their job definitions, and, in fact, were quitting at high rates;

iv.     According CW1, around September of 2020, a Rite Aid Senior Vice President who served as the "Head of Construction" reduced the project's budgets from $8 million to $1 million per store and then lowered it again to about $0.7 million per store;

v.      CW1 recalled that the scope of the Stores of the Future project was dramatically reduced. Where Rite Aid initially planned to upgrade a few hundred stores, with 75 upgraded in Fiscal 2021, this target was quickly reduced to fifty (50) stores and then to ten (10);

vi.     According to CW2, the few changes that were implemented as part of the Stores of the Future project did not meaningfully impact Rite Aid's performance because they were merely cosmetic;

vii.    The Telehealth part of RxEvolution was unsuccessful because, as CW1 recalled, patients were not using telehealth services and, thus, the dedicated rooms in pharmacies instead were being used for storage;

viii.   According to CWs 1 and 2, Rite Aid's plan to push natural and holistic products was not succeeding and Rite Aid's category sales reports throughout the Class Period showed that customers came to Rite Aid for familiar products like ibuprofen and NyQuil and were "just not interested in natural products" that Rite Aid was trying to sell as part of its RxEvolution transition;

117

ix.   CW1 stated that Defendants had significantly reduced their plans for new Stores of the Future, and would only open—at most—two additional stores between the pilot rollout and November 2021;

x.   Rite Aid was already acknowledging internally that vaccines would not be a continuing source of significant revenue; and

xi.   The Company remained burdened with enormous amounts of debt and ongoing related expenses that its earnings could not sustainably cover.

### C. THE TRUTH IS REVEALED

#### 1. March 30, 2022 Corrective Disclosure

242.   The truth with respect to Rite Aid's exposure to substantial opioid liability began to emerge on March 30, 2022, when CVS reached a $484 million settlement with the state of Florida related to opioid prescriptions at its pharmacies. On the announcement of the CVS $484 million settlement, RAD common stock fell $0.90, or *8.77*%, from a close of $10.26 on March 29, 2022 to a close of $9.36 on March 30, 2022 on unusually high trading volume.

243.   The CVS settlement was highly significant to Rite Aid investors because, like CVS, Rite Aid was named in multiple lawsuits relating to unlawfully filling opioid prescriptions in the United States. Moreover, also like CVS, Rite Aid was a top-10 dispenser of opioids by volume in the United States.[27] Rite Aid differed from CVS, however, in that its significant debt burden threatened its ability to withstand a significant judgment or settlement amount.

244.   As a result of the March 30, 2022 partial corrective disclosure, Rite Aid's subsequent filings with the SEC included, in connection with the opioid litigation to which it was a party, that "[s]ubstantial damages are sought from the Company in virtually all of these matters."

---

[27] Jenn Abelson, et al., *At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids, Washington Post*, Washington Post (November 7, 2019), https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/.

## 2. September 29, 2022 Corrective Disclosure

245.    On September 29, 2022, Rite Aid shocked the market with its announcement of its Q2 2023 financial results, which included $331.3 million in losses for the quarter compared to a loss of $100.3 million a year earlier. In the Retail Pharmacy segment, adjusted EBITDA was $31.5 million, or 0.7% of revenues, equaling a $37.9 million, or greater than 50%, decline from adjusted EBITDA of $69.4 million, or 1.6% of revenues, in Q2 2022. In Rite Aid's press release announcing these results, Rite Aid disclosed that the declines in the Retail Pharmacy segment were driven "by a reduction in COVID vaccine and testing revenue as well as store closures." On an earnings call held that same day, Defendant Schroeder reiterated that Rite Aid's disappointing revenues for the quarter resulted in part from "a decline in COVID testing and vaccine revenue."

246.    These disclosures revealed for the first time that COVID testing and vaccine revenue was masking Rite Aid's weak core retail performance and failed RxEvolution plan. In particular, Defendants' disclosure revealed for the first time that Defendants had not been aggressively rolling out the RxEvolution plan or seen significant improvements in Rite Aid's financial results from initiatives focused on growing the core retail business, as previously represented. Further, the disclosure began to reveal the true extent that COVID-19 vaccine and testing revenue had been masking Rite Aid's failing RxEvolution plan and declining financial performance. On this news, Rite Aid's stock price fell $1.97 per share, or **28.02**%, from a close of $7.03 on September 28, 2022 to a close of $5.06 per share on September 29, 2022.

## 3. December 21, 2022 Corrective Disclosure

247.    On December 21, 2022, Rite Aid Announced dismal Q3 2023 financial results. Quarterly revenue fell 2.3% to $6.08 billion, and net loss nearly doubled to $67.1 million compared to a loss of $36.1 million the year prior. Additionally, Rite Aid updated its guidance to reflect an

expected increase in net losses to a range of $584 million to $551 million from a range of $520.3 to $477.3 million. In an earnings call held that same day, Defendants expressly attributed the declines in revenue to, foremostly, "a decline in COVID testing and vaccine revenue," and acknowledged that demand for COVID-19 vaccines in the quarter was "weaker than we expected." Similarly, in the December 21, 2022 press release, Defendant Donigan attributed the lowered guidance to pharmacy margins, explaining "we are lowering our full year guidance due to headwinds including pharmacy margin[.]" Thus, Defendants revealed for the first time the full extent to which Covid test and vaccine revenue had inflated earnings and that the RxEvolution plan was unsuccessful and would not replace those earnings when they abated, as previously represented.

248.    On this news, Rite Aid's stock price fell $0.76 per share, or ***17.23***%, from a close of $4.41 on December 20, 2022 to a close of $3.65 per share on December 21, 2022 on unusually high trading volume.

### 4.   March 13, 2023 Corrective Disclosure and Materialization of Risk

249.    On Monday, March 13, 2023, after market hours, the DOJ announced in a press release that it had filed a lawsuit against Rite Aid intervening in a whistleblower action against Rite Aid and various subsidiaries, alleging that Rite Aid repeatedly and <u>knowingly</u> filled unlawful prescriptions for controlled substances from at least May 2014 through June 2019 in violation of the False Claims Act (FCA). The DOJ complaint also included allegations involving violations of the Controlled Substances Act (CSA). The DOJ Press Release stated, in pertinent part:

> "We allege that Rite Aid filled hundreds of thousands of prescriptions that did not meet legal requirements," said Associate Attorney General Vanita Gupta. "According to our complaint, ***Rite Aid's pharmacists repeatedly filled prescriptions for controlled substances with obvious red flags, and Rite Aid intentionally deleted internal notes about suspicious prescribers***. These practices opened the floodgates

for millions of opioid pills and other controlled substances to flow illegally out of Rite Aid's stores."

***

The government's complaint alleges that, from May 2014 through June 2019, Rite Aid knowingly filled at least hundreds of thousands of unlawful prescriptions for controlled substances that lacked a legitimate medical purpose, were not for a medically accepted indication, or were not issued in the usual course of professional practice. These unlawful prescriptions included, for example, prescriptions for the dangerous and highly abused combination of drugs known as "the trinity," prescriptions for excessive quantities of opioids, such as oxycodone and fentanyl, and prescriptions issued by prescribers whom Rite Aid pharmacists had repeatedly identified internally as writing illegitimate prescriptions.

The government alleges that Rite Aid pharmacists filled these prescriptions despite clear "red flags" that were highly indicative that the prescriptions were unlawful. The government further alleges that Rite Aid not only ignored substantial evidence *from multiple sources that its stores were dispensing unlawful prescriptions, including from certain pharmacists, its distributor, and its own internal data, but compounded its failure to act by intentionally deleting internal notes about suspicious prescribers written by Rite Aid pharmacists and directing district managers to tell pharmacists "to be mindful of everything that is put in writing." By knowingly filling unlawful prescriptions for controlled substances, the government alleges that Rite Aid violated the CSA and, where Rite Aid sought reimbursement from federal healthcare programs, also violated the FCA.*

250.    Thus, the DOJ Complaint revealed to the investing public that Rite Aid had systematically, repeatedly, and knowingly dispensed controlled substances that were not medically indicated for a period of years in blatant violation of state and federal law and at extreme costs to public health and human lives and held copious evidence of the same.

251.    On this news, Rite Aid's stock fell $0.62 per share, or *18.9*%, from a close of $3.28 on March 13, 2023 to a close of $2.66 on March 14, 2023 on unusually heavy trading volume.

### 5.  August 25, 2023 Corrective Disclosure and Materialization of Risk

252.    The truth of Rite Aid's distressed financial condition and the impact of its exposure to the opioid litigations, as well as Defendants' decision and failure to execute on the RxEvolution plan more fully emerged when news leaked publicly, revealing that Rite Aid was preparing to file

121

for Chapter 11 bankruptcy due to the impact of opioid lawsuits on its financial position.  On

August 25, 2023, an article published by the Wall Street Journal entitled "Rite Aid Prepares

Bankruptcy That Would Halt Opioid Lawsuits," revealed to the public that "Rite Aid is preparing

to file for bankruptcy in coming weeks to address mass federal and state lawsuits the drugstore

chain is facing over its alleged role in the sale of opioids, according to people familiar with the

company's plans." The article further explained that the "chapter 11 filing would cover Rite Aid's

more than $3.3 billion debt load."

253.     On the revelation of Rite Aid's planned bankruptcy, RAD common stock fell $0.73,

or nearly 50.69%, from a close of $1.44 on August 24, 2023 to a close of $0.71 on August 25,

2023 on unusually high trading volume.

### D.  ADDITIONAL SCIENTER ALLEGATIONS

254.     As alleged herein, Defendants acted with scienter in that they knew, or recklessly

disregarded, that the public documents and statements they issued and disseminated to the public

in the name of the Company, or in their own name, during the Class Period were materially false

or misleading when made. Defendants, by virtue of their receipt of information reflecting the true

facts regarding Rite Aid' exposure to the opioid litigation and negative financial impact from

deliberately abandoning the RxEvolution plan in favor of capturing a quick buck from distributing

COVID-19 tests and vaccines, and their control over, receipt, and modification of Rite Aid's

materially misleading statements, were active and culpable participants in the fraudulent scheme

alleged herein.

255.     As discussed below, Defendants were aware of, or recklessly disregarded that, their

statements made to the investing public during the Class Period were materially false and

misleading when made from: (1) Defendants' admitted cooperation with regulatory and lawsuit

subpoenas concerning Rite Aid's role in the opioid crisis; (2) Rite Aid's Regulatory Affairs Department reviewed or recklessly ignored "thousands" of tickets from pharmacist documenting "red flags" indicating Rite Aid's pharmacies were unlawfully dispensing controlled substances; (3) Defendants' attendance at weekly meetings discussing declining COVID revenues; (4) Defendants' deliberate decision to divert resources away from RxEvolution to COVID-19 projects; (5) Defendants had access to and/or received, internal reports demonstrating Rite Aid was unlawfully dispensing controlled substances and that its RxEvolution Plan was a failure; (6) Defendants knowingly violated Rite Aid's own internal policies and procedures; (7) Defendants' detailed responses to analyst questions and press releases; (8) excessive executive resignations at suspicious times; and (9) corporate scienter. Moreover, Defendants were motivated to inflate Rite Aid's stock prices to profit from insider sales.

### 1. That Defendants Admittedly Produced Documentary Evidence of Rite Aid's Illicit Dispensing of Controlled Substances in Response to Governmental and Regulatory Subpoenas Supports a Strong Inference of Scienter

256.   For over a decade, Defendants cooperated with multiple Federal and State agencies regarding investigations into its dispensing practices. As Defendants admitted in Rite Aid's 2019 10-K, starting in April 2012, Rite Aid received administrative subpoenas from the U.S. Drug Enforcement Administration and the U.S. Attorney's Office for the Northern District of New York regarding sales of pseudoephedrine products and possible civil violations of the Combat Methamphetamine Epidemic Act of 2005.

257.   Furthermore, in June 2013, the United States Attorney's Office for the Eastern District of California served Rite Aid with a civil investigative demand regarding Rite Aid's drug utilization review and prescription dispensing protocol as well as the dispensing of drugs designated as "Code 1" by the State of California.

258.    Also, in its 2019 10-K, Rite Aid disclosed that it is a defendant in the consolidated multidistrict litigation proceeding, *In re National Prescription Opiate Litigation* (Case No. 17-md-2804), pending in the U.S. District Court for the Northern District of Ohio. New cases continued to be added each week to the multi-district litigation, which at one point included over 860 federal court lawsuits that named the Company, including lawsuits filed by counties and municipalities in several states. Attorneys General of several states and the federal government disseminated subpoenas, civil investigative demands, warrants, subpoenas, civil investigative demands, and other requests for documents and information regarding opioids and other controlled substances in connection with these lawsuits against Rite Aid.

259.    Rite Aid admitted in its 10-Ks every year from 2019-2022 that "the Company was cooperating with and responding to these investigatory inquiries."

260.    On March 13, 2023, the DOJ intervened in the multi-district litigation in Ohio, which revealed the extent and systematic nature of Rite Aid's inappropriate and legally problematic dispensing practices and Defendants' knowledge of the same. The DOJ complaint revealed to the public, for the first time, internal evidence produced by Rite Aid that the DOJ collected to support its claims. By its own admissions, Rite Aid had collected, cooperated, and provided the information cited in the DOJ complaint, and thus was fully aware of its own documents and information (including witness interviews and depositions) provided in connection with the subpoenas.

261.    Accordingly, Rite Aid's admitted cooperation with, personal knowledge of, and involvement in, multiple investigations where in it produced mountains of documents evidencing Rite Aid's direct participation in the opioid crisis in which its pharmacies filled unlawful prescriptions of controlled substances culminating in the DOJ complaint, is strong evidence that

Defendants knew that the false statements detailed herein were materially false and misleading when made and/or they were reckless in making those statements.

> **2.  That Rite Aid's Regulatory Affairs Department Knew the Company Was Illegally Dispensing Opioids Creates a Strong Inference of the Individual Defendants' Scienter and Corporate Scienter**

262.    From at least 2014 to 2019, Rite Aid systematically, improperly, and knowingly filled highly suspect prescriptions, despite the prescriptions being marked as containing "red flags." As detailed in Section V.A.3.b, *supra*, Rite Aid collected information about the dispensing of prescriptions related to the following red flags: (1) Trinity prescriptions; (2) prescriptions for excessive quantities and prolonged periods; (3) duplicative prescriptions by multiple prescribers; (4) early refills; (5) prescriptions for patients receiving only opioid and Trinity prescriptions; and (6) prescriptions by prescribers acting outside the usual course of professional practice. For example, as detailed in the DOJ complaint, an internal corporate review conducted in August 2017 for fills in June 2017 found that over 1,000 patients filled Trinity prescriptions at Rite Aid stores in that month alone.

263.    Rite Aid's internal system, HARP, was instituted to prevent unlawful dispensing of controlled substances. The steps included (1) review prescription, (2) validate prescription, (3) validate prescriber, (4) validate patient, (5) dispense or not dispense, and (6) report suspicious activity. Rite Aid instructed its pharmacists to comply with HARP Step 6 by submitting "tickets" through RACS.

264.    According to the DOJ Complaint, during the period 2014 through 2019, Rite Aid's Regulatory Affairs Department received and reviewed and/or recklessly ignored these tickets, which documented "red flags" relating to suspicious prescribers and prescriptions that they identified. Even when Rite Aid's Regulatory Affairs Department did review tickets, it disregarded them and told the pharmacists to continue filling prescriptions unless Rite Aid had issued a

corporate block (which never happened). The DOJ uncovered several examples of this behavior which are detailed in Section V.A.3.c-d, *supra*.

265.   Defendants had access to pharmacist tickets documenting "red flags" through the RACS system. Indeed, Defendants were directly informed that Rite Aid was failing to properly monitor opioid dispensing by Janet Hart who oversaw the Regulatory Affairs Department during the Class Period. According to the DOJ Complaint, Hart personally acknowledged to Rite Aid senior management in December 2017 that "Rite Aid could leverage existing tools 'to identify outlier prescribers but at present there is not enough time to dive into the data.'"

266.   Defendants' access to internal data documenting pharmacists' reports of "red flags" and incidents of dispensing controlled substances is strong evidence that the Defendants knew, or recklessly disregarded that  Rite Aid was filling highly suspect prescriptions and that the statements they made concerning opioids were materially false and misleading when made and/or were made with reckless disregard for the truth.

267.   Rite Aid was also alerted by external distributor, McKesson, about its practice of unlawfully dispensing controlled substances. According to the DOJ Complaint,  McKesson raised concerns directly with rite Aid relating to the large volume of prescriptions of frequently abused drugs, like oxycodone 30 milligrams, that were filled by Rite Aid Stores. McKesson alerted Rite Aid specifically about Pennsylvania Store 03637, which was the "top purchaser of oxycodone and ha[d] the highest ratio of oxycodone to total [prescriptions] when compared to all other Rite Aid stores." McKesson followed up with Rite Aid two more times about this store's suspect prescriptions.

268.     When pharmacists wrote notes about suspicious prescribers, the Regulatory Affairs Department at Rite Aid intentionally took steps to delete those notes, which strongly supports an inference of scienter.

269.      That Rite Aid intentionally caused the notes to be deleted and admonished its pharmacists for writing them in an attempt to hide that its stores were dispensing controlled substances based on invalid prescriptions supports a strong evidence that Rite Aid knew that the false statements detailed herein were materially false and misleading when made and/or were reckless in making those statements, indicating a strong inference of scienter.

> **3.      That the Individual Defendants Attended Weekly Meetings Discussing Rite Aid's Declining Covid-19 Revenue Supports a Strong Inference of Scienter**

270.     CW1 reported that Rite Aid hosted weekly "war room" meetings from the beginning of Rite Aid's Covid vaccine rollout through April 2021, when the Company reached its goal of administering 1 million Covid vaccines. These meetings were led by Defendants Konrad or Karen Staniforth, both of whom reported directly to Defendant Donigan. Rite Aid's senior executives, including Donigan and Peters, were also in attendance.

271.     CW1 recalls that the Company's 1 million shot goal, as well as its strategy for distributing the vaccine, were discussed at these meetings. Meeting attendees discussed the numbers of COVID vaccines the Company was administering and therefore would also have known that COVID-19 vaccine volumes began declining staring around the second quarter of 2021. In addition, meeting attendees discussed the efforts the Company was making toward the vaccine effort, and therefore would have known when those efforts abated by around the same time. According to CW1, "you would have had to be completely oblivious not to see the change."

272.    Further, CW2 recalls that Defendant Donigan, herself, discussed the "inevitable" decline in Covid vaccine revenue at a Company meeting held in the Company's Pennsylvania office.

**4.  That Defendants Deliberately Abandoned and Diverted Resources from Rite Aid's RxEvolution Initiatives Supports a Strong Inference of Scienter**

273.    According to CW1, in late 2020, shortly after Rite Aid initiated the RxEvolution initiative, Defendants began deliberately diverting resources away from the plan and cutting back on its scope and reach. In fact, CW1 was specifically hired to work on the Stores of the Future initiative but was reassigned to the COVID-19 vaccine project.

274.    In addition to diverting personnel, in September 2020, Defendants reallocated the budget from the Stores of the Future, reducing the per store budget, according to CW1, from $8 million to $1 million and then to $700,000. Accordingly, Defendants knew by at least as early as September 2020 date, and likely significantly earlier, that Rite Aid would no longer be pursuing the RxEvolution initiatives they had touted to investors.

**5.  That Defendants Tracked Data on RxEvolution Initiatives and Received Regular Reports on RxEvolution Targets Supports a Strong Inference of Scienter**

275.    Defendants would have known about the decision to reduce RxEvolution efforts as well as the failures of the RxEvolution initiatives that were implemented through their access to extensive data and receipt of regular reports.

276.    First, CW1 recalls that the Company tracked a lot of data metrics, including details about what customers bought and the overall cost or size of their baskets, and "everyone" had access to this data. CW1 says the Company was very "data-driven" and that there was "data guy" on the finance team who had "all the information."  CW1 said anybody could ask CW1 for that data and that CW1 "spent a lot of time giving people data." CW1 recalls that basket-level data

from the new Stores of the Future indicated no impact from the changes after an initial temporary bump in the first week or two. Defendants had access to this same data and would have known the same.

277.    Moreover, CW1 was part of an email chain within the Company wherein two members of the construction team sent out updated lists of stores to be upgraded on a bi-weekly basis. CW1 recalls that multiple Rite Aid senior executives were included on these emails, including Defendant Konrad and Andy Persaud. CW1 recalls that around September of  2020the number of stores targeted as Stores of the Future and reported in the above emails declined rapidly. That senior executives, including Konrad and Persaud, who were copied on these emails had knowledge of the decline in stores Rite Aid was upgrading supports a strong inference of scienter.

### 6.   Defendants' Violations of Rite Aid's Own Internal Policies Support a Strong Inference of Scienter

278.    Rite Aid's practices with respect to dispensing and overseeing the dispensing of opioids were violative of the Company's own internal policies. Specifically, per Rite Aid's policies, pharmacists were instructed to follow the HARP protocol, *see* Section V.A.3.c.2, *supra,* in connection with dispensing controlled substances. The HARP protocol required pharmacists to file notes using the Company's RACS system if a prescription or prescriber raised rad flags and indicated that the Company's Regulatory Affairs Department needed to review those notes to evaluate the flagged prescribing.

279.    As detailed above, however, Rite Aid failed to staff the Regulatory Affairs department, failed to properly review pharmacist notes that were submitted and discouraged pharmacists from filing notes or otherwise raising red flags in the first place. The Regulatory Affairs also instructed the pharmacists to ignore the situations and, in some instances, admonishing them for documenting suspect prescribing in the Company's software system.

280.     Defendants were directly informed that Rite Aid was failing to properly monitor opioid dispensing by Janet Hart who acknowledged to Rite Aid senior management in December 2017 that "Rite Aid could leverage existing tools 'to identify outlier prescribers but at present there is not enough time to dive into the data.'"

281.     Furthermore, during the Class Period, Defendants were particularly attuned to the internal policies relevant to preventing improper opioid dispensing because, on a May 15, 2018 Analyst Day Call, Defendant Konrad expressly admitted such and claimed that Rite Aid monitored prescriptions for "red flags" to ensure they were for "legitimate medical needs:"

> **We continue to review and enhance our policies and procedures and invested significantly to make enhancements to our systems to ensure every prescription is filled accurately**... **Additionally, we've implemented a red flag process to validate controlled substance prescription, ensuring they are for legitimate medical needs**.

282.     Moreover, Defendants were attuned to Rite Aid's internal Company policies relating to opioids because shareholders demanded at the October 30, 2018 annual meeting of Rite Aid shareholders that Rite Aid's the independent directors disclose in a report provided to investors by October 1, 2019, what governance measures they had taken since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis.

283.     The Government Affairs group also deliberately violated the Company's own internal policies by deleting pharmacist notes from Prescriber V.O.'s profile. The notes included statements such as "DO NOT FILL CONTROLS," "md under investigation," and "Corporate monitoring this D.R. Possible suspicious activity." A Regulatory Affairs analyst email states stated that notes were removed from the prescriber profile on October 20, 2015. Notes were simply deleted, and district managers were directed to tell their employees "to be mindful of everything that is put in writing . . . ."

284.     Furthermore, Rite Aid knew that its High Alert Review Process did not prevent pharmacists from filling unlawful prescriptions because, as exposed by the DOJ, "the dispensing system would "auto fail" and prevent the pharmacist from restarting the prescription in the dispensing software only where a pharmacist answered "no" to two questions: (1) is the prescription validated under Rite Aid's protocol; and (2) is there a valid patient-prescriber relationship. For any other question, if the pharmacist answered "no," Rite Aid pharmacists could complete the process and fill the prescription by typing comments into the notes field. Rite Aid pharmacists could type any explanation in that field to work around this validation process."  As a result, Rite Aid's dispensing protocol proved to be little more than lip service to its corresponding responsibility.

285.     In light of the significant internal policies regularly violated by the Company's dispensing practices, Defendants knew, or were reckless in not knowing, the extent of the problematic dispensing occurring at Rite Aid pharmacies.

> **7.     That Defendants Regularly Issued Press Releases and Provided in-Depth Responses to Analyst Questions Detailing Particularized Efforts to Combat the Opioid Crisis, Including Implementation of a Purported "Red Flags" Process to Identify Suspicious Prescriptions, Supports a Strong Inference of Scienter**

286.     Throughout the Class Period, Rite Aid issued press releases that emphasized and highlighted all of its efforts to combat the opioid crisis. For example, on June 1, 2018, Rite Aid issued a press release announcing a plan to install medical disposal units in its pharmacies "as part of its comprehensive strategy to address drug abuse and misuse in the country." Rite Aid further detailed its other efforts to combat the opioid epidemic, such as providing free DisposeRx packets (which dissolves drugs so they can be safely discarded) to new opioid prescriptions and patients with chronic opioid prescriptions every six months. Rite Aid also announced earlier that year, that

naloxone, a medication that can be used to reverse the effects of an opioid overdose, was available at all of its locations without a prescription. Rite Aid specifically added that "[t]he increased access to naloxone supports the U.S. Surgeon General's recent Advisory on Naloxone and Opioid Overdose. Additionally, all patients with opioid prescriptions will receive educational information on opioid use, safe storage, disposal and proper use of naloxone, and all patients with new opioid prescriptions will receive required counseling on their prescription from Rite Aid pharmacists."

287.    In the same June 1, 2018 press release, Rite Aid boasted about its prescription drug monitoring program, which included the "red flag" process, and emphasized that the Company provided education and training for pharmacists:

> In addition to supporting the Centers for Disease Control and Prevention (CDC) guidelines for prescribing opioids, Rite Aid also participates in prescription drug monitoring programs including a "red flag" process for pharmacists to regularly review prescriptions for patients not known by the pharmacy or where there may be concerns or suspicions of misuse. The Company also provides on-going education and training of Rite Aid pharmacists, covering topics including risk factors for opioid abuse, how to identify symptoms of an overdose and what to do in the event of an overdose, an overview of the various naloxone therapies available and proper administration of each and recommendations for follow-up care.

288.    On March 22, 2018 Rite Aid announced that it launched the Prescription Drug Safety program to high schools in markets served by Rite Aid stores, "[i]n an effort to help address adolescent drug abuse and misuse[.]" The program started in Pittsburgh area high schools, and, a year later "more than 150 teachers across Pennsylvania have implemented the curriculum, at more than 115 high schools, reaching over 11,700 students." On March 21, 2019, Tracy Henderson, director of The Rite Aid Foundation, stated: "The abuse and misuse of opioids is an unprecedented crisis that is gripping the country, including our nation's young people. To help combat this crisis and to help educate children in our communities, The Rite Aid Foundation is proud to partner with

EVERFI, the Pittsburgh Penguins Foundation and Pennsylvania Attorney General Josh Shapiro to implement the Prescription Drug Safety program into schools in the Pittsburgh-area."

289.    In addition, Defendants provided detailed answers to direct analyst questions, thereby presenting themselves as familiar with the topics they discussed and evidencing scienter. For example, on the earnings call held on June 24, 2021, analyst Glen Santangelo asked Defendants to explain how they would achieve sufficient, sustainable free cash flow to cover $300 million in CapEx requirements, $200 million in interest expense. In response, Defendant Donigan provided the below detailed answer:

> Yes. Well, I mean that is the ultimate dilemma of taking over a company in the situation with this amount of debt. And so, I think we are a company that is very much in need of demonstrating organic growth. **And I think had -- we have some early indicators of showing that we can do that even in the middle of a pandemic**.
>
> If you look at our inventory turns and if you look at our recent results ex-OTC and acute, you can see, what I will call, rays of hope that **our underlying business is improving**. And so I think the issue that we have right now is the most profitable part of our business has been under extreme duress, and not just has been but still is, and that's the cough, cold, flu, and all the acute business that has not yet come back.
>
> So, as we look at it and as we model this out, we have to just take that into consideration and look at the business ex all of those factors and what a rebound would look like plus increase. **We have taken market shares, so we have shown that on the front end, we can take market share**. At the end of the day, what we've said, I think repeatedly, is we have to grow scripts, that is our number one priority is growing scripts.
>
> …
>
> And the other thing I would say is **COVID vaccines are not a one-time thing for us as a company. COVID vaccines, whether there is a booster shot this year or next year, we're living with COVID. We're living with -- COVID vaccines will be a permanent, I think, weapon in our arsenal**. And what we don't know is how many boosters, when will the boosters, if they'll do it under 12. We are not assuming any of that happens this year.

290.     Similarly, in the earnings call held on June 23, 2022, Defendant Donigan once again provided a direct and detailed response to an analyst question about whether the Company's ex-vaccine growth:

**George Robert Hill**, Deutsche Bank AG, Research Division

Yes. I guess, Matt, my first question is kind of a big picture question, which is that if you look at the $100 million in EBITDA that the company delivered this quarter, *you take out $30 million to $35 million in the vacs, the business did $65 million*. Of course, there will be a continuing benefit from the vacs *but the profitability of the business basically needs to double every quarter from this quarter to kind of hit around the midpoint of the guidance*. You've talked about some of the embedded cost cuts. I guess what I would ask is, could you and Heyward kind of talk through where you see the growth opportunities versus the cost reductions? Kind of what I'm trying to get to is that -- are we -- *do we feel like we're back in the growth phase* of the business coming out of the pandemic? Or are we still more than a shrink-to-grow type outlook?

**Heyward Rutledge Donigan**, President, CEO & Director

Yes, George, it's Heyward. Thanks. I think it's a combination. We are -- **we've shown that we can grow our scripts, even cycling the significant benefit we got from vaccines last year. So our core scripts are up. And that's just the beginning**…

291.     That the Company regularly issued press releases directly addressing the subjects of the fraud alleged herein and provided detailed answers to analyst questions on those topics evidences Defendants' scienter.

### 8.     Excessive Executive Turnover at Suspicious Times Supports Scienter

#### a.     Defendant Donigan Was Forced out of the Company in January 2023, Amidst Corrective Disclosures

292.     Defendant Donigan joined Rite Aid as CEO in August 2019 and left on January 7, 2023. Donigan was the head of the Company throughout the COVID-19 pandemic, but once the vaccine and testing revenue dried up, the true condition of the Company began to emerge. On September 30, 2022, Rite Aid announced its poor Q2 results, which caused the stock price to drop

134

32.88%. On December 21, 2022, Rite Aid further announced another quarter of poor results. On January 7, 2023, Rite Aid announced that Donigan stepped down, effective immediately.

293.     The departure was unexpected and rattled investors. For example, in an article entitled, *C-Suite Transitions: Rite Aid CEO Departs Abruptly*, Asif Suria of Seeking Alpha labeled Donigan's departure "abrupt," adding, "Rite Aid is set to elect its second CEO in less than four years, following the departure of President and CEO Heyward Donigan." [28] Elizabeth Burr was appointed interim CEO while they searched for a replacement.

294.     Similarly, on January 9, 2023 analysts at Deutsche Bank described Donigan's disappearance as "a move that was a bit of a surprise," but noted that "[d]uring her reign, these past three years, the company has struggled to be profitable, seeing both a Covid related boom and headwind." Donigan's unexpected departure supports a strong inference of scienter.

**b.  Chief Legal Officer Paul D. Gilbert Announced His Resignation on March, 10 2023, Mere Days Before the DOJ Complaint Was Filed**

295.     Paul Gilbert joined Rite Aid on May 21, 2020, serving on an interim basis. On August 5, 2020, he was officially named as General Counsel and Corporate Secretary for Rite Aid. Gilbert was a critical asset to Rite Aid, serving on Rite Aid's Executive Leadership Team, Senior Leadership Team and guiding the RxEvolution strategy. But not long after being named the Chief Legal Officer and assuming all leadership over the Company's legal efforts in 2022, he left. On March 10, 2023, Paul D. Gilbert provided notice to Rite Aid Corporation of his intent to resign as Executive Vice President, Chief Legal Officer and Secretary to pursue other opportunities.  Three

---

[28] January 12, 2023, Seeking Alpha "C-Suite Transitions: Rite Aid CEO Departs Abruptly" https://seekingalpha.com/article/4569622-c-suite-transitions-rite-aid-ceo-departs-abruptly   (Last visited September 6, 2023).

days later, the DOJ filed its complaint. The departure of the Chief Legal Officer, mere days before the Company was hit with the incriminating DOJ complaint, is a strong inference of scienter.

### c. Chief Retail Officer Andre Persaud Departed with No Explanation

296.    Andre Persaud was the Executive Vice President of Retail for Rite Aid from June 1, 2021 up until his departure on March 6, 2023. Not even two years into the role, he mysteriously departed with little explanation from Rite Aid other than he "is no longer with the Company." [29] In an article entitled, "Rite Aid Executive Departures Continue with Retail Chief Persaud Exit," Homepagenews writes, "Rite Aid Chief Retail Officer Andre Persaud has left the company in an additional high-level executive departure following a tough third quarter." [30]

### d. Rite Aid's  Chief Operating Officer Position Wass Eliminated After Heavy Turnover

297.    Rite Aid has struggled to keep the role of Chief Operating Officer filled.  Prior to 2017, the COO role was held steady by Kenneth Martindale for a solid five years. However, starting in 2017, the position was a revolving door. Kermit Crawford held the title of COO for only a year and five months, from October 5, 2017 to March 12, 2019. Next, Bryan Everett held the role for a mere seven months before "leaving the company for other opportunities" as stated in a press release issued by Rite Aid on October 3, 2019. Finally, Jim Peters held the title of COO for barely two years before the position was eliminated entirely. On March 8, 2022, Rite Aid announced in a press release "the elimination of the Rite Aid Chief Operating Officer (COO)

---

[29]    March 15, 2023, Drug Store News, "Andre Persaud departs Rite Aid" https://drugstorenews.com/andre-persaud-departs-rite-aid (Last visited September 6, 2023).
[30] March 17, 2023, Homepagenews "Rite Aid Executive Departures Continue With Retail Chief Persaud Exit," https://www.homepagenews.com/retail-articles/rite-aid-executive-departures-continue-with-retail-chief-persaud-exit/ (Last visited September 6, 2023).

position" in order to "realign its management team and streamline the company's operations." The extremely chaotic and heavy turnover rates for this position supports a strong inference of scienter.

### e. High Levels of Executive Turnover, Generally

298.    The Company experienced an unusually high degree of executive turnover throughout the Class Period.  Starting in 2019 with the departure of  CEO John Standley, Rite Aid struggled to keep employees for more than three years, particularly in the C-Suite, as shown in the below Table.

### Table 2:

| Position | Name | Start Date | End Date | Months in Position |
|---|---|---|---|---|
| Chief Executive Officer | Heyward Donigan | August 1, 2019 | January 7, 2023 | 41 |
| Chief Operating Officer | Kermit Crawford | October 5, 2017 | March 12, 2019 | 17 |
| Chief Legal Officer | Paul Gilbert | August 5, 2020 | April 7, 2023 | 32 |
| Chief Retail Officer | Andre Persaud | June 1, 2021 | March 6, 2023 | 21 |
| Chief Pharmacy Officer | Jocelyn Konrad | October 1, 2019 | March 7, 2022 | 29 |
| Executive VP Store Operations | Derek Griffith | October 17, 2017 | March 12, 2019 | 16 |
| Chief Operating Officer | Bryan Everett | March 12, 2019 | November 1, 2019 | 7 |
| Chief Marketing & Merchandising Officer | Erik Keptner | June 24, 2019 | April 1, 2022 | 34 |
| Chief Operating Officer, Elixir | Lance Neill | September 1, 2021 | December 1, 2021 | 3 |
| Chief Operating Officer | Jim Peters | October 7, 2019 | March 7, 2022 | 29 |

299.    Even long-time employees of Rite Aid once promoted to the C-Suite level, left after a short period of time. The sheer number of executive departures in such a short period of time and that they occurred at suspicious times and/or under suspicious circumstances supports a strong inference of scienter.

300.    CWs also confirmed the high turnover. CW2 confirmed that, after new leadership arrived in March 2020 there was a "mass exodus," with many seasoned long-term employees leaving.  The new leaders "destroyed Rite Aid's existing culture." CW2 stated that "working at Rite Aid used to be like having a "family-style dinner," whereas under the new regime there were "power lunches" where everyone was on their cell phone."  As a result, "everyone wanted to leave from associates to middle management." CW2 further explained that "the new management did not know about the company or how the stores operated," and after legacy employees were forced to resign in all departments, "a lot of institutional knowledge was lost." According to CW2, the negative "tone at the top" from the new leadership is the main reason why Rite Aid became unprofitable.

### 9.   Corporate Scienter

301.    Defendant Rite Aid Corporation's scienter with respect to the allegations included herein is imputed from the scienter of the Individual Defendants and other Rite Aid senior management, including Karen Staniforth and Janet Hart, as well as the Regulatory Affairs Department, as described above. The bases for the scienter of the Individual Defendants are detailed herein in Sections V.D.1-8, *supra*, as well as incorporated into the allegations set forth in Section V.A, *supra*. In addition, Karen Staniforth, Janet Hart, and Daniel Miller had detailed knowledge of Rite Aid' internal policy violations and illegal prescribing of opioids and the extent thereof and liability arising therefrom through their direct oversight and involvement in Rite Aid's Regulatory Affairs Department. The extent of these practices and the liability arising therefrom was concealed from investors in violation of Defendants' disclosure requirements, as alleged herein.

302.     Similarly, the scienter of Chief Legal Officer Paul Gilbert is properly imputed to Rite Aid. As depicted in Figure 6, *supra* Section V.A.3.c.1, Gilbert ranked amongst Rite Aid's most senior executives and reported directly to Defendant Donigan. Gilbert's role as Chief Legal Officer during hundreds of investigations and lawsuits regarding Rite Aid's opioid dispensing, as well as his decision to depart Rite Aid just days before the DOJ Complaint was filed, evidences his knowledge of the scope and extent of Rite Aid's opioid dispensing and Rite Aid's exposure to liability and significant judgment or settlement amounts arising therefrom. Due to Gilbert's senior role at Rite Aid, his scienter is properly imputed to the Company.

**10.     Insider Selling**

**Defendant Donigan**

303.     Defendant Donigan joined Rite Aid as CEO in August 2019 and left in January 2023. By virtue of her position as CEO—as well as her regular attendance at meetings, receipt of relevant reports, and access to data, as detailed above—Donigan had access to relevant inside information about Rite Aid's operations, including information about Rite Aid's earnings, retail and turnaround operations, and susceptibility to significant liability for its role in the opioid epidemic. Armed with the truth of the frauds alleged herein, Donigan looked to cash out before the truth was released to the public and the price of Rite Aid common stock collapsed.

304.     On July 7, 2022, Donigan sold 27,026 shares at $7.42 per share for a transaction value of $200,532.92. On July 8, 2022, Donigan sold 19,719 shares at $7.07 per share for a transaction value of $139,413.33. On August 12, 2022, Donigan sold 37,370 shares at $11.05 per share for a transaction value of $412,938.50. In total, from July 7, 2022 to August 12, 2022, Donigan sold 84,115 shares (constituting approximately 14% of Donigan's total eligible shares)

of Rite Aid common stock, pocketing a total of $752,884.75. None of these sales were made pursuant to 10b5-1 plans.

305.    Eighteen days later, on September 30, 2022, Rite Aid announced its poor Q2 results, which caused the stock price to drop 32.88%. Then, on December 21, 2022, Defendants' fraud was further revealed to the market, causing Rite Aid's stock to drop 17.23%. By the time the remainder of the fraud was revealed to the public, Donigan had already departed from Rite Aid.

306.    Donigan's massive sales of stock prior to the September 30, 2022 and December 21, 2022 corrective disclosures exceeded her total annual sales for in any other year in the Class Period, as below:

| July 23 | N/A |
|---|---|
| July and August 2022 | (84,115) |
| Total 2021 | (57,090) |
| Total 2020 | (39,034) |
| Total 2019 | N/A |
| Total 2018 | N/A |

307.    Thus, Defendant Donigan's suspicious Class Period trading evinces a strong inference of scienter.

**Defendant Schroeder**

308.    Defendant Schroeder joined Rite Aid in 2010 and has served as Rite Aid's CFO since March 2019. By virtue of his position as CFO—as well as his regular attendance at meetings, receipt of relevant reports, and access to data, as detailed above—Schroeder had access to relevant inside information about Rite Aid's earnings, retail and turnaround operations, and susceptibility to significant liability for its role in the opioid epidemic. Armed with the truth of the frauds alleged

herein, Schroeder looked to cash out before the truth was released to the public and the price of Rite Aid common stock collapsed.

309.    On July 7, 2022, the same day Defendant Donigan sold her shares, Schroeder sold 8,224 shares at $7.42 per share for a transaction value of $61,022.08. On July 8, 2022, Schroeder sold 5,997 shares at $7.07 per share, for a transaction value of $42,398.79. On July 17, 2022, Schroeder sold 4,684 shares at $7.19 per share, for a transaction value of $33,677.96. In total, from July 7, 2022 to July 17, 2022, Defendant Schroeder sold 18,905 shares (constituting 17% of his total eligible shares), for proceeds of $137,098.83. None of these sales were made pursuant to 10b5-1 plans.

310.    About two months later, on September 30, 2022, Rite Aid announced its poor Q2 results, which caused Rite Aid's stock price to drop 32.88%. Then, on December 21, 2022, Defendants' fraud was further revealed to the market, causing Rite Aid's stock to drop 17.23%.

311.    Combined, Defendants Donigan and Schroeder sold 103,020 shares of Rite Aid common stock for a total of $889,983.58 in July and August of 2022, while possessing material, non-public information about the Company. These massive sales of stock prior to the September 30, 2022 and December 21, 2022 corrective disclosures evince a strong inference of their scienter.

312.    In addition, in July 2023, just prior to the August 25, 2023 corrective disclosure, Defendant Schroeder sold an additional 31,573 shares. On July 7, 2023, Schroeder sold 14,224 shares (equaling 6.26% of his total holdings) at $1.64 per share, for a total transaction value of $23,327.36. Barely three weeks later, on July 27, 2023, Schroeder sold an additional 17,349 shares (equaling 8.14% of his total holdings) at $1.58 per share, for a total transaction value of $27,411.42. Combined, Schroeder's July 2023 sales yielded proceeds of $50,738.78. Neither of these sales was made pursuant to a 10b5-1 plan.

313.    Schroeder's July 2023 sales in July 2023 just prior to the August 25, 2023 revelation of Rite Aid's looming Chapter 11 filing, and Schroeders July 2022 sales just prior to the September 29, 2022 and December 21, 2022 corrective disclosures, exceeded Schroeder's total annual sales in any other year during the Class Period, as below:

| | |
|---|---|
| Jul-23 | (50,738) |
| Jul-22 | (18,905) |
| Total 2021 | (7,619) |
| Total 2020 | (5,792) |
| Total 2019 | (781) |
| Total 2018 | (236) |

314.    Thus, Schroeder's suspicious trading during the Class Period evinces a strong inference of scienter.

**Other Executives**

315.    In addition to Defendants, several other corporate executives at Rite Aid also dumped their shares immediately once eligible. In July of 2022, Justin Mennen, Chief Information Officer, sold $41,785.74 worth of shares; Jessica Kazmaier, Chief Human Resource Officer, sold $38,585.71 worth of shares; Andre Persaud, Chief Retail Officer, sold $31,273.34 worth of shares; and Brian Hoover, Chief Accounting Officer, sold $21,201.04 worth of shares. On August 17, 2022, Paul Gilbert, General Counsel of Rite Aid, sold $28,671.28 worth of shares. In total, these Rite Aid executives sold $161,517.11 in the months of July and August 2022. Combined with Defendants Donigan and Schroeder's sales, these sales yielded over $1.1 million in proceeds.

316.    These significant sales of stock just prior to the September 30, 2022 and December 21, 2022 corrective disclosures raise a strong inference of scienter.

### E. LOSS CAUSATION

317.   During the Class Period, as detailed herein, Defendants materially misled the investing public by publicly issuing untrue statements of material fact and omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading, thereby inflating the price of Rite Aid common stock. The specific statements and omissions enumerated herein were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Rite Aid's business, operations, and prospects.

318.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the progress and prospects of Rite Aid's turnaround initiatives pursuant to the RxEvolution plan, the nature and scope of the Company's exposure to opioid liability and related judgments, and the sustainability of their Covid-era Revenue and EBITDA. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

319.   By not disclosing the adverse facts detailed herein, Defendants presented a misleading picture of Rite Aid's business, risks, and current and future financial prospects. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Rite Aid's common stock declined significantly as the prior, artificial inflation came out of the prices of the common stock as follows:

## 1.   March 30, 2022 Corrective Disclosure

320.    On March 30, 2022, CVS announced it reached a $484 million settlement with the state of Florida related to opioid prescriptions at its pharmacies. On the announcement of the CVS $484 million settlement, RAD common stock fell $0.90, or *8.77*%, from a close of $10.26 on March 29, 2022 to a close of $9.36 on March 30, 2022 on unusually high trading volume.

321.    The CVS settlement was highly significant to Rite Aid investors because, like CVS, Rite Aid was named in multiple lawsuits relating to unlawfully filling opioid prescriptions in the United States. Moreover, also like CVS, Rite Aid was a top-10 dispenser of opioids by volume in the United States. Rite Aid differed from CVS, however, in that its significant debt burden threatened its ability to withstand a significant judgment or settlement amount.

322.    The March 30, 2022 drop in the price of RAD common stock resulted directly from the public revelation of the extent of liabilities sought from retail pharmacies like Rite Aid for improperly dispensing opioids. Prior to the March 30, 2022 disclosure event, Rite Aid knowingly withheld from investors the extent of damages sought in the opioid actions to which it was a party. Prior to this public disclosure, Rite Aid's SEC filings had stated, in connection with risks associated with other categories of litigation to which it was a party, that "[s]ubstantial damages are sought from the Company in virtually all of these matters."  However, Rite Aid had conspicuously omitted this language in its discussion of opioid litigation. By contrast, in Rite Aid's first filing with the SEC following the announcement of the CVS settlement—the 2022 10-K, filed on April 25, 2022—Rite Aid changed its risk disclosures to add this precise language in connection with opioid litigation.

323.    Analysts expressly acknowledged the significance of the March 30, 2022 settlement and its implications for Rite Aid and RAD stock. In a report released one week later by Deutsche Bank, analyst George Hill observed that "RAD could have meaningful opioid exposure"

and printed a figure depicting that Rite Aid was one of the "10 biggest opioid distributors" from 2006 to 2012. Directly connecting Rite Aid's significant liability risk to the March 30, 2022 CVS settlement, the report further stated:

> Rite Aid could also have some exposure to opioid litigation and related penalties/ settlements, as the prosecution of these cases has now moved on from the drug wholesalers and downstream to the retail pharmacies, **with CVS announcing a near half-billion dollar settlement with the state of Florida last week**.

324.     Thus, Defendants' fraud, which was partially corrected by the March 30, 2022 disclosure, was a direct cause of losses experienced by the Class.

### 2.   September 29, 2022 Corrective Disclosure

325.     On September 29, 2022, Rite Aid shocked the market with its announcement of its Q2 2023 financial results, which included $331.3 million in losses for the quarter compared to a loss of $100.3 million a year earlier. On an earnings call held that same day, Defendant Schroeder attributed Rite Aid's disappointing revenues, in part from "a decline in COVID testing and vaccine revenue," thereby revealing for the first time that COVID revenue was masking Rite Aid's declining performance and failed RxEvolution plan.

326.     On this news, Rite Aid's stock price fell $1.97 per share, or ***28.02***%, from a close of $7.03 on September 28, 2022 to a close of $5.06 per share on September 29, 2022.

327.     Rite Aid's September 29, 2022 stock drop resulted directly from the public revelation of declines in retail-pharmacy earnings caused by declining COVID test and vaccine numbers which were not offset by positive impact from the turnaround initiatives that Defendants had previously touted but secretly abandoned. The results thus directly contradicted Defendants' prior claims that they were pursuing turnaround initiatives and that they were seeing growth in core retail pharmacy as a result.

328.     Analysts recognized that Rite Aid's disappointing financial results were the direct result of the poor performance from its core business. For example, in a September 29, 2022 report by Evercore ISI, analysts Elizabeth Anderson and Patrick McNally observed:

> **Retail EBITDA collapsed** (down >50% qoq) given a 50 bps qoq (160 bps yoy) decline in gross margin and a 1.7% increase in SG&A/store (deleveraging in a high fixed cost industry is ugly). RAD did 875K COVID tests in the Q (~$17.5 MM of EBITDA out of $31.5 MM Retail EBITDA) and sold >3 MM antigen tests, **raising questions about core profitability going forward**.

329.     That same day, on the earnings call itself, Elizabeth Anderson ("Anderson") queried whether the Company had even achieved positive EBITDA in its core business in the quarter, asking:

> When I'm thinking about your retail EBITDA in the quarter, the $31.5 million, it seems like at least you did like 875,000 vaccines in the quarter. It's -- and obviously, the test that you also required. It seems like your EBITDA might have been negative on a core basis ex-COVID. Is that the right way to think about that?

330.     Anderson's question reflected the new, widespread recognition by analysts, as a result of Defendants' disclosures, that Rite Aid's retail pharmacy earnings were unimproved and had merely been temporarily inflated by COVID tests and vaccines, and that Rite Aid had—contrary to Defendants' representations—failed to implement the changes to Rite Aid's core business through the RxEvolution turnaround initiatives that Defendants had touted in order to maintain those earnings absent the COVID benefits.

331.     For example, on September 30, 2022, in a report titled, "Indigestion: RAD F2Q Results Hard to Stomach," research analyst George Hill from Deutsche Bank wrote:

> Weakness in the Core: RAD reported F2Q results where **the company's core pharmacy business continues to erode**, and improvements in the PBM segment may prove short lived as the company stares down lower membership in C2023 due to a client loss. RAD reported F2Q EBITDA of $79mm (-26%), below our estimate of $107mm and the consensus of $110mm. Pharmacy segment EBITDA came in at $31mm (-55%) vs our $72mm while PBM EBITDA came in at $47mm (+28%) vs our $35mm. While the pharmacy segment was facing a tough covid comparison, **by**

*our estimate, core EBITDA was down 47% to about $15mm adjusting out the benefit of vaccines*, which continue to decline.

332.    Similarly, in a September 29, 2022 report by J.P. Morgan, analysts Lisa C. Gill and Calbin Sternick wrote:

> **Retail Pharmacy adjusted EBITDA was well below our estimate.** Retail Pharmacy revenue was $6.9M below our forecast and down -1.1% y/y. Overall SSS of +5.6% was above our 3.6% estimate, with pharmacy up +8.0% (vs. our estimate of 5.1%) and front end down -0.3% (we had expected front end to be +0.2%), although ex the impact of cigarettes/tobacco, front end was +0.2%). Comparable scripts rose +3.1% y/y (management noted that other acute prescriptions were up +5.1% and maintenance prescriptions were up +1.2%). Adjusted EBITDA of $31.5M was below our $81.0M estimate and down 54.6% y/y. **RAD noted that the y/y decline was due to decreased gross profit, from the decline in COVID vaccinations and testing** partially offset by a decrease [in] SG&A.

333.    Thus, Defendants' fraud, which was partially corrected by the September 29, 2022 disclosure, was a direct cause of losses experienced by the Class.

### 3.    December 21, 2022 Corrective Disclosure

334.    On December 21, 2022, Rite Aid Announced dismal Q3 2023 financial results. Quarterly revenue fell 2.3% to $6.08 billion, and net loss nearly doubled to $67.1 million compared to a loss of $36.1 million the year prior. Additionally, Rite Aid updated its guidance to reflect an expected increase in net losses to a range of $584 million to $551 million from a range of $520.3 to $477.3 million. In an earnings call held that same day, Defendants attributed the declines in revenue to "a decline in COVID testing and vaccine revenue," acknowledged that demand for COVID-19 vaccines in the quarter was "weaker than expected." In the December 21, 2022 press release, Donigan attributed the lowered guidance to pharmacy margins, explaining "we are lowering our full year guidance due to headwinds including pharmacy margin" thereby revealing for the first time the full extent to which Covid test and vaccine revenue had inflated earnings and that the RxEvolution plan was unsuccessful and would not replace those earnings when they abated, as previously represented.

147

335.     On this news, Rite Aid's stock price fell $0.76 per share, or ***17.23***%, from a close of $4.41 on December 20, 2022 to a close of $3.65 per share on December 21, 2022 on unusually high trading volume.

336.     The December 21, 2022 drop in the price of RAD common stock was a direct result of Defendants' disclosure of the full extent that COVID-19 revenues were masking Rite Aid's true financial condition and performance of its core business and that decreases in COVID-19 test and vaccine revenue would not be offset by any positive impact from the turnaround initiatives Defendants had previously touted. The results thus directly contradicted Defendants' prior claims that they were pursuing turnaround initiatives and that they were seeing growth in core retail pharmacy result.

337.     Analysts expressly recognized the cause of RAD's December 21, 2022 stock price decline. For example, on December 22, 2022, analyst Lisa Gill at JP Morgan lowered its price target for RAD due, in part, to "challenges lapping…COVID-19 contributions." Further, the report noted that Rite Aid's progress on turnaround initiatives was slow and that progress was not yet evident. Specifically, the report stated:

> We continue to see a long road ahead for RAD as it executes on the ongoing turnaround, and await progress around the new strategic vision and efforts to drive improved performance.

338.     In a separate December 22, 2022 J.P. Morgan report, analysts noted weaknesses in Rite Aid's retail earnings and free cash flow—reflecting an inability to compensate for COVID vaccine and test declines—and observed that Rite Aid's "4Q Retail guide was considerably weaker than expected," that the Company had "cut Retail EBITDA guidance ($265-285mn from $305-335mn, a big move for only 1Q remaining)," and that "lack of FCF [free cash flow] keep[s] us on the sidelines."

339.    Thus, Defendants' fraud, which was partially corrected by the December 21, 2022 disclosure, was a direct cause of losses experienced by the Class.

### 4.   March 13, 2023 Corrective Disclosure and Materialization of Risk

340.    On Monday, March 13, 2023, after market hours, the DOJ announced in a press release that it had filed a lawsuit against Rite Aid intervening in a whistleblower action against Rite Aid and various subsidiaries, alleging that Rite Aid repeatedly and <u>knowingly</u> filled unlawful prescriptions for controlled substances from at least May 2014 through June 2019 in violation of the False Claims Act (FCA). The DOJ complaint also included allegations involving violations of the Controlled Substances Act (CSA).

341.    On this news, Rite Aid's stock fell $0.62 per share, or **_18.9_**%, from a close of $3.28 on March 13, 2023 to a close of $2.66 on March 14, 2023 on unusually heavy trading volume.

342.    The March 13, 2023 drop in the price of Rite Aid common stock resulted directly from the DOJ Complaint's revelation of the scope and extent of Rite Aid's exposure to liability for improper opioid dispensation. The disclosure, thus, directly contradicted Defendants' prior understatements of that risk and omissions of material, relevant facts concerning Rite Aid's opioid dispensing practices.

343.    Analysts expressly recognized the cause of the Rite Aid's March 13, 2023 stock price decline and viewed the DOJ Complaint as a revelation of the scope and extent of Rite Aid's opioid liability. On March 13, 2023, in a report titled, "DOJ Joins Complaint Alleging RAD Violated Controlled Substances Act," research analyst Lisa Gill from J.P. Morgan noted the significance of the DOJ Complaint, writing: "[I]n our experience these charges should not be taken lightly. We do not believe that the DOJ would have joined the whistle-blower complaint without believing it had a strong case."  According to the report, revelations in the DOJ complaint boiled down to that "1) RAD dispensed controlled substances inappropriately; 2) RAD did not have

proper systems and controls in place to prevent dispensing of controlled substances; and 3) When RAD's Government Affairs team was made aware of red-flagged dispensed prescriptions, it did not take appropriate steps to resolve the issue and even deleted documentation in certain circumstances."

344.    Moreover, analysts lacked confidence that Rite Aid could handle the liability likely to ensue from the litigation. In the same March 13, 2023 J.P. Morgan report, Gill further stated:

> While in many cases a company might settle charges like this, pay a fine, and admit no wrongdoing, we are unsure that RAD has that luxury. Given the company's $3.2B debt load (we estimate FY23 Net Debt/EBITDA of 6.3x) we do not believe that RAD has significant flexibility to pay a meaningful fine that would be a "win" for the DOJ.

345.    Thus, Defendants' fraud, which was partially corrected by the March 13, 2023 disclosure, was a direct cause of losses experienced by the Class.

### 5.   August 25, 2023 Corrective Disclosure and Materialization of the Risk

346.    The truth of Rite Aid's distressed financial condition and the impact of its exposure to the opioid litigations, as well as Defendants' decision and failure to execute on the RxEvolution plan more fully emerged when news leaked publicly, revealing that Rite Aid was preparing to file for Chapter 11 bankruptcy due to the impact of opioid lawsuits on its financial position.  On August 25, 2023, an article published by the Wall Street Journal, revealed to the public that "Rite Aid is preparing to file for bankruptcy in coming weeks to address mass federal and state lawsuits the drugstore chain is facing over its alleged role in the sale of opioids, according to people familiar with the company's plans." The article further explained that the "chapter 11 filing would cover Rite Aid's more than $3.3 billion debt load."

347.    On the revelation of Rite Aid's planned bankruptcy, RAD common stock fell $0.73, or nearly 50.69%, from a close of $1.44 on August 24, 2023 to a close of $0.71 on August 25, 2023 on unusually high trading volume.

348.    The August 25, 2023 drop in the price of RAD common stock resulted directly from the Wall Street Journal's revelation that Rite Aid would be filing for bankruptcy as a result of its liability for improperly dispensing opioids. The disclosure thus directly contradicted Defendants' prior understatements of that risk and omissions of material, relevant facts concerning Rite Aid's opioid dispensing practices.

349.    Outlets directly linked the significant drops in RAD's share price to the bankruptcy revelation. In an update posted later that same day entitled, "Rite Aid Stock Plummets After Bankruptcy Report" Jack Pitcher of the Wall Street Journal observed that "[s]hares of Rite Aid plunged by about 50% after The Wall Street Journal reported the drugstore chain is preparing to file for chapter 11 bankruptcy in the coming weeks."

350.    Similarly, in an article titled "Rite Aid Prepares Bankruptcy Filing, Store Closures Amid Opioid Lawsuits," Yahoo! Finance reported that "Rite Aid (RAD) stock fell more than 50% Friday after The Wall Street Journal reported the retail pharmacy is preparing to file for Chapter 11 bankruptcy as it faces mounting costs related to opioid lawsuits…The preparations come after the company was sued by the US government in April over its failure to detect what the Department of Justice called "red flags" around its filling of prescriptions for opioids and other painkillers."

351.    Thus, Defendants' fraud, which was corrected by the August 25, 2023 disclosure, was a direct cause of losses experienced by the Class.

352.     Each of the declines in the prices of Rite Aid common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' misrepresentations and/or fraudulent conduct being revealed to investors and the market. The timing and magnitude of the price declines in Rite Aid common stock negates any inference that the losses suffered by Plaintiffs and the other members of Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' material misrepresentations and/or fraudulent conduct.

353.     The economic loss, i.e., damages, suffered by Plaintiffs and the other members of the Class was a direct result of Defendants' false statements that artificially inflated the price of Rite Aid common stock and the subsequent significant declines in the value of Rite Aid common stock when Defendants' prior misrepresentations were disclosed.

354.     The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## VI.    CLASS ACTION ALLEGATIONS

355.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Rite Aid common stock between April 26, 2018 and August 25, 2023, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are Rite Aid and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

356.     Because Rite Aid securities were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiff believes that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by Rite Aid or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

357.     Plaintiff's claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent who are experienced in class action and securities litigation.

358.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

- Whether Defendants violated the federal securities laws as alleged herein;

- Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Rite Aid's business and operations;

- Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period;

- Whether the price of Rite Aid common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

- Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

359.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.    PRESUMPTION OF RELIANCE

360.    Plaintiff is presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

- Rite Aid's common stock was actively traded on the NYSE;

- The market price of Rite Aid common stock reacted promptly to the dissemination of public information regarding the Company;

- The Company's stock was followed by financial analysts, including those cited in this Complaint;

- The average weekly trading volume for Rite Aid stock during the Class Period was approximately 13.92 million shares;

- As a regulated issuer, Rite Aid filed with the SEC periodic public reports during the Class Period;

- Rite Aid regularly communicated with public investors via established market communication mechanisms; and

- During the Class Period, the Company had over 55.22 million shares outstanding and the Company's market capitalization was over 2.23 billion on June 25, 2018.

361.    Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Rite Aid and the Individual Defendants continued to pump materially false and misleading information into the marketplace regarding the Company and material facts relevant to ongoing and potential opioid litigation and the performance of its pharmaceutical services reporting segment. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's securities.

362.    As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for Rite Aid securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

363.    Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result

of their purchases of Rite Aid common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

364. Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

365. Had Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased Rite Aid common stock at artificially inflated prices.

## VIII. NO STATUTORY SAFE HARBOR

366. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

367. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

368. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Rite Aid who knew that the statement was false when made.

## IX.   CLAIMS FOR RELIEF

### A.   COUNT I: FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

369.   Plaintiff realleges each allegation as if fully set forth herein.

370.   This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

371.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Rite Aid common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Rite Aid common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

372.   During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, all in an effort to maintain artificially high market prices for Rite Aid securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of

conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

373.    During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

374.    The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

375.    As a result of the foregoing, the market price of Rite Aid common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business plans, Plaintiff and the other members of the Class relied on the statements and business plans described above and/or the integrity of the market price of Rite Aid common stock during the Class Period in purchasing Rite

Aid common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

376.     Had Plaintiff and the other members of the Class been aware that the market price of Rite Aid securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Rite Aid common stock at the artificially inflated prices that they did, or at all.

377.     As a result of the wrongful conduct alleged herein, Plaintiff and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiff's and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company.  Plaintiff and other members of the Class purchased Rite Aid common stock in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of Rite Aid common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, Defendants' concealment of material facts related to opioid prescriptions filled by Rite Aid pharmacies in violation of federal and state laws.

378.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Rite Aid common stock during the Class Period.

## B.  COUNT II: FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

379.     Plaintiff realleges each allegation as if fully set forth herein.

380.     This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

381.     Rite Aid and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

382.     The Individual Defendants acted as controlling persons of Rite Aid within the meaning of Section 20(a) of the Exchange Act.  Because of their positions, the Individual Defendants had the power and authority to cause Rite Aid to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

383.     Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of Rite Aid, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiff's and the Class's investments in Rite Aid common stock within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

384.     The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements.  Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

385.     The Individual Defendants knew or recklessly disregarded the fact that Rite Aid's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

386.     By virtue of their high-level positions and their participation in and awareness of Rite Aid's operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

387.     As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

388.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Rite Aid common stock.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiff as a Class representative;

2.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

3.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

4.      Granting Plaintiff leave to amend this complaint to conform to the evidence; and

5.      Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

## XI.   DEMAND FOR TRIAL BY JURY

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

Dated: September 8, 2023              Respectfully submitted,

                                      **BIELLI & KLAUDER, LLC**

                          By:    */s/ Melissa M. Hartlipp*
                                 Ryan M. Ernst (Juris No. 202191)
                                 Melissa M. Hartlipp (Juris No. 333323)
                                 1204 N. King Street
                                 Wilmington, DE 19801
                                 Tel: (302) 803-4600
                                 Email: rernst@bk-legal.com
                                 Email: mhartlipp@bk-legal.com

                                 **LEVI & KORSINSKY, LLP**
                                 Shannon L. Hopkins (to be admitted *pro hac vice*)
                                 Gregory M. Potrepka (to be admitted *pro hac vice*)
                                 Rachel A. Berger (to be admitted *pro hac vice*)
                                 1111 Summer Street, Suite 403
                                 Stamford, CT 06905
                                 Tel: (212) 992-4523
                                 Fax: (212) 363-7171
                                 Email: shopkins@zlk.com
                                 Email: gpotrepka@zlk.com
                                 Email: rberger@zlk.com

                                 *Lead Counsel for Plaintiff and the Class*