**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **DAVID HOLLAND and HAROLD SETLIFF,**<br>　　　　　　　　**Plaintiffs,**<br><br>　　　　**v.**<br><br>**JOHN T. STANDLEY,<br>DARREN KARST,<br>HEYWARD DONIGAN,<br>MATTHEW C. SCHROEDER,<br>JAMES PETERS,<br>JOCELYN KONRAD and<br>ELIZABETH BURR,**<br>　　　　　　　　**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  23-2962** |

**HODGE, J.**                                                              **August 21, 2025**

## MEMORANDUM

Lead Plaintiff Jennifer DaSilva[1] ("Plaintiff") brings this class-action lawsuit individually and on behalf of all others similarly situated against Rite Aid Corporation,[2] John T. Standley, Darren Karst, Heyward Donigan, Matthew Schroeder, James Peters, Jocelyn Konrad, and Elizabeth Burr for violations of the Securities Exchange Act of 1934 ("Exchange Act"). Heyward Donigan was the Chief Executive Officer ("CEO") of Rite Aid Corporation ("Company") from August 12, 2019 until January 9, 2023. Matt Schroeder has been the Company's Executive Vice President and Chief Financial Officer ("CFO") since March 2019. James Peters served as the Company's Chief Operating Officer ("COO") from October 3, 2019 until March 8, 2022. Jocelyn Konrad served as Executive Vice President/Chief Pharmacy Officer ("VP/CPO") from October 2019 through March 2022. John Standley served as CEO from June 2010 until August 2019.

---

[1]　　Jennifer DaSilva was appointed as Lead Plaintiff by Order on June 22, 2023. (ECF No. 27.)

[2]　　Plaintiff filed a notice of voluntary dismissal of all claims against Rite Aid Corporation ("Company") on May 16, 2024, following the resolution in a Bankruptcy action, *In re Rite Aid Corp., et al.*, No. 3:23-bk-18993 (Bankr. D. N.J.). (ECF No. 59.)

Darren Karst joined the Company as CFO and Executive Vice President in August 2014 and took on the additional role of Chief Administrative Officer ("CAO") in September 2015. Karst left Rite Aid in May of 2019. Elizabeth Burr currently serves as the Interim CEO of the Company and has been on the Board of Directors since 2019. Collectively, these remaining individual Defendants shall be referred to as " Defendants".

Plaintiff alleges that the Defendants engaged in conduct in violation of the Exchange Act between April 26, 2018 and August 25, 2023 ("Class Period"). (ECF No. 40 ¶ 1.) Specifically, Plaintiffs bring claims against Defendants for violations of Section 10(b) and Rule 10b-5 of the Exchange Act (Count I), along with a violation of Section 20(a) of the Exchange Act (Count II). Defendants have filed a Motion to Dismiss the Amended Class Action Complaint ("Motion"). (ECF No. 64.) Lead Plaintiff opposes the Motion. (ECF No. 66.)

After having considered the arguments of the parties in their briefings and oral argument, the Court grants the Defendant's Motion to Dismiss. The basis for the Court's determination is as follows.

## I.    FACTUAL BACKGROUND[3]

Rite Aid was founded in 1962 as a local health and beauty store. (ECF No. 40 ¶ 34.) At the time of the filing of the Amended Class Action Complaint, Rite Aid owned and operated over 2,300 retail drug stores across 17 states. (*Id*.) Rite Aid has two business segments, Retail Pharmacy and "Pharmacy Services."[4] (ECF No. 40 ¶ 35.) "The Retail Pharmacy segment includes both prescription pharmacy and front-end retail products, like greeting cards, personal care items, and

---

[3]    The Court adopts the pagination supplied by the CM/ECF docketing system.
[4]    Rite Aid has a "Pharmacy Benefits Manager" segment called Elixir that offers Pharmacy Services. (ECF No. 40 ¶¶ 34, 35.) This Court has already issued a holding in the litigation concerning Elixir. *See generally In re Rite Aid Sec. Litig.*, 2025 WL 968306 (E.D. Pa. March 31, 2025) (dismissing action with prejudice). The present cause of action is separate and apart from that matter.

foods and beverages. Within retail pharmacy, prescription drugs generate the majority of sales." (ECF No. 40 ¶ 36.) Plaintiff alleges that in 2023, prescription drug sales accounted for over seventy-one percent (71%) of total sales of the Company. (*Id.*)

Plaintiff alleges that for much of the past three decades, Rite Aid has been "massively overleveraged due to a series of ill-fitted, debt-financed acquisitions." (ECF No. 40 ¶ 38.) By March of 2007, this resulted in around $3.1 billion of outstanding indebtedness. (ECF No. 40 ¶ 39.) This increased to over $5 billion after another acquisition. (ECF No. 40 ¶ 39.) During the Class Period, Plaintiff alleges that Defendants continually acknowledged this debt burden and recognized the need to increase revenue to reduce the Company's leverage ratio. (ECF No. 40 ¶ 40.)

The Court notes that while Plaintiff includes a plethora of factual background in their Amended Complaint, many of these facts are not relevant to the Court reaching a decision on the issue before it. Relevant to the Court are those allegations for which Plaintiff pleads loss causation, a necessary requirement for pursuing any claim under the Exchange Act. Plaintiff pleads loss causation, a necessary element of a securities claim, for only four groups of corrective disclosures.[5] Therefore, for those groups of corrective disclosures where the necessary element of loss causation has not been pled, the Court cannot and does not contemplate the issue. The Court will therefore only address the facts from this relevant period and related to those statements made in those four groups of disclosures. These "corrective disclosures" relate to two operative theories of liability: (1) Opioid Litigation and (2) RxEvolution. The Court fashions its opinion addressing those two theories of liability.

---

[5]     These "corrective disclosures" are those issued on (1) March 30, 2022; (2) September 29, 2022 and December 21, 2022; (3) March 13, 2023; and (4) August 25, 2023. (ECF No. 66, at 52-57.) The Court notes that these "corrective disclosures," as the Plaintiff puts it, are not disclosures made in accordance with any SEC rule, rather they include other sources of information revealed to investors through means other than SEC disclosures.

### i. *Opioid Litigation*

Plaintiff alleges that "[i]n an effort to bolster prescription revenue, from at least 2015 to 2019, Rite Aid systematically, improperly, and knowingly filled unnecessary prescriptions for dangerous and addictive substances in violation of U.S. law and at extreme costs to public health and human lives." (ECF No. 40 ¶ 50.) This culminated in the Department of Justice ("DOJ") intervening in a whistleblower lawsuit brought under the False Claims Act ("FCA") against the Company and filing a Complaint ("DOJ Complaint").[6] (*Id.*) Since 2000, the opioid crisis has resulted in more than 500,000 overdoses and has resulted in a high death rate amongst individuals aged 25 to 34. (ECF No. 40 ¶ 52.) Plaintiff alleges that the inappropriate dispensing of opioids was used to boost Rite Aid profits, resulting in exposure for litigation liability, impacting the financials of the Company. (*See generally* ECF No. 40.) Plaintiff alleges that Defendants knew, throughout the Class Period, that Rite Aid pharmacists were "systematically dispensing controlled substances." (ECF No. 40 ¶ 57.)

### a. Background

Rite Aid has an internal department known as its "Regulatory Affairs Department" which was responsible for ensuring Rite Aid's compliance with federal and state laws. (ECF No. 40 ¶ 58.) Rite Aid, in order to monitor opioid prescriptions, used the High Alert Review Protocol ("HARP").[7] (ECF No. 40 ¶ 61.) In order to comply with step 6 of HARP, Rite Aid had internal policies requiring its pharmacies to "submit tickets" through the Retail Automated Customer Service ("RACS") reporting system. (ECF No. 66, at 13.) Plaintiff alleges that from February 2013

---

[6]    The Court notes that Plaintiff mentions several facts from the DOJ complaint as allegations of truth. The Plaintiff admits that the basis for the present action "largely" relies on those allegations in the DOJ Complaint. (ECF No. 78, at 78:11–23.) However, the Court notes that the allegations by the DOJ are just that—allegations. The Court views them as such.

[7]    The HARP review process consisted of six steps: (1) review prescription, (2) validate prescription, (3) validate prescriber, (4) validate patient, (5) dispense or not dispense, and (6) report suspicious activity. (ECF No. 40 ¶ 61.)

through February 2018, Rite Aid only assigned a single Regulatory Affairs officer to review[8] all the tickets for Rite Aid pharmacies nationwide. (ECF No. 40 ¶ 65.) If the analyst felt as if the ticket should be elevated, it went to a supervisor, Janet Hart,[9] who had three options: "(1) unilaterally end the review, (2) direct the analyst to re-run the dispensing data in six months, or (3) present the file to a three-person committee of Rite Aid employees (the Review Committee), which included Hart, to determine what, if any, course of action to take on that prescriber." (ECF No. 40 ¶ 67.)

### b.  Alleged Improper Distribution

Plaintiff alleges that Defendants knew, or should have known, that Rite Aid's pharmacies were filling suspicious and unlawful prescriptions for controlled substances. (ECF No. 40 ¶ 68.) Plaintiff alleges, using confidential witnesses and the DOJ Complaint as support, that Rite Aid ignored thousands of tickets documenting suspicious controlled substance prescriptions constituting "red flags." (ECF No. 40 ¶ 69.)

As a result of these allegedly illegal prescription practices, Plaintiff asserts that, throughout the Class Period, Defendants concealed evidence demonstrating that Rite Aid had significant legal and regulatory exposure. (ECF No. 40 ¶ 87.) Plaintiff alleges that Rite Aid faced multiple lawsuits and regulatory actions related to their unlawful dispensing of opioid prescriptions as early as 2012.[10] (ECF No. 40 ¶ 92.) On October 26, 2017, then-President Trump declared the opioid crisis

---

[8]     "When the Regulatory Affairs analyst actually did review the ticket, the analyst was supposed to consider: (1) Rite Aid's dispensing data for the prescriber; (2) information about the prescriber, including whether the prescriber had a valid DEA registration number and any history of disciplinary action; (3) internet research on the prescriber and the prescriber's office; and (4) in and after December 2013, dispensing data that Rite Aid purchased from a commercial entity comprising approximately ninety percent of all retail pharmacies in the country." (ECF No. 40 ¶ 66.)

[9]     Janet Hart was the Director of Government Affairs. (ECF No. 40 ¶ 67.)

[10]    Plaintiff alleges that as early as April 2012, the Drug Enforcement Agency ("DEA") sent the Company an administrative subpoena requesting information about the sales of pseudoephedrine products. (ECF No. 40 ¶ 92.) In 2012, the U.S. Attorney's Office ("USAO") for the Northern District of New York issued a subpoena to Rite Aid in connection with investigation of possible civil violations of the Combat Methamphetamine Epidemic Act of 2005. (*Id.*) In June 2013, the USAO for the Eastern District of California served Rite Aid a Civil Investigation Demand regarding the Company's drug review process and dispensing of drugs categorized as "Code 1" by the State of California. (*Id.*)

a "public health emergency." (ECF No. 40 ¶ 93.) In 2017, Rite Aid was named a defendant in a multi-district litigation ("MDL") on opiates in the Northern District of Ohio. *In re National Prescription Opiate Litig.*, 17-MD-2804 (J.P.M.L. Dec. 12, 2017). At the October 30, 2018 annual meeting of Rite Aid shareholders, the shareholders voted to require the independent directors of Rite Aid's Board to "disclose in a report to be provided to investors by October 1, 2019, what governance measures they had taken since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis." (ECF No. 40 ¶ 96.) Plaintiff alleges that Defendants should have known the "significant liability likely to arise [from Rite Aid's improper distribution of controlled substances throughout the Class Period]." (ECF No. 40 ¶ 97.) Rite Aid cooperated with the federal government's investigations into the Company and produced relevant documentation throughout the Class Period. (ECF No. 40 ¶ 98.)

c. <u>Opioid Settlements</u>

In March of 2022, peer pharmacies started announcing opioid settlements.[11] (ECF No. 40 ¶ 100.) Plaintiff alleges that this should have revealed the extent of Rite Aid's litigation exposure since Rite Aid, like CVS, was amongst the top 10 largest distributors of opioids in the United States between 2006 and 2012. (*Id.*) After this news was revealed, Rite Aid stock prices fell from $10.26 to $9.36, reflecting an 8.77% drop.[12] (ECF No. 40 ¶ 320.) Following the CVS settlement, Rite Aid disclosed in its 2022 10-K[13] filed on April 25, 2022, that the Company had adjusted its

---

[11]    In March of 2022, CVS announced a $484 million settlement with the state of Florida related to opioid prescriptions at its pharmacies. (ECF No. 40 ¶ 100.) On November 2, 2022, CVS and Walgreens agreed to pay $5 billion each to settle lawsuits nationwide relating to prescription opioids. (*Id.*)

[12]    The Court notes that when stock prices "drop", this encompasses the time period from the closing of a particular trading day to the opening on the next trading day.

[13]    A 10-K is an annual report that companies submit to the SEC in compliance with the Exchange Act. *See General Instructions*, Securities and Exchange Commission, https://www.sec.gov/files/form10-k.pdf (last visited July 31, 2025).

risk disclosures to include that substantial damages were sought in connection with the opioid litigation. (ECF No. 40 ¶ 103.)

On March 13, 2023, the DOJ intervened in the MDL and filed a complaint against Rite Aid alleging that "Rite Aid failed to implement effective controls to prevent illegal and improper dispending [sic] of opioids, or to otherwise detect diversion and abuse of controlled substances and committed violations of the Controlled Substances Act and the False Claims Act in connection with Rite Aid's systematic dispensing of controlled substances." (ECF No. 40 ¶ 105.) On this news, Rite Aid stock fell from $3.28 to $2.66, reflecting a 18.9% drop. (ECF No. 40 ¶ 251.)

### *ii.*    *RxEvolution*

Plaintiff alleges that after facing negative publicity for its role in the opioid crisis and an enormous debt load, Rite Aid pivoted in 2019 to develop a strategic plan called "RxEvolution" (ECF No. 40 ¶ 112.)

### a.    Background

This new "RxEvolution" plan included the following:

> As outlined, the plan had three prongs: (1) growing Rite Aid's PBM, Elixir, into the dominant midmarket PBM; (2) shifting to a pharmacist-centric approach, wherein pharmacists would regularly come out from behind the counter to engage with consumers and act as consumer advocates; and, most significantly, (3) growing retail. In particular, the plan aimed to appeal to a target consumer base of millennial and Gex-X women by creating an integrated and holistic pharmacy experience that offered direct contact with pharmacists and pushed "natural" and organic supplements and treatments in addition to traditional pharmaceuticals.

(ECF No. 40 ¶ 114.) "Prescription scripts" were allegedly the key part of the RxEvolution plan. (ECF No. 40 ¶ 115.) In a June 24, 2021 earnings call, then-CEO Defendant Donigan emphasized the importance of growing scripts and making it a priority. (*Id.*)

The retail component of the RxEvolution plan was unveiled during the March 16, 2020 Analyst Day Call and had several components. (ECF No. 40 ¶ 116.) First, was a transition to

"Stores of the Future" which included a remodel to meet customers' personal needs. (*Id.*) The stated goal for 2021 was to introduce 75 of these stores. (*Id.*) The second initiative included repositioning pharmacists to the "front and center" as "chief whole being health advocates." (*Id.*) This initiative also included a new product lineup of "better for you" products. (ECF No. 40 ¶ 117.) Plaintiff alleges that Rite Aid promised investors "more than a [sic] just new logo, touting that 'it's truly a transformation deep to our core, not a superficial one.'" (ECF No. 40 ¶ 118.) Plaintiff stated that the initiative turned out to be just a new logo and new signage. (*Id.*) Third, Plaintiff alleges that RxEvolution was supposed to place a greater emphasis on telehealth resulting in the installation of "wellness rooms" in Rite Aid stores for customers to engaged in digital wellness. (ECF No. 40 ¶ 128.)

      b. <u>COVID-19 Pandemic</u>

Unexpectedly, the announcement of the RxEvolution strategy coincided with the COVID-19 outbreak, which was announced on March 11, 2020 by the World Health Organization ("WHO"). (ECF No. 40 ¶ 119.) Plaintiff alleges that during the pandemic, the Defendants began diverting Company resources away from the RxEvolution projects and into COVID-19 relief efforts such as COVID-19 testing and vaccine administration. (*Id.*) Confidential Witness 1 ("CW1") was hired as a project manager for the "Stores of the Future" project and alleged that the initial estimated budget for the transformation was $8 million per store. (ECF No. 40 ¶ 121.) CW1 then stated that around September 2020, the budget was reduced to $1 million per store and then further dropped to $0.7 million per store. (ECF No. 40 ¶ 122.) CW1 also alleges that much of the team hired along with them to develop the Stores of the Future were reassigned to the COVID-19 vaccine project. (*Id.*) Confidential Witness 2 ("CW2") stated that the rebranding was "utter chaos" and that they felt as if "there was no plan in place." (ECF No. 40 ¶ 120.)

Plaintiff alleges that because of the diversion of resources, the scope of the Stores of the Future was dramatically reduced. (ECF No. 40 ¶ 124.) After the pandemic, the target goal for Stores of the Future was cut from 75 stores to 50 and then to 10. (*Id.*) The Company piloted its first three Stores of the Future in November 2020. (ECF No. 40 ¶ 125.) By November 2021, Plaintiff alleges that only five or fewer stores were opened. (*Id.*) Furthermore, CW1 stated that as a result of COVID-19, patients were not using telehealth services in the dedicated rooms in the pharmacies, instead opting for Zoom and other online telehealth services from their home. (ECF No. 40 ¶ 129.)

During the COVID-19 pandemic, Plaintiff alleges that the revenue from COVID-19 tests and vaccines masked Rite Aid's declining financial performance. (ECF No. 40 ¶ 139.) In fact, shortly after the COVID pandemic was declared, in six quarters in 2020 and 2021, Rite Aid's EBIT[14] exceeded its interest expense. (ECF No. 40 ¶ 140.) This financial success continued based on revenue generated from testing and vaccines as the pandemic progressed. (ECF No. 40 ¶ 140–49.)

    c.  <u>Post-Pandemic</u>

After the pandemic subsided, however, the Company experienced a large decrease in revenue, primarily due to the decline in vaccines issued and reduced interest in booster shots. (ECF No. 40 ¶ 155.) Plaintiff alleges that Defendants represented to investors that Company revenue would be sustained post-pandemic, but did not implement changes pursuant to the RxEvolution initiative to offset the decline in COVID-19 related revenues. (ECF No. 40 ¶ 150–58.)

---

[14]    "EBIT" refers to earnings before interest and taxes. (ECF No. 40 ¶ 4.)

In 2022, Plaintiff alleges that Rite Aid executives made several statements reassuring investors about the continued presence of COVID and that the RxEvolution plan was progressing successfully. (ECF No. 40 ¶ 161–62.) Some of these statements are included below, such as:

> COVID vaccines are not a onetime thing for us as a company… COVID vaccines will be a permanent, I think, weapon in our arsenal. I think it is very fair to assume that these vaccines, just like flu shots, just like Shingrix, just like pneumonia, are here to stay and a permanent part of our arsenal. So I think it's one of the benefits of COVID.

Heyward Donigan, Q1 2022 Earnings Call (June 24, 2021). (*Id.*)

> I really, really strongly believe is there's no ex COVID. I don't think there's any time in the next 3 to 4 years if we're lucky that there is no COVID. And I think COVID testing is here to stay as well. . . . I don't think we see a world without COVID vaccines.…I think that they're very likely to forever in our lifetime us to be happening once or twice a year…"

Heyward Donigan, Investor Call[15] (December 21, 2021). (*Id.*)

Donigan also stated that "[o]ur RxEvolution strategy is showing promising results and I'm encouraged that we're not only exceeding expectations, but also demonstrating that our strategy is gaining momentum." (ECF No. 40 ¶ 162.) Plaintiff alleges that Rite Aid's earnings projections falsely presumed that revenue would continue at COVID-19 levels post-pandemic even though Defendants knew internally that such revenues were continuing to decline. (ECF No. 40 ¶ 163.)

On September 29, 2022, Rite Aid announced their Q2 financial results which revealed a "shock[ing]" loss resulting from "a decline in COVID testing and vaccine revenue." (ECF No. 40 ¶ 245.) After this announcement, Rite Aid's stock price fell from $7.03 to $5.06 or 28.02%. (ECF No. 40 ¶ 246.)

On December 21, 2022, Rite Aid announced their Q3 2022 financial results which were, as Plaintiff alleges, "dismal." (ECF No. 40 ¶ 247.) Again, this loss was attributed to a decline in

---

[15]    Plaintiff does not specify in what context that this statement was made aside from the fact that it was made to investors. (ECF No. 40 ¶ 161.)

COVID testing and vaccine revenue. (*Id.*) After this announcement, Rite Aid's stock price fell from $4.41 to $3.65 or 17.23%. (ECF No. 40 ¶ 248.)

On August 25, 2023, it was revealed through a Wall Street Journal article titled "Rite Aid Prepares Bankruptcy That Would Halt Opioid Lawsuits" that the Company was preparing to file Chapter 11 bankruptcy due to the impact of opioid lawsuits on its financial position. (ECF No. 40 ¶ 252.) After this news, Rite Aid stock fell from $1.44 to $0.71, reflecting a 50.69% drop. (ECF No. 40 ¶ 253.)

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In deciding whether a complaint fails to state a claim upon which relief can be granted, the court is required to accept as true all factual allegations in the complaint as well as all reasonable inferences that can be drawn from the complaint. *Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994). These allegations and inferences are to be construed in the light most favorable to the plaintiff. *Id.* But, the court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Plaintiffs cannot prove facts they have not alleged. *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). Thus, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of

action will not do." *Iqbal*, 556 U.S. at 678. Rather, a complaint must recite factual allegations enough to raise the plaintiff's claimed right to relief beyond the level of mere speculation. *Id.*

However, as compared to a standard Rule 12(b)(6) motion to dismiss, a complaint in a securities litigation must plead more than just "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Inst. Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). A plaintiff in a securities case must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").[16] *See* 15 U.S.C. §§ 78u–4 *et seq.* The PSLRA provides two pleading requirements, both of which must be met to survive a motion to dismiss. *Id.* First, a complaint "must specify each misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Avaya*, 564 F.3d 242 at 252–53 (citing *Winer Fam. Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007)); 15 U.S.C. § 78u–4(b)(1). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This is an exacting pleading standard for state of mind, also known as "scienter." *Avaya*, 564 F.3d 242 at 252–53 (citing *Tellabs*, 551 U.S. 308, 320). If a plaintiff fails to meet this heightened pleading requirement under the PSLRA, the complaint must be dismissed.

## III.    DISCUSSION

Plaintiffs bring claims against Defendants for violations of Section 10(b) and Rule 10b-5 of the Exchange Act (Count I), along with violations of Section 20(a) of the Exchange Act (Count II).

---

[16]    The Court notes that the PSLRA has replaced Rule 9(b) as the pleading standard governing private securities class actions. *See Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). However, the particularity requirement of Rule 9(b) is comparable and effectively subsumed by the PSLRA. *Id.*

### A. **Section 10(b) and Rule 10b-5**

Plaintiffs bring claims against Defendants under Section 10(b) and Rule 10b-5 of the Exchange Act, which prohibits fraud in connection with the sale or purchase of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5(b). To state a claim under these Sections, Plaintiff must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).

Defendants argue that Plaintiffs fails to (1) allege any false or misleading statement or omission; (2) plead facts giving rise to a strong inference of scienter; and (3) plead loss causation as it related to the opioid theory and the RxEvolution theory of liability. (ECF No. 64-3, at 25, 40.) The Court need not, and therefore does not, address scienter because falsity and loss causation are dispositive in the present case.

### i. *False/Misleading Statements*

A statement is actionable under securities laws if it "(i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *Dang v. Amarin Corp. PLC*, 750 F. Supp. 3d 431, 459 (D. N.J. 2024) (citing *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023)). The PSLRA does, however, provide a "safe harbor" provision for forward-looking statements. *Id.*; 15 U.S.C. § 78u-5(c). Alleged misrepresentations are not actionable if the statements "are (1) identified as [forward-looking], and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *Id.* (citing *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278

(3d Cir. 2010)); 15 U.S.C. § 78u-5(c). Finally, the Court "must distinguish material representations from statements that 'constitute no more than puffery and are understood by reasonable investors as such.'" *Id.* (citing *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020)).

a. Opioid Theory

Plaintiff contends that three large groups of statements were false or misleading as they related to the opioid litigation. The first are the statements made in Rite Aid's SEC filings, which Plaintiff contends failed to adequately disclose the risk of legal liability as it related to potential and/or active opioid litigation. (ECF No. 66, at 21–23.) The second group are statements made regarding compliance with regulations in the relevant SEC filings, which Plaintiff alleges were misrepresented by Defendants. (ECF No. 66, at 23–24.) Finally, there are those statements made during an investor call that "touted" Rite Aid's internal procedures for dispensing controlled substances. (ECF No. 66, at 25–27.)

Defendants argue that the challenged statements are not false or misleading because the risk contingencies of pending litigation were adequately disclosed with the amount of knowledge that was available to the Company at the time. (ECF No. 64-3, at 26, 30.) Defendants also argue that securities laws do not require a Company to accuse itself of wrongdoing, therefore making the disclosures accurate and in compliance with the relevant regulations. (ECF No. 64-3, at 27–28.) Defendants also argue that any statements about the Company's compliance with regulations or its internal procedures were not false, nor can Plaintiff show that they were. (ECF No. 64-3, at 32.)

**SEC Filing Statements**

The Court will first address the SEC filings[17] (Form 10-Ks) and the alleged misstatements therein. Plaintiff argues that the 2018 and 2019 Form 10-Ks do not adequately disclose the risk

---

[17]    There are several documents that are attached to both the Plaintiff and Defendants' pleadings in the present case. (ECF Nos. 64-4, 64-5, 64-6, 64-7, 64-8, 64-10, 64-11, 66-1, 72-1, 72-2, 72-3, 72-3, 72-4, 72-5.) Neither party

associated with legal proceedings. Plaintiff argues that the statement: "the Company's management does not believe the outcome of any of these legal matters will be material" is misleading. (ECF No. 72-1, at 13; ECF No. 72-2, at 8, 14.) However, the Court notes that this statement is taken out of context and a reasonable reader of the 10-Ks would not necessarily interpret the statements in the same way Plaintiff has. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund.*, 575 U.S. 175, 190 (2015) ("The reasonable investor understands a statement of opinion in its full context."). The 2018 10-K makes several disclosures related to "Legal Matters and Regulatory Proceedings." (ECF No 72-1, at 8.) The Disclosure states that "[t]he Company is involved in legal proceedings and is subject to investigations, inspections, claims, audits, inquiries, and similar actions by governmental authorities arising in the ordinary course of its business." (*Id.*) The Disclosure then goes in depth with all of these active matters and details about them. (ECF No. 72-1, at 8–13.) At the end of each of these matters, the Company then discloses what they expect the impact of the litigation may be, if any. For example, the Company says, for an unrelated suit, that "[a]t this stage of the proceedings, the Company is not able to either predict the outcome of this lawsuit or estimate a potential range of loss with respect to the lawsuit and is vigorously defending this lawsuit." (ECF No. 72-1, at 11.) For another suit, the Company says "[w]hile the Company's management cannot predict the outcome of these

---

has opposed the Court judicially noticing the exhibits. The Court holds that they are hereby judicially noticed and may be considered. When "decid[ing] a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). However, an exception to the general rule holds that when a document attached to a motion to dismiss is integral or explicitly relied upon in the complaint, the document can be considered without converting the motion into one for summary judgment. *Id.* The purpose of the rule against inclusion of documents is lack of notice to a plaintiff. *Id.* Where a plaintiff has actual notice and has relied on those documents in framing the complaint, that concern is dissipated. *Id.* "It is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint, nor should a plaintiff be able to evade accountability for such documents simply by not attaching them to [their] complaint." *Id.* at 250. The Court holds that all documents attached, by virtue of consent by both parties and by their substance, are considered integral or explicitly replied upon in the Amended Complaint.

matters, it is possible that the Company's results of operations or cash flows could be materially affected by an unfavorable resolution." (*Id.*) The 2018 10-K then proceeds to disclose the pending MDL and the Company states "The Company is vigorously defending all such matters." (ECF No. 72-1, at 13.) Afterwards, there is what Defendants call a "catchall" paragraph which states:

> In addition to the above described matters, the Company is subject from time to time to various claims and lawsuits and governmental investigations arising in the ordinary course of business. While the Company's management cannot predict the outcome of any of the claims, the Company's management does not believe that the outcome of any of these legal matters will be material to the Company's consolidated financial position. It is possible, however, that the Company's results of operations or cash flows could be materially affected by an unfavorable resolution of pending litigation or contingencies.

(*Id.*) Plaintiff argues that this provision refers to the active MDL, conveniently omitting the first two sentences of the "catchall provision". The Court finds that this provision is a catchall provision and not referring to the MDL litigation above. Looking at the surrounding context, the Company discloses its "opinion" on each of the active matters. As stated above, Rite Aid disclosed that, regarding a previous suit, "it is possible that the Company's results of operations or cash flows could be materially affected by an unfavorable resolution." The pattern of the 10-K clearly reveals that each paragraph addressing each active legal matter offers the Company's opinion with the last paragraph simply being a "catchall" clause, referring to matters "*in addition to* the above." (*Id.*) (emphasis added).

The same pattern of disclosures appears in the 2019 Form 10-K. (ECF No. 72-2.) The 2020 10-K, while incorporating a slightly different structure, states essentially the same thing in the same manner. (*See* ECF No. 72-3.) The 2021 Form 10-K continues to include meaningful cautionary language and removes the catchall provision. (ECF No. 72-4.) In the 2021 Form 10K, the Company states that "[a]t this stage of the proceeding, the Company is not able to predict the outcome of the opioid-related lawsuits or estimate a potential range of loss regarding the lawsuits,

and is defending itself against all relevant claims." (*Id.*) According to Rite Aid, once the impact on the Company became more clear, following CVS's settlement, Rite Aid disclosed, in their 2022 Form 10-K that "substantial damages are sought from the Company in virtually all of these matters." (ECF No. 72-5.)

"The reasonable investor understands a statement of opinion in its full context." *Omnicare,* 575 U.S. at 190. An investor, like the Court, would and must read the 10-Ks with its full context, and, in doing so, would see that the catchall clause was referring to "various claims and lawsuits and governmental investigations arising in the ordinary course of business" separate and apart from the disclosures of the specific pending litigations. For this reason, the Court holds the statements in the 10-Ks regarding opioid disclosure are not actionable because they are not false or misleading. *See Dang v. Amarin Corp. PLC*, 750 F. Supp. 3d 431, 459 (D. N.J. 2024) ("A statement or omission of fact is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'") (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

Even if the Court were to determine that this statement referred to the pending MDL, "statements of opinion [] are inactionable under the *Omnicare* standard." *Allegheny Cnty. Emp. Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 225 (E.D. Pa. 2021). *Allegheny County* contemplated statements of opinion that are similar to those in the present case. The plaintiff in *Allegheny County* claimed, with regard to ongoing investigations or litigation, that they are "confident that [they] have not acted to violate any criminal laws" and that they have "not engaged in any form of criminal activity." *Id.* The Supreme Court has held that even though an opinion on the outcome of a litigation or the legality of a company's actions may turn out to be wrong, it is

not actionable under the PSLRA. *Id.* (citing *Omnicare*, 575 U.S. at 188). Rite Aid repeatedly in their 10-Ks acknowledged that their opinions of the litigations before them were beliefs or opinions, not statements of facts.[18] These statements were consistently accompanied by meaningful cautionary language throughout that "the Company is not able to predict the outcome of these matters." (ECF No. 72-1, at 11, 13; ECF No. 72-2, at 8, 14; ECF No. 72-3, at 11; ECF No. 72-4, at 8, 10.)

Furthermore, Plaintiff's arguments that the aforementioned risk had already transpired is unavailing. At the time of the 2018 through 2021 Form 10-Ks, there had not been any settlements in the ongoing MDL nor any comparable metric to evaluate exposure. Lawsuits can transpire in many ways, often leading to unpredictable results and at unpredictable times. Forecasting outcomes and when those outcomes will manifest themselves is difficult, if not impossible to state, to say the least. Furthermore, to the extent Plaintiff argues that the risks of litigation had already transpired because the Defendants "knew" that they were distributing illegal prescriptions, "the securities laws do not 'require a company to accuse itself of wrongdoing.'" *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 67 n.8 (D. Del. 2020), *aff'd*, 2022 WL 3442353 (3d Cir. Aug. 17, 2022); *see also In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *10 (D. N.J. Nov. 12, 2019); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("'[D]isclosure is not a rite of confession,' and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."). Rite Aid is not required to disclose an "uncharged, unadjudicated wrongdoing in connection with its statements regarding its

---

[18]    Examples of the statements include: "the Company's management does not ***believe*** that the outcome of these legal matters will be material to the Company's consolidated financial position." (ECF No. 72-1, at 13 (emphasis added).)

compliance with governing laws and regulations." *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *12 (E.D. Pa. March 25, 2022).

This principle is also applicable to Plaintiff's other arguments regarding the Company's compliance with regulations. Plaintiff claims that the Company's statements, such as "noncompliance with applicable regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our business" and "errors in the dispensing and packaging of pharmaceuticals could lead to serious injury or death" are false because those risks had already materialized. Again, a Company is not required to accuse themselves of unadjudicated wrongdoing. The statements about the possible risks of noncompliance are not false, in fact, quite the contrary, they are true statements. Plaintiff does not dispute that noncompliance *could* affect business or that errors *could* lead to serious injury. These statements are neither false or misleading. For these reasons, the Company's statements regarding compliance with regulations are not actionable.

## **Investor Meeting Statements**

The next group of statements that Plaintiff alleges are materially false are those made by Defendant Konrad on May 15, 2018 during an investor meeting.

> On May 15, 2018, Defendant Konrad falsely touted Rite Aid's efforts to combat the opioid crisis by claiming that Rite Aid had policies and procedures in place "to ensure every prescription is filled accurately[,]" and had "implemented a red flag process to validate controlled substance prescription, ensuring they are for legitimate medical needs." Konrad further touted that Rite Aid's "proprietary dispensing system known as next-gen is paramount to our commitment to patient safety and supports all of our key initiatives[,]" and assured investors that the Red Flag Process "ensures the prescription is valid and legitimate[.]"

(ECF No. 66, at 25.) Again, Plaintiff has failed to show how these statements were false or misleading. There were, in fact, policies and procedures in place to ensure that prescriptions are filled accurately and that there was a red flag process. This is detailed extensively in the Amended

Complaint and is undisputed by Plaintiff. (ECF No. 40 ¶¶ 61–67.) Defendant Konrad made no statement on the efficacy of the procedures which would make the statement false. Furthermore, the statements could also constitute puffery. "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993). Discussing how the company's dispensing system is "paramount to [Rite Aid's] commitment to patient safety" would fall into this category of puffery. *See infra* note 18. There is no truth value to this statement aside from the fact that the internal policies and procedures exist, which Plaintiff does not dispute.

For the reasons stated above, the statements related to the Opioid theory are not false or misleading. Therefore, they are dismissed as a matter of law as Plaintiff has failed to meet the pleading requirement of the PSLRA.

### b. RxEvolution Theory

Plaintiff alleges twenty (20) statements made by various individuals that are false or misleading as they relate to the RxEvolution theory. The Court will enumerate them here and address them individually for clarity. The Court will highlight the relevant portions of the transcript as the Plaintiff did. (*See generally* ECF No. 66-1.) However, at the outset, the Court notes that none of the below statements were made by Defendant Standley, Karst, or Burr. As a result, any claims against those three individual Defendants are dismissed.

## Statement 1

**We're aggressively accelerating the key initiatives that will drive our transformation through the RxEvolution strategy**, which focuses on becoming a dominant mid-market PBM, unlocking the value of our pharmacists and revitalizing our retail and digital experiences. And finally, **we're focused on continuing to drive the operational excellence needed to achieve strong results and position our company for future long-term sustainable growth**…**Overall, the fundamentals of our business are strong . . . we haven't missed a beat in bringing our strategy to life . . .**

Heyward Donigan, Q2 2021 Earnings Call (September 24, 2020). (ECF No. 66-1, at 38.)

"Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993). The statements regarding "accelerating key initiatives" and "focus[ing] on continuing to drive the operational excellence needed to achieve strong results" are terms that carry no actual meaning, constituting puffery within the direct sense of the term. *See In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *11 (W.D. Pa. May 18, 2023) (holding that statements such as (1) "commitment" to "maintaining the highest quality manufacturing standards at its facilities around the world", (2) being "best positioned to take [its] entire product portfolio across the globe", (3) its ability to "leverage" its platform and portfolio, and (4) "celebrating" or expressing "excitement" about "the credibility of [defendant's] science, our portfolio, our ability, our operational excellence, the ability to manufacture high-quality, high-volume products around the globe" were puffery). Adjective-laden statements are too vague to be verified and are therefore inactionable. *Id.* "A reasonable investor would not put stock in these corporate platitudes." *Id.* These types of statements are in line with what other courts have deemed to be puffery.[19]

---

[19]    *See, e.g., id.*; *Key Equity Inv., Inc. v. Sel-Leb Mktg., Inc.*, 246 F. App'x 780, 785–86 (3d Cir. 2007) (holding that statements about "strong revenue and earnings growth" were puffery and did not give rise to liability under Section 10(b)); *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) (holding that assertions of current fact, when too vague, are inactionable); *In re PayPal Holdings Inc. Sec. Litig.*, 2025 WL 325603, at *21 (D. N.J. Jan. 29, 2025) (holding that statements of "strong growth" are inactionable as statements of opinion or puffery); *In re Nice Sys., Ltd.*

Furthermore, to the extent that this statement refers to expected results or future expectations, they would be "forward looking statements" that are protected by PSLRA's safe harbor provision. Alleged misrepresentations are not actionable if the statements "are (1) identified as [forward-looking], and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *Dang v. Amarin Corp. PLC*, 750 F. Supp. 3d 431, 459 (D. N.J. 2024) (citing *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278 (3d Cir. 2010)); 15 U.S.C. § 78u-5(c). As Defendants state, all earnings calls began with a disclosure:

> [T]oday's conference call includes certain forward-looking statements. These forward-looking statements are presented in the context of certain risks and uncertainties that can cause actual results to differ. These risks and uncertainties are described in our press release in Item 1A of our most recent annual report on Form 10-K and in other documents that we file or furnish to the SEC.

(ECF No. 64-3, at 19.) This cautionary language also included specific disclaimers that COVID-19 could have a material impact on various Rite Aid operations in addition to Rite Aid's ability to implement their new business strategy, specifically mentioning RxEvolution. (*See* ECF No. 64-7, at 24–25, 43, 75–76, 89, 112–13, 124, 142–43, 152; ECF No. 64-8, at 7–8, 20, 38–39, 51, 67, 74, 90, 94.) While the broad cautionary language provided at the start of all earnings calls may be "too blanket or vague to constitute meaningful cautionary language," the Court need not reach that issue because there was more specific cautionary language which addressed COVID-19 and

---

*Sec. Litig.*, 135 F. Supp. 2d 551, 580 (holding that statements predicting "another year of continuous growth" is nothing more than mere puffery); *Kovalev v. Lidl US LLC*, 647 F. Supp. 3d 319, 343 (E.D. Pa. 2022) (holding that "New and Improved" and "High Quality" are examples of puffery); *Painaway Austl. Pty Ltd. ACN 151 146 977 v. MaxRelief USA, Inc.*, 2022 WL 1028024, at *3–4 (E.D. Pa. April 6, 2022) (holding that "Australia's #1" is puffery); *Travelers Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 553 ("aggressive positive marketing" does not automatically equate to actionable statements.); *Percoco v. Deckers Outdoor Corp.*, 2013 WL 3584370, at *3 (D. Del. July 8, 2013) (holding that general or vague statements of intention or optimism are puffery); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *24 (D. N.J. Dec. 27, 2019) (holding that "embraced transparency" and "caring unconditionally for others" and "great strides" were terms of puffery and not actionable under securities laws). The Court holds the same here.

RxEvolution directly. *Id.*; *see Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d. 621, 644 (D. N.J. 2021) (holding that general cautionary language accompanied by more specific cautionary statements tailored to the risk at issue would be sufficient to invoke safe harbor as to those statements which looked to the future); *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 503–05 (E.D. Pa. 2018) (same), *Avaya*, 564 F.3d at 257 (same).

### Statement 2

> Much important work lies ahead of us. We know that. **But I am energized by the progress we're making as we aggressively implement the RxEvolution strategy** and work together to become a growing, differentiated and thriving organization. . . . Before I turn it over, I'd just like to say that **we are moving swiftly and confidently to execute our plan and build a whole new Rite Aid by relaunching our brand, overhauling our stores and merchandise, building our Stores of the Future, and evolving the role the pharmacist plays as a community health provider and connector.**

Jim Peters, Q2 2021 Earnings Call (September 24, 2020). (ECF No. 66-1, at 41.)

The same analysis for Statement 1 applies here, the statements made by Jim Peters constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would similarly be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

### Statement 3

**Our increase in Retail Pharmacy segment revenue was driven by an increase in same-store sales of 3.5%.**

Matthew Schroeder, Q2 2021 Earnings Call (September 24, 2020). (ECF No. 66-1, at 44.)

Plaintiff argues that this statement is false and misleading because the statement "failed to disclose" that the increased revenues were due to COVID-19. (*Id.*) The general rule in the case of an omission of a material fact is that "silence, absent a *duty to disclose*, is not misleading under Rule 10b-5." *United States v. Yeaman*, 987 F. Supp. 373, 378 (E.D. Pa. 1997) (citing *United States*

*Sec. Exch. Comm'n v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996)). Plaintiff has not alleged any statute that would create a duty to disclose that the increased revenues were due to COVID-19, in this context. Furthermore, this statement does not give the reason for the increase in same-store sales, only that it was increasing. Plaintiff only makes a conclusory statement that the statement was false without providing any substantive allegations to support that proposition. For that reason, this statement is not actionable.

To the extent that Plaintiff argues this statement is incomplete, incomplete statements are only actionable if they are "so incomplete as to mislead investors." *The Winer Fam, Trust v. Queen*, 2004 WL 2203709, at *7 (E.D. Pa Sept. 27, 2004) (holding that disclosing a large investment partnership to investors without discussing a previous unprofitable relationship with that same partner was misleading). There is only a duty to disclose a certain fact "when necessary to make statements made, in light of the circumstances under which they were made, not misleading." *Strougo v. Lannett Co., Inc.*, 2019 WL 1172992, at *13 (E.D. Pa. Mar. 13, 2019) (citing *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017)). "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). The Court is not persuaded that this statement is incomplete. This statement was discussed on an earnings call, strictly talking about numbers, and not discussing any context around the numbers.

**Statement 4**

I'm excited to give you an exclusive sneak peek at some elements of our full brand relaunch **which we roll out across all our markets in just a couple of weeks, a brand launch that involves far more than a new logo but one with substance and impact that involves every step of the consumer journey, both digitally and in store. . . .** We're unlocking their potential for that perfect fusion where traditional therapies meet alternative remedies and being the whole health advocate for every single customer that comes into the pharmacy. **Our pharmacists are embracing this new role. They love the fact that they're engaging in a way they envision when they actually chose to become a pharmacist. . . .** We're cleaning and refreshing all our store exteriors with our new logo, signage and digital pylons and **we'll soon be formally launching our new brand with the surround sound messaging on the perfect fusion between traditional and alternative remedies.** As the customer shops the front, end they'll soon notice our merchandise overall, and it is an overhaul, with visually impactful messaging emphasizing the better for you products our consumers want, **not the traditional mass items we've been incentivized by vendors to promote. . . .We're thrilled to be grand opening our very first Stores of the Future this month within weeks with many more to come as we continue to redefine the Rite Aid experience across our retail footprint. . . .**With an updated blue mortar and pestle to reinforce our pharmacy core and replacing the old, tired red with green leaves to represent our embrace of holistic alternative remedies, our new logo better represents the new Rite Aid in what we stand for to be clear. **Our efforts obviously go well beyond a new logo you just saw. Our branding is more than a symbol. It's a redefinition of purpose, a revitalization of a business….**

Jim Peters, "A New Day at Rite Aid" YouTube Presentation (October 28, 2020). (ECF No. 66-1, at 47.)

The same analysis for Statement 1 applies here, the statements made by Jim Peters constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

**Statement 5**

We're making our pharmacists even more accessible than they have been in the past and **they will be front and center in every one of our pharmacies in the Stores of the Future. . . .**We're allowing our pharmacists **and freeing up their time through lean initiatives** and, I will tell you, speaking to **our pharmacists, they are so excited** that for the first time in retail pharmacy that we are empowering them **to do exactly what they've always wanted to do. They love being in front of the customers they love that we actually physically put them there** and we're creating the space around them to support them so that they can interact more with their customers through every interaction that they have. The Store of the Future definitely is a completely different experience than any other retail pharmacy in the market.

Jocelyn Konrad, "A New Day at Rite Aid" YouTube Presentation (October 28, 2020). (ECF No. 66-1, at 50.)

The same analysis for Statement 1 applies here, the statements made by Jocelyn Konrad constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

**Statement 6**

We're really pleased with the results for the quarter. **We continue to grow our business and achieve major milestones in our transformation through the RxEvolution strategy**, all the while demonstrating the essential role we play in our communities during this unprecedented global pandemic. . . . **So as a team, we're accelerating the key initiatives that will drive our transformation through the RxEvolution strategy**, which focuses on establishing Elixir as a clearly differentiated market leader in managing pharmacy spend and total cost of care for health plan and employer clients as well as omnichannel member engagement to drive better health outcome. **And in retail, we're unlocking the value of our pharmacists and revitalizing our retail and digital experiences. And we'll continue working together to deliver the operational excellence needed to achieve strong results as we generate free cash flow, reduce our debt and improve our leverage ratio.**

Heyward Donigan, Q3 2021 Earnings Call (December 17, 2020). (ECF No. 66-1, at 52.)

The same analysis for Statement 1 applies here, the statements made by Heyward Donigan constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

### Statement 7

Customer feedback to our pilot stores has been outstanding, and we are pleased **with the early initial results, both in terms of sales and margin performance. We plan to roll out our next wave of pilot store in Q4. More broadly, we will continue to upgrade our entire fleet** using an analytical approach that guides the type of investment, the level of investment and the timing of investment on a market-by-market and store-by-store basis.

Jim Peters, Q3 2021 Earnings Call (December 17, 2020). (ECF No. 66-1, at 55.)

The same analysis for Statement 1 applies here, the statements made by Jim Peters constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

### Statement 8

It was also a year in which our **RxEvolution strategy was not only validated, but proven essential.** I'm really eager to share more on how our strategy came to life throughout the year. *** Just over a year ago at our Analyst Day, we told you we would be a demonstrably different company within the next year. And **we have delivered on that promise, making substantial changes to position us for profitable growth...**We opened our first three flagship store remodels, and we continue to be pleased with both the sales and margin performance in these stores. *** Despite the short-term challenges, our teams are clear on what needs to be done: Win today and in the future by creating real health care value, improving the consumer engagement and transforming our work to improve financial performance. **With these initiatives well underway, we're accelerating our actions toward a more nimble, efficient and effective Rite Aid.** We have and will continue to effectively manage through this crisis **while positioning our business for current and long-term success.**

Heyward Donigan, Q4 2021 Earnings Call (April 15, 2021). (ECF No. 66-1, at 57.)

The same analysis for Statement 1 applies here, the statements made by Heyward Donigan constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

### Statement 9

We're just one year into our RxEvolution transformation and **this year has shown signs of real progress and validation of our strategy.** And we are encouraged that **we are focused on the right opportunities looking ahead.**

Jim Peters, Q4 2021 Earnings Call (April 15, 2021). (ECF No. 66-1, at 60.)

The same analysis for Statement 1 applies here, the statements made by Jim Peters constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

### Statement 10

**Everything is on track.** I mean, I think that's one of the most remarkable things that I even kind of reflect on and can't believe is that **we have executed on every strategic initiative that we set ourselves up for back at Analyst Day over a year ago.** \*\*\* So I think there is a lot of noise in the pandemic. But the fact that **we've been able to do all of that** in addition to launching COVID testing, keeping our store clean, protecting our associates and our customers and getting people vaccinated, it's been quite a year. **And so we remain committed to everything that we had set out to do.**

Heyward Donigan, Q4 2021 Earnings Call (April 15, 2021). (ECF No. 66-1, at 62.)

There are multiple portions of this statement that need to be analyzed separately. There are three main categories of statement contained here. The first group includes the statements: "everything is on track" and "we have executed on every strategic initiative that we set ourselves up for back at Analyst Day over a year ago." The second group is the statement "we've been able

to do all of that." The last group is the statement "we remain committed to everything we had set out to do."

The second and third groups of statements are mere puffery. The language contained within the statements don't correlate to any quantifiable metric or result. The same analysis for Statement 1 applies here, the statements made by Heyward Donigan constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

The first group of statements, however, is less of a clear story. "A mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) (citation omitted). However, as in *Avaya*, the "assertions of current fact are too vague to be actionable." *Id.* The statements made by Heyward Donigan do not justify any financial projections or any particular metric. As a result, the statements by Donigan are inactionable. Nonetheless, even if the Court were to conclude that the statement was actionable, loss causation is not met, as analyzed below, and therefore the claims are dismissed regardless.

### Statements 11 and 12

> **In addition, this quarter, we opened seven new flagship stores**, four of which opened in Boise, Idaho, and three in the Virginia Beach, Virginia market. **This brings us up to 10 flagship stores opened**, and Jim will share more on what we're seeing and learning in this important work as it progresses

Heyward Donigan, Q1 2021 Earnings Call (June 24, 2021). (ECF No. 66-1, at 65.)

> As Heyward mentioned earlier, **we opened seven new flagship pilot stores this quarter, bringing us to 10 total stores open.**

Jim Peters, Q1 2021 Earnings Call (June 24, 2021). (ECF No. 66-1, at 67.)

Plaintiff does not make a single allegation nor provide any argument that these statements were false. Plaintiff does not dispute that seven new flagship stores were opened, bringing the total to 10. This statement is therefore not actionable.

### Statement 13

> Yes. Well, I mean that is the ultimate dilemma of taking over a company in the situation with this amount of debt. And so, I think we are a company that is very much in need of demonstrating organic growth. **And I think had -- we have some early indicators of showing that we can do that even in the middle of a pandemic. . . .** If you look at our inventory turns and if you look at our recent results ex-OTC and acute, you can see, what I will call, rays of hope that **our underlying business is improving. . . .** So, as we look at it and as we model this out, we have to just take that into consideration and look at the business ex all of those factors and what a rebound would look like plus increase. We have taken market shares, **so we have shown that on the front end, we can take market share.** At the end of the day, what we've said, I think repeatedly, is we have to grow scripts, that is our number one priority is growing scripts. . . . And the other thing I would say is **COVID vaccines are not a one-time thing for us as a company. COVID vaccines, whether there is a booster shot this year or next year, we're living with COVID. We're living with -- COVID vaccines will be a permanent, I think, weapon in our arsenal.**

Heyward Donigan, Q1 2022 Earnings Call (June 24, 2021). (ECF No. 66-1, at 69.)

The same analysis for Statement 1 applies here, the statements made by Heyward Donigan constitute no more than puffery. *See supra* note 19. Furthermore, Plaintiff never alleges that the COVID vaccine was not a permanent "weapon in [Rite Aid's] arsenal." There is no allegation that Rite Aid stopped offering COVID vaccines, which would be the only fact that would make this statement false or misleading. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

**Statement 14**

We're almost three times in terms of our inventory terms which are up 8% and that's really a reflection on **how strong our merchandise mix is as well as our better for you organic product offerings which are more on trend targeting our new customer** which is the female from age 25 to 49. She's really coming into buy things for her kids and things for herself and things for her parents. So we're pretty excited because **we really are starting to see the results and the traction that we were hoping for.**

Heyward Donigan, CNBC Interview (June 24, 2021). (ECF No. 66-1, at 73.)

The same analysis for Statement 1 applies here, the statements made by Heyward Donigan constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

**Statement 15**

Since launching our strategy last March, **our organization is executing a clear plan to build top-line momentum with an intense focus on improving our profitability. We have transformed our business to be more relevant to our target growth consumer and more efficient in how we operate, while making investments necessary to drive the long-term health of our business. The progress on our RxEvolution strategy validates our belief that, as the trusted everyday care connector, Rite Aid will drive lower healthcare costs through better coordination, stronger engagement, and personalized services that help our customers achieve whole health for life.**

Matthew Schroeder, 8-K (September 23, 2021). (ECF No. 66-1, at 76.)

The same analysis for Statement 1 applies here, the statements made by Matthew Schroeder constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

## Statement 16

Before digging into the results, I want to spend a moment on the big picture. Our RxEvolution strategy is showing promising results and I'm encouraged **that we're not only exceeding expectations, but also demonstrating that our strategy is gaining momentum.** We all know the important role pharmacists play in the health of the communities we serve. Never has that been more obvious than during a pandemic. **We're also seeing our retail and digital evolution drive new growth** and demonstrate a new Rite Aid for our retail customers.¶230. As for the second quarter, we grew our revenues 2.2% to $6.1 billion, including a 6.5% increase in our retail segment. And we improved our inventory turns by 7%. **Continuing our strong trend in inventory turns from prior quarters demonstrating that people are really liking our new merchandise.**

Heyward Donigan, Q2 2022 Earnings Call (September 23, 2021). (ECF No. 66-1, at 79.)

The same analysis for Statement 1 applies here, the statements made by Heyward Donigan constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

## Statement 17

I'm pleased with our third quarter performance as we grew our revenue and increased adjusted EBITDA by nearly 13%. … As we move forward, **we are unleashing the next evolution of our strategy, and we are laser-focused on an evolved view of the pharmacy of the future.** What that really means is a pharmacy business that's not limited to what we usually think about, a traditional in-store definition of pharmacy. **Rather, our efforts, and we've been talking about this for a couple of years, are centered on an expanded view of pharmacy and what we've been calling internally our omnipharmacy strategy. That is our RxEvolution is driving our transition from a company with numerous loosely tied pharmacy parts to an omnipharmacy business whose value and relevance as a whole is far greater than the sum of its individual parts.**

Heyward Donigan, Q3 2022 Earnings Call (December 21, 2021). (ECF No. 66-1, at 82.)

The same analysis for Statement 1 applies here, the statements made by Heyward Donigan constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward

looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

## Statement 18

We recognize the headwind that the expected reduction in COVID-related benefits is to fiscal 2023. **We expect benefits from several areas to offset this gap**, including: cost reductions from our store closure program, which we expect to contribute benefits in excess of the $25 million run rate benefit that we will get from the 63 closures already approved; **improvements in front-end margin from the launch of a new loyalty program and expansion of our own brands**; improved PBM margins from our new rebate aggregation agreement; **progression toward more normalized levels of acute script activity in the pharmacy**; and operating expense efficiencies from further back office consolidation in our retail and pharmacy businesses and continuing to leverage lean.

Matthew Schroeder, Q3 2022 Earnings Call (December 21, 2021). (ECF No. 66-1, at 85.)

The same analysis for Statement 1 applies here, the statements made by Matthew Schroeder constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

## Statement 19

**We expect to see continued growth in comp sales and script growth in our core business after excluding the impact of COVID.**

Matthew Schroeder, Q4 2022 Earnings Call (April 14, 2022). (ECF No. 66-1, at 88.)

To the extent that this call mentions forward looking statements, they would be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

## Statement 20

**We are -- we've shown that we can grow our scripts, even cycling the significant benefit we got from vaccines last year. So our core scripts are up. And that's just the beginning.**

Heyward Donigan, Q1 2023 Earnings Call (June 23, 2022). (ECF No. 66-1, at 91.)

The same analysis for Statement 1 applies here, the statements made by Heyward Donigan constitute no more than puffery. *See supra* note 19. To the extent that this call mentions forward looking statements, they would like wise be safeguarded by the safe-harbor provision of the PSLRA, as explained above.

For the reasons stated above, Plaintiff has failed to plead any false or misleading material statements to the heightened standard required by the PSLRA. For this reason, the Court will grant the Motion to Dismiss.

### ii.    *Loss Causation*

Despite the Court holding that no statements alleged in the present case are actionable, the Court will nonetheless discuss loss causation because it would also be dispositive in this case. In determining loss causation, the Court asks, "whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007). In other words, a plaintiff must show that "the revelation of [the alleged] misrepresentation or omission was a *substantial factor* in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Id.* at 425–26 (emphasis added). Loss causation focuses on "whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff." *Id.* at 425. It is not enough for a plaintiff to show that the price of a security was artificially inflated at the time of purchase because of a defendant's misrepresentations. *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *5 (E.D. Pa. Sept. 3, 2010). Rather, a plaintiff must show that "the share price fell significantly after the truth became known." *Id.* at *5 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

a.  <u>Opioid Theory</u>

Plaintiff alleges three key dates as they relate to the loss suffered as a result of the alleged Opioid misstatements. The first "corrective disclosure" was March 30, 2022 where CVS, a different pharmacy, announced a $484 million settlement with the State of Florida to settle claims related to unlawful opioid prescriptions dispensed by its pharmacies.

The second "corrective disclosure" was when the DOJ announced the filing of the DOJ complaint against Rite Aid on March 13, 2023, alleging that Rite Aid repeatedly and knowingly filed unlawful prescriptions for controlled substances.

The third "corrective disclosure" was when the Wall Street Journal published an article on August 25, 2023, that Rite Aid was rumored to be considering bankruptcy to alleviate its debt obligation and opioid litigation impact. The Court will look at these three dates separately in evaluating loss causation.

First, turning to the CVS settlement news, it is unclear how this is a corrective disclosure. It is unclear how Rite Aid would be responsible, as a matter of public policy, for a settlement that was reached with a different pharmaceutical company. No common facts were "revealed" during this "corrective disclosure". Likewise, no falsity or omission was "corrected" by this announcement as nothing about Rite Aid was said on this day. Moreover, no "truth" about Rite Aid became known on this day. For this reason, the March 30, 2022 CVS Settlement is not adequate to prove loss *causation*, despite the fact that Rite Aid's stock did, in fact, drop on this day. It is not sufficiently correlated with Rite Aid specifically nor related to any previous restatement.

Looking to the March 13, 2023 DOJ complaint, the Court reaches the same conclusion. The DOJ complaint is a set of allegations, not adjudicated facts, as to the conduct of Rite Aid.

While Rite Aid had disclosed the DOJ investigation as early as 2018, allegations by the DOJ do not amount to any uncovering of fact that would "make the truth known" as required to show loss causation. The DOJ Complaint was nothing more, at that time, than allegations and hence, cannot be taken as truth.

Lastly, the Court will consider the *Wall Street Journal* article which Plaintiff argues is a "corrective disclosure." Plaintiff makes no allegations that Rite Aid hid any intentions to declare bankruptcy nor that it made false and/or misleading statements related to bankruptcy. Furthermore, at the time this article was released, Rite Aid had contemplated the possibility of "significant damages" in their 2022 Form10-K. The Court agrees with Defendants recitation that "The fact that Rite Aid was considering bankruptcy in 2023 reveals nothing about the falsity of the Opioid Challenged Statements made in 2018-2022. It identifies no specific penalties or losses tied to opioids, nor does it suggest that they existed and were known by Rite Aid at the time of the Opioid Challenged Statements." (ECF No. 64-3, at 39.)[20]

Thus, in addition to Plaintiff failing to plead any false or misleading statements that are actionable under the PSLRA, Plaintiff also fails to establish loss causation as it relates to those statements.

b. RxEvolution Theory

Plaintiff alleges two key dates as they relate to the loss suffered as a result of the alleged RxEvolution misstatements: the September 29, 2022 press release and earnings call and the December 21, 2022 press release and earnings call.

---

[20]    The Court does take notice that Lead Plaintiff sold all of her stock in the Company prior to the August 25, 2023 publication. (ECF No. 40-1, at 2.) The Court need not and does not reach any determination on whether or not that is dispositive of the present issue since the failure to satisfy the other pleading requirements of the PSLRA are dispositive.

"Earnings statements do not, on their own, constitute 'corrective disclosures,' when they do not specifically relate to—or correct—the alleged misrepresentations." *Halman*, 2022 WL 889158, at *18 (collecting cases). While Plaintiff argues that the aforementioned press releases and earnings calls announced losses because "RxEvolution was not generated revenues" as expected, this does not amount to a correction of previous statements. Rite Aid, in these calls, never revealed that there were fraudulent misrepresentations similar to those cases that Plaintiff cites in support of their argument. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 656 (E.D. Pa. 2015). In *Urban Outfitters*, defendants filed a financial statement which revealed misrepresentation of sales trends. *Id.* In the present case, Plaintiff is not alleging any financial statements revealed anything, only relying on earnings calls and press releases. Furthermore, these calls and press releases do not correct any alleged previous misstatements. They only reveal the poor financial situation that Rite Aid was in—a fact known to investors for the past "three decades." (*See* ECF No. 40 ¶ 38 ("For close to three decades, Rite Aid has been massively overleveraged due to a series of ill-fated, debt-financed acquisitions.").)

For these reasons, the Plaintiff has failed to adequately plead loss causation as to their RxEvolution theory and those claims are dismissed.

## B. <u>Section 20(a)</u>

Plaintiff also brings claims against the Defendants under Section 20(a) of the Exchange Act, which imposes joint and several liability upon one who controls a violator of Section 10(b). *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006); 15 U.S.C. § 78t(a). In order to succeed on a claim under Section 20(a), a plaintiff must successfully plead a primary violation of Section 10(b) of the Exchange Act. *Id.*; *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 622 (E.D. Pa. 2009). Because the Court has determined that Plaintiff fails to plead a primary

violation of Section 10(b), his Section 20(a) claim fails as well. *Anderson v. Stonemore Partners, L.P.*, 296 F. Supp. 3d 693, 704 (E.D. Pa. 2017).

## IV.    CONCLUSION

For the aforementioned reasons, Plaintiff has failed to satisfy the heightened pleading standard under the PSLRA as the Amended Complaint fails to adequately plead falsity as to any alleged misstatement by Defendants along with loss causation. As a result, the Court grants the Motion to Dismiss.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**_____**

**HODGE, KELLEY B., J.**